**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION**

| | |
|---|---|
| **In re:** | ) |
| | ) **Case No. 24-31702-SHB** |
| **SALEM POINTE CAPITAL, LLC,** | ) |
| | ) **Chapter 11** |
| **Debtor.** | ) |
| | ) |

**CHAPTER 11 TRUSTEE' STATUS MEMO REGARDING AMENDED APPLICATION
TO EMPLOY CBRE, INC., AS REAL ESTATE PROFESSIONAL**

Gary M. Murphey, Chapter 11 Trustee ("Trustee") for Salem Pointe Capital, LLC ("Debtor"), respectfully submits this Status Memo Regarding the Amended Application for an order, pursuant to section 327 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Trustee to retain and employ CBRE, Inc. ("CBRE") as real estate professional in this Chapter 11 Case, retroactive to March 25, 2026 (Dkt. 828, the "Amended Application").[1]

1.  Despite the recent withdrawal of the Sale Motion (Dkt. 774, the "Sale Motion"), the Trustee still needs to employ CBRE, because the Trustee had reserved the right to pursue a sale process even if the initial Sale Motion had to be withdrawn.  The Trustee expects to file a new Sale Motion in the next few weeks, possibly with a new Stalking Horse Bidder.  But this depends on the employment of CBRE.

2.  Since the filing of the initial Application to Employ CBRE on March 25, 2026 (Dkt. 782), CBRE has been working in anticipation of being employed by the Trustee.  CBRE has: visited the Property numerous times; reviewed financial information to estimate value; visited several other golf courses in the area around the Property to assess comparative values; contacted

---

[1] Capitalized terms, not otherwise defined herein, shall have the meanings ascribed to them in the Amended Application.

numerous potential bidders from its vast proprietary network of golf and resort buyers and investors; showed the Property to at least seven (7) potential bidders; setting up a "data room" with relevant documents for potential bidders, began preparing its own work product regarding the property, such as an offering memorandum and pro formas; and, significantly, provided the Trustee some preliminary feedback on marketing the Property.

3.      But since CBRE has not yet been retained, CBRE's work for the Trustee has understandably slowed over the last couple of weeks, out of concern about its employment being approved.  If the Amended Application is approved, CBRE could resume its marketing efforts, possibly identify a new Stalking Horse Bidder, continue to bring new potential bidders for tours, finalize the data room and its work product, and provide multiple potential bidders for a new sale process.

4.      The Amended Application resolved an objection raised by the U.S. Trustee (Dkt. 801) regarding the Flat Fee, such that it would be subject to a reasonableness review. This was primarily because the Flat Fee applied in the event Rarity Bay Partners ("RBP"), the proposed Stalking Horse Bidder under the proposed APA would become the Successful Bidder.  Some additional parties have now been added to the parties who would be subject to the Flat Fee.

5.      Some objections were filed to the Amended Application: the Objection of Siedlecki, Mayer, and others (Dkt 836, the "Seidlecki Objection") and the Objection of RBCAI (Dkt. 840, "RBCAI Objection" and together with the Siedlecki Objection, the "Objections").[2]  The Trustee and these objectors have had discussions over the past few days, and the Objections have been resolved, except for one, discussed below in paragraphs 7-8.  In some cases, a particular

---

[2] BEP Rarity Bay also filed a Preliminary Objection (Dkt. 829), but it was primarily concerned with compressed timing of the marketing period under the initial Application, which is no longer an issue.

objection issue may be withdrawn, but in many cases, the objection has been resolved by preparing a revised Order incorporating the resolution of the objection issue.

6. The attached collective Exhibit A contains a clean revised Order Approving the Application of CBRE and a redline against the Order that was attached to the Amended Application. For convenience, and since many of the revised Order provisions address paragraphs from the CBRE Agreement, a copy of that Agreement is attached as Exhibit B.

7. The disagreement concerns paragraph 6(c) of the Order. Paragraph 6 was heavily negotiated about having any parties with a "discounted" Flat Fee, considering the loss of RBP as the Stalking Horse Bidder when the Sale Motion was withdrawn. CBRE wanted to have no discounted fees, with every bidder or plan proponent subject to CBRE's Percentage Fee. Some Objectors wanted no fee to be paid to CBRE if a proposed Plan was ultimately confirmed. Paragraph 6 was negotiated to keep the Flat Fee for limited parties defined there. Paragraph 6(c) is requested by CBRE but—as of 5:30 p.m. May 7th—has not been agreed to by the Objectors. Also, RBP has not agreed to paragraph 6(c). Even though RBP was not an objector, the new subparagraph changes the amount that CBRE would be entitled to receive if RBP was a Successful Bidder, based on the Amended Application.

8. The disputed subparagraph would still provide a discounted Flat Fee to the Excepted Parties, but it would provide CBRE a partial fee if one of the Excepted Parties became the Successful Bidder or a Plan Proponent of a confirmed plan at a fixed percentage for amount or value over $8.5 million. This maintains a discount for the Excepted Parties (at least for a few million more dollars of value), while recognizing that CBRE would have brought at least one potential bidder adding value to the estate.

9. The Revised Order does not change the language that resolved the U.S. Trustee's objection regarding the Flat Fee, but it does add several new paragraphs addressing many of the other concerns of the other objectors. And, rather than having a new or revised listing agreement with CBRE, the revised Order provides that if there is an inconsistency between the Agreement and the Order, the Order prevails, so that the revised Order's new paragraphs control the Agreement. The Trustee and his counsel have discussed these revisions with CBRE, and they have agreed to the Revised Order—including paragraph 6(c).

10. One issue is being reserved and is described in paragraph 12 of the revised Order: access to the data room for creditors' attorneys and their client representatives. The Trustee hopes to resolve that issue with (hopefully) an Agreed Protective Order in the next week or two.

Respectfully submitted,

/s/ Gene L. Humphreys
Paul G. Jennings, TN Bar No. 14367
Gene L. Humphreys, TN Bar No. 21807
Bass, Berry & Sims PLC
21 Platform Way South, Suite 3500
Nashville, TN 37203
Telephone (615) 742-6200
Facsimile (615) 742-6293
pjennings@bassberry.com
ghumphreys@bassberry.com
*Counsel for Chapter 11 Trustee*

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of May, 2026, a copy of the **Chapter 11 Trustee's Reply in Support of Amended Application to Employe CBRE, Inc. as Real Estate Professional** was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties as indicated below as receiving notice via electronic filing. Given that none of the mail parties objected to the Amended Application, no parties will be served by U.S. Mail.

/s/ Gene L. Humphreys
Gene L. Humphreys

# SERVICE LIST

## VIA CM/ECF

United States Trustee
800 Market St., Ste. 114
Howard H Baker, Jr. U.S. Cthse
Knoxville, TN 37902-2303
Tiffany.Diiorio@usdoj.gov
Ustpregion08.kx.ecf@usdoj.gov

Michael W. Ewell
Frantz, McConnell & Seymour, LLP
550 W. Main Street, Suite 500
Knoxville, TN. 37902
mewell@fmsllp.com

Mary D. Miller
Mary D. Miller, PLLC
P.O. Box 5339
Knoxville, Tennessee 37928
mmillerservice@millerlaw.solutions

Wynne du M. Caffey-Knight
5616 Kingston Pike, Suite 301
Knoxville, Tennessee 37919
wcaffey@esc-law.com

Erno D. Lindner
Baker, Donelson, Bearman, Caldwell & Ber
1900 Republic Centre
633 Chestnut Street
Chattanooga, TN 37450
423-209-4206
elindner@bakerdonelson.com

Gregory C. Logue
M. Aaron Spencer
Woolf, McClane, Bright, Allen & Carpenter, PLLC
900 Riverview Tower
900 S. Gay Street
Knoxville, Tennessee 37902
logueg@wmbac.com
aspencer@smbac.com

Adam Uriah Holland
Duncan Holland & Fleenor, P.C.
1418 McCallie Ave
Chattanooga, TN 37404
aholland@dhifirm.com

Henry Edward Hildebrand, IV
Dunham Hildebrand Payne Waldron, PLLC
9020 Overlook Blvd.
Suite 316
Brentwood, TN 37027
615-933-5850
ned@dhnashville.com

William F. McCormick
Tennessee State Attorney General Office
P. O. Box 20207
Nashville, TN 37202-0207
(615) 532-8930
agbankparsons@ag.tn.gov

William R. O'Bryan, Jr.
C.E. Hunter Brush
Butler Snow LLP
Neuhoff Building
1320 Adams Street, Suite 1400
Nashville, TN 37208
Bill.obryan@butlersnow.com
Hunter.brush@butlersnow.com

Thomas Dickenson
Jason L. Rogers
Hodges, Doughty & Carson, PLLC
P.O. Box 869
Knoxville, Tennessee 37901-0869
tdickenson@hdclaw.com
jrogers@hdclaw.com

Trent Kinkaid
5616 Kingston Pike, Suite 301
Knoxville, Tennessee 37919
tkinkaid@esc-law.com

James R. Moore
Brenda G. Brooks
Moore & Brooks
6223 Highland Place Way, Ste. 102
Knoxville, TN. 37919
bbrooks@moore-brooks.com
jmoore@moore-brooks.com

5

**EXHIBIT A**

Clean and Redline Revised Order

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) Case No. 24-31702-SHB |
| SALEM POINTE CAPITAL, LLC, | ) |
| | ) Chapter 11 |
| Debtor. | ) |
| | ) |

**ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 327 AND 328 AND
BANKRUPTCY RULE 2014 AUTHORIZING THE RETENTION OF CBRE, INC.,
AS REAL ESTATE PROFESSIONAL FOR THE CHAPTER 11 TRUSTEE**

Upon the Amended Application[3] (the "Application") of Gary M. Murphey, Chapter 11

Trustee ("Trustee") for entry of an order pursuant to sections 327(a) and 328 of title 11 of the

---

[3] Capitalized terms not otherwise defined here shall have the meanings ascribed to them in the Amended Application.

United States Code (the "Bankruptcy Code") and Rules 2014 and 2016 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") authorizing the retention and use of CBRE, Inc.,

("CBRE" or the "Firm") as the Trustee's real estate professional; and the Court having reviewed

the Application and the Court being satisfied with the representations made in the Application that

CBRE represents no interest adverse to the Debtor's estate, that it is a "disinterested person" as

that term is defined pursuant to Bankruptcy Code section 101(14), that its employment is necessary

and in the best interests of the Debtor its estate, its creditors, and other parties-in-interest; and due

and sufficient notice of the Application having been given under the particular circumstances; and

it appearing that no other or further notice needs be provided; and after due deliberation thereon

and sufficient cause appearing therefor, it is hereby ORDERED that:

1.     The Application is GRANTED to the extent provided herein, retroactive to March

25, 2026.

2.     Pursuant to Bankruptcy Code sections 327(a) and 328, the Trustee is authorized to

employ, retain, and use CBRE as his real estate professional in accordance with the Application to

perform the services described therein.

3.     CBRE shall continue to update its internal conflicts review and shall file disclosures

as appropriate.

4.     The Schedule 1 (property to be sold) to be attached to the Agreement is attached

hereto as Exhibit 1 (the "Property").

5.     CBRE shall be compensated in accordance with the fees detailed on the

Application, including all attachments thereto. If CBRE becomes entitled to the flat fee of

$200,000 as defined in the Application as modified herein (the "Flat Fee"), a Request for Payment

of Flat Fee (the "Request") shall be filed with the Court and served on all appropriate parties

2

entitled to notice and set for hearing, with a detailed declaration describing the work done by CBRE. The Flat Fee will be subject to review for reasonableness. The reasonableness review is not required if CBRE becomes entitled to the Percentage Fee.

6. Paragraph 5.1 of the Agreement is hereby amended as follows:

    a) to clarify that CBRE is limited to the Flat Fee as provided in this Order in the event that the Successful Bidder or Plan Proponent of a confirmed plan is:

        i. Rarity Bay Partners; or

        ii. BEP Rarity Bay, solely or in conjunction with The Club at Rarity Bay, Inc., and/or one or more Property Owners ("Property Owners" being defined as any present landowner, lot owner, condominium or villa owner, or homeowner in Rarity Bay Subdivision); or

        iii. The Club at Rarity Bay, Inc., solely or in conjunction with one or more Property Owners;

        iv. The parties identified in Subsection 6. a) (i), (ii), and (iii) are collectively referred to as the "Excepted Parties");

    b) to provide that CBRE is entitled to the Percentage Fee if a Plan for the purchase of the Property is proposed and subsequently confirmed by any person other than the Excepted Parties;

    c) to provide that CBRE is entitled to 10% commission for any amount over $8,500,000 (but never to exceed 5% of the total amount of

3

bid/value of plan), if one of the Excepted Parties is a Successful Bidder or Plan Proponent of a confirmed plan.

7.      Paragraph 5.6 is removed from the Agreement, as an "Option" on the Property will not be accepted.

8.      Paragraphs 8.1 and 8.2 references to "misrepresentation" are clarified to be limited to "intentional material misrepresentation."

9.      Paragraph 10.11 is amended to provide that in the event CBRE elects to terminate the Agreement to enter into a listing agreement with any party in a foreclosure proceeding, CBRE forfeits any right to any fee or reimbursement of expenses under the Agreement.

10.     Notwithstanding anything to the contrary contained in the Agreement or the Amended Application, the provisions of this Order shall control to the extent of any inconsistency with the Agreement or the Amended Application.

11.     All Objections to the Amended Motion are hereby OVERRULED, expect to the extent incorporated herein.  Both the Trustee and all parties that filed objections to the initial Application or Amended Application to Employ CBRE, reserve all rights to issues raised in the initial Application, Amended Application, and any Objection thereto with respect to any issue herein that may be affected by any new Sale Motion filed by the Trustee.

12.     The issue of whether and to what extent creditors and parties-in-interest can have access to the CBRE data room or other information or materials which CBRE develops, produces, or utilizes in regard to the marketing, advertising, and/or sale of the Property is expressly reserved, and will be addressed either by an Agreed Protective Order or otherwise by separate order of the Court.

###

4

APPROVED FOR ENTRY:


/s/ Gene L. Humphreys
Paul G. Jennings, TN Bar No. 14367
Gene L. Humphreys, TN Bar No. 21807
Bass, Berry & Sims PLC
21 Platform Way South, Suite 3500
Nashville, TN 37203
Telephone (615) 742-6200
Facsimile (615) 742-6293
pjennings@bassberry.com
ghumphreys@bassberry.com

*Counsel for the Chapter 11 Trustee*

**EXHIBIT 1**

**Schedule 1 to Exclusive Listing Agreement**

## SCHEDULE 1 – PROPERTY/PURCHASED ASSETS

### INTANGIBLE RIGHTS

- Website:  https://raritybayliving.com;

- All social media accounts;

- All logos, trademarks and intellectual property;

- All member lists;

- All computer software licenses;

- All business licenses; and

- All business records.

The name "Rarity Bay," "Rarity Bay Country Club," and "Rarity Bay on Tellico Lake" and any associated logos or marks (to the extent owned by the Debtor);

### REAL PROPERTY EXCLUDING VACANT LAND (listed below)

- Loudon County Golf Course Property: Approx. 36.91 acres;
  - o Parcel ID: 078   05201 000
    - Rarity Bay Parkway

- Monroe County Golf Course Property: Approx. 165.68 acres; and
  - o Parcel ID: 019   06506 000
    - 403 Rarity Bay Parkway, land
  - o Parcel ID: 019   06506 001
    - 403 Rarity Bay Parkway, main clubhouse
  - o Parcel ID: 019   06506 002
    - 403 Rarity Bay Parkway, enrichment center (snack bar, pool, locker room)

- Any and all right, title, and interest of Seller in and to any real property located in Monroe County or Loudon County, Tennessee, that is not otherwise identified above or in Schedule 2.2(h).

1

## FIXED TANGIBLE ASSETS

- Lounge and corresponding furniture and fixtures;

- Restaurant and corresponding furniture and fixtures;

- Kitchen and corresponding furniture and fixtures;

- Swimming Pool and corresponding equipment, furniture and fixtures;

- Outdoor walkway/trails and corresponding furniture and fixtures;

- Seventeen Televisions;

- Fitness Equipment (26 pieces of Equipment);

- Golf Clubhouse's corresponding furniture and fixture;

- Pro Shop's corresponding fixtures;

- All equipment and materials used on the golf course;

- All equipment located and used on tennis courts;

- All equipment located at and used on pickleball courts;

- Toro Golf Equipment;

- All cleaning supplies; and

- All office furniture, fixtures, supplies and equipment

## INVENTORY

- Raw Materials including food.

- Alcohol and beverages.

- Merchandise in Pro Shop.

**VACANT LAND**

- Unplatted Excess Land:

  - Rarity Bay Pkwy. – Near 13th Hole: Approx. 3.34 acres;
    - Parcel ID: 078    05203 000
  - Rarity Bay Pkwy. – Near Gate House:  Approx. 11.2 acres;
    - Parcel ID: 019    06500 000
  - 288 Keeble Road and Maintenance Building located on property;
    - Parcel IDs:
      - 019    06505 000, land
      - 019    06505 001, maintenance buildings
  - Real Property Located at Turnstone Lane:  Approx. 10.82 acres; and
    - Parcel IDs:
      - 019L B 00500 000 – deed allegedly executed, but not recorded
      - 019L B 00600 000 – deed allegedly executed, but not recorded
      - 019L B 00700 000 – deed allegedly executed, but not recorded
      - 019L B 00800 000 – deed allegedly executed, but not recorded
      - 019L D 00100 000
      - 019L D 00200 000
      - 019L D 00300 000
      - 019L D 00400 000
      - 019L D 00500 000
      - 019L D 00600 000
      - 019L D 00700 000
      - 019L D 00800 000
      - 019L D 00900 000
      - 019L D 01000 000
      - 019L D 01100 000
      - 019L D 01200 000
      - 019L D 01300 000
      - 019L D 01400 000
      - 019L D 01500 000
      - 019L D 01600 000
      - 019L D 01700 000
      - 019L D 01800 000
      - 019L D 01900 000
      - 019L D 02000 000
      - 019L D 02100 000
      - 019L D 02200 000
      - 019L D 02300 000
      - 019L D 02400 000
      - 019L D 02500 000
      - 019L D 02600 000

3

- 019L D 02700 000
- 019L D 02800 000
- 019L D 02900 000
- 019L D 03000 000
- 019L D 03100 000
- 019L D 03200 000
- 019L D 03300 000
- 019L D 03400 000
- 019L D 03500 000
- 019L D 03600 000
- 019L D 03700 000
- 019L D 03800 000
- 019L D 03900 000
- 019L D 04000 000
- 019L D 04100 000
- 019L D 04200 000
- 019L D 04300 000
- 019L D 04400 000
- 019L D 04500 000
- 019L D 04600 000
- 019L D 04700 000
- 019L D 04800 000
- 019L D 04900 000
- 019L D 05000 000
- 019L D 05100 000
- 019L D 05200 000
- 019L D 05300 000
- 019L D 05400 000
- o Real Property Located at Shearwater Drive: Approx. 1.79 acres
  - ▪ Parcel IDs:
    - 019L C 00100 000
    - 019L C 00101 000
    - 019L C 00200 000
    - 019L C 00201 000
    - 019L C 00300 000
    - 019L C 00301 000
    - 019L C 00400 000
    - 019L C 00500 000
- o Real Property Located at Osprey Circle: Approx. 0.48 acres
  - ▪ Parcel IDs:
    - 019E A 05700 000
    - 019E A 06000 000

4

- Platted Lots:

  o 949 Rarity Bay Pkwy.;
    - Parcel ID: 078I B 00500 000
  o 969 Rarity Bay Pkwy.;
    - Parcel ID: 078I B 00600 000
  o 125 Mallard Dr.;
    - Parcel ID: 078H B 00300 000
  o 155 Hummingbird Dr.;
    - Parcel ID: 078G B 00600 000
  o 175 Hummingbird Dr.;
    - Parcel ID: 078G B 00800 000
  o 295 Hummingbird Dr.;
    - Parcel ID: 078G B 02000 000
  o 747 Wood Duck Dr.;
    - Parcel ID: 019D A 01100 000
  o 751 Wood Duck Dr.;
    - Parcel ID: 019D A 01200 000
  o 755 Wood Duck Dr.; and
    - Parcel ID: 019D A 01300 000
  o 761 Wood Duck Dr.
    - Parcel ID: 019D A 01400 000

- Miscellaneous

  o Golf Course Pump Station

## ASSUMED CONTRACTS AND LEASES

- One lease covers 50 2022 E-Z-Go RXV Elite Golf carts with lithium batteries;
- One lease covers the Pace 7EX 7-inch GPS touchscreen and fleet management that provides fleet tracking, geofencing, 3d hole flyover, etc.;
- One lease of an 800XG Hauler; and
- The Management Contract
- Club Membership Contracts

50206617.4

**REDLINE ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 24-31702-SHB |
| SALEM POINTE CAPITAL, LLC, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

**ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 327 AND ~~329~~328 AND
BANKRUPTCY RULE 2014 AUTHORIZING THE RETENTION OF CBRE, INC.,
AS REAL ESTATE PROFESSIONAL FOR THE CHAPTER 11 TRUSTEE**

Upon the Amended Application[4] (the "Application") of Gary M. Murphey, Chapter 11

Trustee ("Trustee") for entry of an order pursuant to sections 327(a) and ~~329~~328 of title 11 of the

United States Code (the "Bankruptcy Code") and Rules 2014 and 2016 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") authorizing the retention and use of CBRE, Inc.,

("CBRE" or the "Firm") as the Trustee's real estate professional; and the Court having reviewed

the Application and the Court being satisfied with the representations made in the Application that

---

[4] Capitalized terms not otherwise defined here shall have the meanings ascribed to them in the Amended Application.

1

CBRE represents no interest adverse to the Debtor's estate, that it is a "disinterested person" as that term is defined pursuant to Bankruptcy Code section 101(14), that its employment is necessary and in the best interests of the Debtor its estate, its creditors, and other parties-in-interest; and due and sufficient notice of the Application having been given under the particular circumstances; and it appearing that no other or further notice needs be provided; and after due deliberation thereon and sufficient cause appearing therefor, it is hereby ORDERED that:

13.      a. The Application is GRANTED to the extent provided herein, retroactive to March 25, 2026.

14.      b. Pursuant to Bankruptcy Code sections 327(a) and 329328, the Trustee is authorized to employ, retain, and use CBRE as his real estate professional in accordance with the Application to perform the services described therein.

15.      c. CBRE shall continue to update its internal conflicts review and shall file disclosures as appropriate.

16.      The Schedule 1 (property to be sold) to be attached to the Agreement is attached hereto as Exhibit 1 (the "Property").

17.      d. CBRE shall be compensated in accordance with the fees detailed on the Application, including all attachments thereto. If CBRE becomes entitled to the flat fee of $200,000 as defined in the Application as modified herein (the "Flat Fee"), a Request for Payment of Flat Fee (the "Request") shall be filed with the Court and served on all appropriate parties entitled to notice and set for hearing, with a detailed declaration describing the work done by CBRE. The Flat Fee will be subject to review for reasonableness. The reasonableness review is not required if CBRE becomes entitled to the Percentage Fee.

2

18. Paragraph 5.1 of the Agreement is hereby amended as follows:

    a) to clarify that CBRE is limited to the Flat Fee as provided in this Order in the event that the Successful Bidder or Plan Proponent of a confirmed plan is:

        i. Rarity Bay Partners; or

        ii. BEP Rarity Bay, solely or in conjunction with The Club at Rarity Bay, Inc., and/or one or more Property Owners ("Property Owners" being defined as any present landowner, lot owner, condominium or villa owner, or homeowner in Rarity Bay Subdivision); or

        iii. The Club at Rarity Bay, Inc., solely or in conjunction with one or more Property Owners;

        iv. The parties identified in Subsection 6. a) (i), (ii), and (iii) are collectively referred to as the "Excepted Parties");

    b) to provide that CBRE is entitled to the Percentage Fee if a Plan for the purchase of the Property is proposed and subsequently confirmed by any person other than the Excepted Parties;

    c) to provide that CBRE is entitled to 10% commission for any amount over $8,500,000 (but never to exceed 5% of the total amount of bid/value of plan), if one of the Excepted Parties is a Successful Bidder or Plan Proponent of a confirmed plan.

19. Paragraph 5.6 is removed from the Agreement, as an "Option" on the Property will not be accepted.

3

20. Paragraphs 8.1 and 8.2 references to "misrepresentation" are clarified to be limited to "intentional material misrepresentation."

21. Paragraph 10.11 is amended to provide that in the event CBRE elects to terminate the Agreement to enter into a listing agreement with any party in a foreclosure proceeding, CBRE forfeits any right to any fee or reimbursement of expenses under the Agreement.

22. Notwithstanding anything to the contrary contained in the Agreement or the Amended Application, the provisions of this Order shall control to the extent of any inconsistency with the Agreement or the Amended Application.

23. All Objections to the Amended Motion are hereby OVERRULED, expect to the extent incorporated herein.  Both the Trustee and all parties that filed objections to the initial Application or Amended Application to Employ CBRE, reserve all rights to issues raised in the initial Application, Amended Application, and any Objection thereto with respect to any issue herein that may be affected by any new Sale Motion filed by the Trustee.

24. The issue of whether and to what extent creditors and parties-in-interest can have access to the CBRE data room or other information or materials which CBRE develops, produces, or utilizes in regard to the marketing, advertising, and/or sale of the Property is expressly reserved, and will be addressed either by an Agreed Protective Order or otherwise by separate order of the Court.

###

4

APPROVED FOR ENTRY:


/s/ Gene L. Humphreys
Paul G. Jennings, TN Bar No. 14367
Gene L. Humphreys, TN Bar No. 21807
~~Sara K. Morgan, TN Bar No. 35261~~
Bass, Berry & Sims PLC
21 Platform Way South, Suite 3500
Nashville, TN 37203
Telephone (615) 742-6200
Facsimile (615) 742-6293
pjennings@bassberry.com
ghumphreys@bassberry.com
~~sara.morgan@bassberry.com~~

*Counsel for the Chapter 11 Trustee*


~~50206617.1~~

5

**EXHIBIT 1**

**Schedule 1 to Exclusive Listing Agreement**

## SCHEDULE 1 – PROPERTY/PURCHASED ASSETS

### INTANGIBLE RIGHTS

- Website:  https://raritybayliving.com;

- All social media accounts;

- All logos, trademarks and intellectual property;

- All member lists;

- All computer software licenses;

- All business licenses; and

- All business records.

The name "Rarity Bay," "Rarity Bay Country Club," and "Rarity Bay on Tellico Lake" and any associated logos or marks (to the extent owned by the Debtor);

### REAL PROPERTY EXCLUDING VACANT LAND (listed below)

- Loudon County Golf Course Property: Approx. 36.91 acres;
  - Parcel ID: 078   05201 000
    - Rarity Bay Parkway

- Monroe County Golf Course Property: Approx. 165.68 acres; and
  - Parcel ID: 019   06506 000
    - 403 Rarity Bay Parkway, land
  - Parcel ID: 019   06506 001
    - 403 Rarity Bay Parkway, main clubhouse
  - Parcel ID: 019   06506 002
    - 403 Rarity Bay Parkway, enrichment center (snack bar, pool, locker room)

- Any and all right, title, and interest of Seller in and to any real property located in Monroe County or Loudon County, Tennessee, that is not otherwise identified above or in Schedule 2.2(h).

## FIXED TANGIBLE ASSETS

- Lounge and corresponding furniture and fixtures;

- Restaurant and corresponding furniture and fixtures;

- Kitchen and corresponding furniture and fixtures;

- Swimming Pool and corresponding equipment, furniture and fixtures;

- Outdoor walkway/trails and corresponding furniture and fixtures;

- Seventeen Televisions;

- Fitness Equipment (26 pieces of Equipment);

- Golf Clubhouse's corresponding furniture and fixture;

- Pro Shop's corresponding fixtures;

- All equipment and materials used on the golf course;

- All equipment located and used on tennis courts;

- All equipment located at and used on pickleball courts;

- Toro Golf Equipment;

- All cleaning supplies; and

- All office furniture, fixtures, supplies and equipment

## INVENTORY

- Raw Materials including food.

- Alcohol and beverages.

- Merchandise in Pro Shop.

## VACANT LAND

- Unplatted Excess Land:

  - Rarity Bay Pkwy. – Near 13th Hole: Approx. 3.34 acres;
    - Parcel ID: 078   05203 000
  - Rarity Bay Pkwy. – Near Gate House:  Approx. 11.2 acres;
    - Parcel ID: 019   06500 000
  - 288 Keeble Road and Maintenance Building located on property;
    - Parcel IDs:
      - 019   06505 000, land
      - 019   06505 001, maintenance buildings
  - Real Property Located at Turnstone Lane:  Approx. 10.82 acres; and
    - Parcel IDs:
      - 019L B 00500 000 – deed allegedly executed, but not recorded
      - 019L B 00600 000 – deed allegedly executed, but not recorded
      - 019L B 00700 000 – deed allegedly executed, but not recorded
      - 019L B 00800 000 – deed allegedly executed, but not recorded
      - 019L D 00100 000
      - 019L D 00200 000
      - 019L D 00300 000
      - 019L D 00400 000
      - 019L D 00500 000
      - 019L D 00600 000
      - 019L D 00700 000
      - 019L D 00800 000
      - 019L D 00900 000
      - 019L D 01000 000
      - 019L D 01100 000
      - 019L D 01200 000
      - 019L D 01300 000
      - 019L D 01400 000
      - 019L D 01500 000
      - 019L D 01600 000
      - 019L D 01700 000
      - 019L D 01800 000
      - 019L D 01900 000
      - 019L D 02000 000
      - 019L D 02100 000
      - 019L D 02200 000
      - 019L D 02300 000
      - 019L D 02400 000
      - 019L D 02500 000
      - 019L D 02600 000

3

- 019L D 02700 000
- 019L D 02800 000
- 019L D 02900 000
- 019L D 03000 000
- 019L D 03100 000
- 019L D 03200 000
- 019L D 03300 000
- 019L D 03400 000
- 019L D 03500 000
- 019L D 03600 000
- 019L D 03700 000
- 019L D 03800 000
- 019L D 03900 000
- 019L D 04000 000
- 019L D 04100 000
- 019L D 04200 000
- 019L D 04300 000
- 019L D 04400 000
- 019L D 04500 000
- 019L D 04600 000
- 019L D 04700 000
- 019L D 04800 000
- 019L D 04900 000
- 019L D 05000 000
- 019L D 05100 000
- 019L D 05200 000
- 019L D 05300 000
- 019L D 05400 000
- Real Property Located at Shearwater Drive: Approx. 1.79 acres
  - Parcel IDs:
    - 019L C 00100 000
    - 019L C 00101 000
    - 019L C 00200 000
    - 019L C 00201 000
    - 019L C 00300 000
    - 019L C 00301 000
    - 019L C 00400 000
    - 019L C 00500 000
- Real Property Located at Osprey Circle: Approx. 0.48 acres
  - Parcel IDs:
    - 019E A 05700 000
    - 019E A 06000 000

4

- Platted Lots:

    - 949 Rarity Bay Pkwy.;
        - Parcel ID: 078I B 00500 000
    - 969 Rarity Bay Pkwy.;
        - Parcel ID: 078I B 00600 000
    - 125 Mallard Dr.;
        - Parcel ID: 078H B 00300 000
    - 155 Hummingbird Dr.;
        - Parcel ID: 078G B 00600 000
    - 175 Hummingbird Dr.;
        - Parcel ID: 078G B 00800 000
    - 295 Hummingbird Dr.;
        - Parcel ID: 078G B 02000 000
    - 747 Wood Duck Dr.;
        - Parcel ID: 019D A 01100 000
    - 751 Wood Duck Dr.;
        - Parcel ID: 019D A 01200 000
    - 755 Wood Duck Dr.; and
        - Parcel ID: 019D A 01300 000
    - 761 Wood Duck Dr.
        - Parcel ID: 019D A 01400 000

- Miscellaneous

    - Golf Course Pump Station

## ASSUMED CONTRACTS AND LEASES

- One lease covers 50 2022 E-Z-Go RXV Elite Golf carts with lithium batteries;
- One lease covers the Pace 7EX 7-inch GPS touchscreen and fleet management that provides fleet tracking, geofencing, 3d hole flyover, etc.;
- One lease of an 800XG Hauler; and
- The Management Contract
- Club Membership Contracts

5

| Summary report: Litera Compare for Word 11.13.0.54 Document comparison done on 5/7/2026 3:47:47 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://bassberry.cloudimanage.com/bbs/50206617/1 - REVISED Amended CBRE Employment ORDER.docx | |
| **Modified DMS:** iw://bassberry.cloudimanage.com/bbs/50206617/4 - REVISED Amended CBRE Employment ORDER.docx | |
| **Changes:** | |
| Add | 361 |
| Delete | 11 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 372 |

6

## EXHIBIT B

Exclusive Sales Listing Agreement



## EXCLUSIVE SALES LISTING AGREEMENT

THIS EXCLUSIVE SALES LISTING AGREEMENT ("Agreement") is entered into as of the ___ day of March, 2026 by and between CBRE Inc., a Delaware corporation with an office located at 5790 Fleet Street, Suite 130, Carlsbad, CA 92008 ("CBRE") and Gary M. Murphey, the Chapter 11 Trustee (the "Trustee") of Salem Pointe Capital, LLC ("Owner"), with an office address at 3330 Cumberland Blvd., Suite 500, Atlanta, GA 30339.

### RECITALS

WHEREAS, Owner owns certain land, buildings, improvements and personal property located at 403 Rarity Bay Pkwy, Vonore, TN 37885 known as Rarity Bay Golf Club as more fully described on Schedule 1, (the "Property" or "Properties"), and

WHEREAS, Owner desires to engage CBRE as its exclusive broker, and to grant to CBRE the exclusive right, to list for sale the Property, and CBRE is agreeable to such engagement on the terms and conditions as set forth in this Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements of the parties hereinafter expressed, the parties hereto agree as follows:

### ARTICLE ONE

### APPOINTMENT

1.1.    Exclusive Right to Sell.  Owner hereby appoints CBRE as its exclusive agent and grants CBRE the exclusive right to solicit and procure prospective purchasers for the Property.  Reference herein to the Property or Properties shall mean all or any portion thereof.  CBRE accepts the appointment and agrees to act in good faith and use diligent efforts to perform the services required by this Agreement.

1.2.    Definition of "Sale" or "Purchase".  As used in this Agreement, the term "sale" or "purchase," in reference to the Property, shall include a sale or exchange of the Property, the granting of an option to purchase the Property, or any other transfer, conveyance, or contribution of a controlling interest in the Property or in the entity which owns the Property, or any other transaction identified in Section 5.2 below.

1.3.    Listing Price.  The Property shall be marketed without a listing price and shall be sold on an "all cash" basis, or such other terms and conditions as acceptable to Owner in its sole and absolute discretion.

1.4.    Appointment Subject to Bankruptcy Court Approval.  Owner is a debtor in a chapter 11 case now pending in the United States Bankruptcy Court for the Eastern District of Tennessee (the "Bankruptcy Court"), Case No. 24-31702-SHB (the "Bankruptcy Case").  Both the effectiveness of this Agreement and

Owner's obligations hereunder, including Owner's agreement to compensate CBRE, are expressly conditioned upon entry of an order by the Bankruptcy Court in the Bankruptcy Case approving the employment of CBRE and this Agreement and its terms.  Owner shall forthwith make appropriate application to the Bankruptcy Court for approval of CBRE's employment and this Agreement and shall advise CBRE of its efforts.

## ARTICLE TWO

## TERM

2.1.     Term of Agreement.  The term ("Term") of this Agreement shall commence on the date hereof and shall end at midnight, December 31st, 2026 unless sooner terminated or extended in accordance with the provisions of this Agreement.  The Term shall be extended only by an agreement in writing signed by the parties hereto.  Notwithstanding anything contained herein to the contrary, in the event the Property is removed from the market due to the opening of an escrow or acceptance of an offer to purchase the Property during the Term, or any extension thereof, and the sale is not consummated for any reason then, in that event, the Term shall be extended for a period of time equal to the number of days that the escrow had been opened and/or the Property had been removed from the market, whichever is longer, provided that, in no event shall such extension(s) exceed one hundred eighty (180) calendar days in the aggregate.

## ARTICLE THREE

## CBRE'S REPRESENTATIONS AND DUTIES

3.1.     Licensing.  CBRE hereby represents that it and its personnel providing services are, to the extent required by law, duly licensed.  CBRE shall, at its expense, obtain and keep in full force and effect throughout the Term of this Agreement all licenses and permits required to be maintained by CBRE in connection with the rendering of the services.

3.2.     Performance of Services.  CBRE shall perform the services through able, qualified and trained personnel of CBRE in sufficient number to properly render the services in the manner appropriate for the Property as required by this Agreement.  CBRE shall have the exclusive right to hire, direct, discipline, compensate and terminate the personnel of CBRE, and shall exercise complete and exclusive control over the conduct of CBRE's personnel.  Such services shall include:

(a)     Inspection, Review and Analysis.  CBRE shall review the Property to determine its relative market appeal, quality of location, market and area trends, and potential for value enhancement prior to entering the market.  CBRE shall be entitled to rely on information provided by Owner, Owner's agents, and any property manager for the Property, and shall not be responsible for verifying the accuracy or completeness of any such information.

(b)     Marketing Plan.  CBRE shall develop and prepare for Owners' review and approval a detailed marketing plan (the "Marketing Plan") setting forth a comprehensive strategy for sale of the Property.

(c)     Offering Materials.  CBRE shall assemble and produce for Owners' review and approval an offering brochure and/or other marketing materials of a type which is customary for similar properties.  Owners shall provide the information in its possession, custody or control regarding the Property necessary for CBRE to prepare a professional offering brochure. The brochure shall include, as appropriate, property facts, photographs, high-

2

quality graphics, market competition data, descriptive area and location information, site plan, and other relevant information as available. Owners shall be responsible for expenses reasonably incurred by CBRE in the preparation of the offering including without limitation, any necessary travel incurred in marketing and showing the Property. The reimbursement for these expenses shall not exceed the sum of $10,000.00 and, subject to Bankruptcy Court approval.

(e)     Marketing Efforts and Advertising.  Owners have authorized CBRE to advertise the Property for sale.  CBRE shall expose the Property to a wide variety of purchasers via direct mail, print advertising and on the Internet, as deemed appropriate by CBRE.  CBRE shall provide prospective purchasers with additional information and coordinate site visits.  CBRE shall not disseminate any offering brochures or other written promotional materials, until approved by Owners in writing.  Upon completion of the sale of the Property, CBRE may advertise or issue a press release or other public announcement regarding the sale, in form and content reasonably acceptable to Owners.  Owners hereby consent to the use of a "tombstone" type ad and CBRE's internal newsletters and publications.  All print advertising (other than CBRE's internal marketing, newsletters and publications) shall be paid for by Owners. Upon expiration of the listing Term, you shall not use any CBRE Work Product ("Work Product") without the express written consent of CBRE. Work Product shall include any Offering Brochure, Offering Memorandum, Marketing Materials, or Pro Forma produced by CBRE. Any use of Work Product without the express written consent of CBRE shall act as a constructive extension to the listing agreement on a month-to-month basis until you discontinue use of the Work Product. Upon expiration of the listing Term, if you, without the express written consent of CBRE, use Work Product to attract or secure a successful buyer, you shall pay CBRE a commission in accordance with this Agreement and the Calculation of Fee (see Section 5.1).

(f)     Prospective Purchaser Qualification and Inspections.  CBRE shall solicit and identify prospective purchasers of the Property, deliver the offering materials to such prospective purchasers and, in connection therewith, assist Owners in qualifying prospective purchasers prior to recommending acceptance of an offer, provided, however, that Owners shall have the ultimate responsibility for determining the financial condition and capabilities of any prospective purchaser.  If requested by Owners, CBRE shall require each prospective purchaser to execute and deliver to CBRE Owners' form confidentiality agreement.  CBRE shall make the necessary arrangements with Owners or Owners' agent to permit prospective purchasers to physically inspect the Property.

(g)     Inquiries.  CBRE shall promptly inform Owners of all offers and inquiries received from brokers, prospective purchasers or anyone else with respect to the Property.

(h)     Negotiations and Legal and Tax Advice.  All negotiations with prospective purchasers shall be conducted by CBRE in conjunction with Owners and Owners' counsel.  Owners and their counsel shall be responsible for determining the legal sufficiency of the purchase and sale agreement and all other documents relating to any transaction contemplated by this Agreement; and Owners and their financial advisors shall be solely responsible for determining the tax consequences of any transaction contemplated under this Agreement.

(i)     Closing.  At Owners' request, CBRE shall assist Owners and Owners' counsel in the preparation and execution of the closing checklist and provide information necessary to complete closing documentation and shall coordinate with the property manager for the

3

Property to secure all documents and information required for closing.

3.3.     Staffing.  CBRE's listing team for purposes of implementing the obligations of CBRE hereunder shall consist of Jeff Woolson, Brandon Schempp, and Roscoe High (the "Listing Team") and such other CBRE employees who provide services to Owners.  Owners and CBRE appoint the Listing Team as Owners' legal agent, to the exclusion of all other CBRE-affiliated brokers and salespersons (the "Non-Listing Team Agents").  The Listing Team shall assume primary responsibility for the initiation of all discussions and the conduct of all negotiations with prospective purchasers on the part of CBRE. CBRE may replace any member of the Listing Team during the Term in the event a member of the Listing Team dies, becomes incapacitated or terminates his/her employment with CBRE, provided such replacement individual has similar or greater experience than the replaced member and provided that Owners consent, which consent shall not be unreasonably withheld.  Upon written request by Owners, any member of the Listing Team shall be replaced by another qualified salesperson employed by CBRE, subject to Owners' approval, which approval shall not be unreasonably withheld.  For compensation purposes, Non-Listing Team Agents who represent prospective purchasers shall be treated as Cooperating Brokers under Section 3.6 below.

3.4.     Reports.  With mutually agreed upon frequency, CBRE shall submit to Owners a report on the marketing of the Property which shall include an updated list of all prospective purchasers and a summary of the status of any offers or negotiations.

3.5.     Confidentiality.

(a)      As used in this Agreement, the term "Confidential Information" means information provided by Owners to CBRE pertaining to the Property which Owners believe in good faith contains legally protectable and/or otherwise confidential trade secrets, non-public research, development, or commercial information and that Owners designate in writing as confidential at the time it is provided to CBRE.  Confidential Information does not include information that (i) was known to CBRE at the time it was provided by Owners, (ii) was publicly available at the time it was provided by Owners or thereafter becomes publicly available without breach by CBRE of its obligations hereunder, (iii) becomes available to CBRE on a non-confidential basis from a source other than Owners or their representatives, (iv) can be shown to have been developed independently by CBRE, (v) is required to be disclosed by court order, regulation, or other law or legal process; or (vi) is approved for release by written agreement of Owners.

(b)      For a period of two (2) years from the date of disclosure of any Confidential Information to CBRE, CBRE agrees to hold such Confidential Information in trust and confidence for Owners, and agrees not to use Confidential Information other than as required in the performance of its obligations under this Agreement, which shall include disclosure to CBRE's personnel who have a need to know.

3.6.     Other Brokers – No Fee Sharing.  CBRE and the Listing Team shall solicit and cooperate with other real estate brokers not affiliated with CBRE who have procured and are authorized to represent prospective purchasers for the Property.  CBRE shall not share its fee or commission with any cooperating broker and shall not be responsible for payment of any cooperating broker fee or commission due and payable as a result of a sale of the Property.  Any such cooperating broker fee, commission or other compensation shall be the responsibility of the purchaser. CBRE shall not be obligated to provide any marketing materials or other information to any cooperating broker representing a prospective purchaser unless such cooperating broker (i) represents the prospective purchaser pursuant to a written agreement, a copy of which is furnished to CBRE, (ii) executes and delivers to CBRE a confidentiality agreement, if

4

required by Owners and on Owners' form, and (iii) executes and delivers written confirmation that neither CBRE nor Owners will be responsible to pay any cooperating broker fee, commission or other compensation.

3.7.    <u>Nondiscrimination</u>.    Owners and CBRE agree that the Property will be offered in compliance with all applicable federal, state and local anti-discrimination laws and regulations.

3.8.    <u>Compliance With Laws</u>.    CBRE shall comply with all applicable federal, state and local laws, regulations, codes, ordinances and administrative orders having jurisdiction over the parties, the Property or the subject matter of this Agreement, including, but not limited to, the 1964 Civil Rights Act and all amendments thereto, the Foreign Investment in Real Property Tax Act, the Comprehensive Environmental Response Compensation and Liability Act, and The Americans With Disabilities Act.

## ARTICLE FOUR

## CBRE'S AUTHORITY

4.1.    <u>Limitation of CBRE's Authority</u>.    Notwithstanding any designation of CBRE as "agent" in this Agreement, CBRE shall have no right, power or authority to enter into any agreement with any prospective purchaser, real estate broker or any other person in the name of, on behalf of, or otherwise binding upon Owners, nor may CBRE create any other obligations or liabilities binding on Owners, except as otherwise provided by applicable law.

## ARTICLE FIVE

## FEES AND EXPENSES

5.1.    <u>Calculation of Fee</u>.    CBRE's sole and exclusive compensation for its services hereunder (the "Fee") shall be $200,000 if the Stalking Horse Bidder is the Successful Bidder, regardless of price. If any other bidder is the Successful Bidder, the Fee shall be calculated at the rate of five (5%) percent of the gross purchase price. As used in this Agreement, the term "gross purchase price" shall include any existing mortgage or loan of Owner which purchaser assumes or takes title to the Property subject to such mortgage or loan. Gross sales price shall include financial consideration received or receivable, in whatever form, as well as the assumption or release of existing mortgage and/or commercial loan liabilities (the "Existing Liabilities"). The commission shall be earned and paid on the date title to the Property is transferred to the Purchaser; provided, however, that if the transaction involves an installment contract, then payment shall be made upon execution of such contract.

5.2.    <u>When Earned</u>.    The Fee shall be earned for services rendered if, during the Term: (a) the Property is sold to a purchaser procured by CBRE, Owner or anyone else; and the (b) close of escrow for the sale of the Property by Owner.

5.3.    <u>When Payable</u>.    The Fee shall be payable hereunder at closing of escrow, recordation of deed, or taking of possession by the purchaser, whichever is earlier; provided that the Fee shall not be payable unless Owner have received the cash representing the purchase price for the Property.

5.4.    <u>Rights After Term</u>.    Owner shall pay CBRE the Fee in accordance with the terms of this Agreement if, within one hundred twenty (120) calendar days after the expiration or earlier termination of the Term, the Property is sold to, or Owner enter into a contract of sale of the Property with, or negotiations continue, resume or commence and thereafter continue leading to a sale of the Property to, any person or

entity (including his/her/its successors, assigns or affiliates) with whom CBRE or Owner has negotiated (either directly or through another broker or agent) or to whom the Property has been submitted prior to the expiration or termination of the Term. CBRE is authorized to continue negotiations with such persons or entities.  CBRE shall submit a list of such persons or entities to Owner no later than fifteen (15) calendar days following the expiration or termination of the Term, provided, however, that if a written offer has been submitted, then it shall not be necessary to include the offeror's name on the list.

5.5.    Reimbursement of Expenses.    In the event (i) this Agreement is terminated by Owner in accordance with the provisions of Section 6.4 of this Agreement, or (ii) Owner removes the Property from the market in accordance with the provisions of Section 6.3 of this Agreement, then Owners shall  reimburse CBRE for all out-of-pocket expenses incurred while marketing the Property and that have been approved by the Bankruptcy Court, including but not limited to travel expenses, mailings, and travel expenses. Provided the expenses have been approved by the Bankruptcy Court, the reimbursement of expenses shall be paid to CBRE on the date the termination becomes effective or the Property is removed from the market, as applicable.

5.6.    Option.  In the event an option to purchase the Property is granted, Owner shall pay CBRE the Fee, on the price paid for the option and for any extensions thereof.  This Fee shall be paid upon receipt by Owner of any such payment(s).  In the event that such option is exercised, whether during the Term or thereafter, Owner shall also pay CBRE the Fee. Notwithstanding the foregoing, to the extent that all or part of the price paid for the option or any extension thereof is applied to the sales price of the Property, then any commission previously paid by Owner to CBRE on account of such option payments shall be credited against the commission payable to CBRE on account of the exercise of the option.

## ARTICLE SIX

## OWNER'S RIGHTS AND OBLIGATIONS

6.1.    Refer All Inquiries.  Owner shall cooperate with CBRE in bringing about a sale of the Property, shall provide all available information to permit CBRE to properly market the Property in accordance with the terms of this Agreement, and shall immediately refer to CBRE all offers and inquiries received from brokers, prospective purchasers or anyone else interested in the Property.

6.2.    Rights Reserved By Owner.  Owner reserves the right, in all events and in Owner's sole and unfettered discretion, to approve, modify or disapprove any and all proposals and offers regarding pricing, marketing and terms of sale of the Property, and to approve or reject any prospective purchaser. Owner reserves the right to adjust the terms and conditions of any offer made or received, including, but not limited to, adjustment of the offering price for the Property upward or downward.

6.3.    Withdrawal From The Market.  Owner may, by written notification to CBRE, at any time in its sole and unfettered discretion, remove the Property from the Market, in which event, Owner shall be responsible to pay to CBRE reimbursement of expenses, in accordance with Section 5.5 of this Agreement.

6.4.    Termination For Cause.  Either party shall have the right to terminate this Agreement upon not less than sixty (60) days' prior written notice to the other in the event of a material breach or default by the other party of any of its obligations hereunder.  The notice shall specify with particularity the material breach or default with respect to which the notice is given and the acts which the breaching party must undertake to remedy such failure and, in the event that such material breach or default is not cured by that date which is thirty (30) days from the breaching party's receipt of said notice, this Agreement shall terminate upon the party's receipt of a second written notice from Owner declaring such termination.

6

6.5.    <u>FIRPTA</u>.  Owner represents that it is the owner of the property and that, except as may be disclosed in writing to CBRE, no person or entity who has an ownership interest in the property is a foreign person as defined in the Foreign Investment in Real Property Tax Act (commonly known as "FIRPTA").

6.6.    <u>Hazardous Materials</u>.

(a)    The Property is being sold in an "as is" condition, without representation or warranty of any kind, expressed or implied, oral or written, concerning the Property or any matter related thereto, including zoning, availability of access or utilities, the presence and location of asbestos, PCB transformers, other toxic, hazardous or contaminated substances, or underground storage tanks ("<u>Hazardous Materials</u>") in, on, or about the Property. Prospective purchasers shall be advised of this fact and shall be allowed to make independent investigations of the Property made by their own experts, at their own expense. Language reflecting the above shall be inserted into any purchase and sale agreement entered into by Owner, which language shall also disclaim any such representations regarding the condition of the Property by CBRE and any reliance on such representations by the prospective purchaser.

(b)    Prospective purchasers are responsible for retaining qualified experts to detect and/or remediate any current, past or potential Hazardous Materials in, on or about the Property. Owner hereby releases and forever discharge CBRE, its directors, officers, employees, agents, successors and assigns from any and all actions, causes of action, suits, covenants, judgments, claims and demands whatsoever, in law or in equity, for or on account of or in any manner connected with Hazardous Materials in, on or about the Property and the violation of any federal, state or local law, statute, ordinance or regulation, any court or administrative order or decree or private agreement relating to the collection, storage, treatment or disposal of hazardous materials, excluding any such claims arising out of CBRE's gross negligence or intentional wrongful conduct.

6.7.    <u>Compliance with Laws</u>.  Owner agrees to comply with all applicable federal, state and local laws, regulations, codes, ordinances and administrative orders having jurisdiction over the parties, any Property that is the subject of an acquisition or proposed acquisition or the subject matter of this Agreement, including, but not limited to, the 1964 Civil Rights Act and all amendments thereto, the Foreign Investment in Real Property Tax Act, the Comprehensive Environmental Response Compensation and Liability Act, and The Americans With Disabilities Act.

6.8.    **OFAC Screening.  CBRE and Owner represents and warrants to the other that they are currently in compliance with, and shall use their best efforts at all times during the term of this Agreement (including any extension thereof) to remain in compliance with, the regulations of the Office of Foreign Asset Control ("<u>OFAC</u>") of the Department of the Treasury, and any statute, executive order or other governmental action relating thereto, including, but not limited to, Executive Order 13224 (dated September 23, 2001) "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism".**

**ARTICLE SEVEN**

**CONFLICTS OF INTEREST**

7.1.    <u>INTENTIONALLY DELETED.</u>

7.2.    <u>Other Interests</u>.  Owner acknowledges that, from time to time, CBRE may provide to other

7

persons or other properties services that are similar to or in conflict with those that are to be provided pursuant to this Agreement, including, for example, listing other properties which may be competitive with the Property and showing prospective purchasers other properties in addition to the Property.  Such other persons and/or properties may be in direct or indirect competition with Owner, and Owner consents thereto, provided that CBRE shall not disclose the confidential information of Owner.

       7.3.    CBRE Affiliated Entities. Owner acknowledges that CBRE and its affiliates provide a wide range of real estate services and certain CBRE affiliates (including employees), may: (a) assist with the transaction(s) contemplated by this Agreement; (b) represent clients who have competing interests in such transaction(s), including assisting prospective purchasers with the financing or valuation of the Property, and (c) pay and/or receive referral fees and other compensation relating to the foregoing, including to and from CBRE; provided that: (y) in no event shall the Listing Team represent any party other than Owner with respect to the Property, and (z) in the event any Non-Listing Team Agent represents another party with respect to the Property, such Non-Listing Team Agent shall be treated as a cooperating broker in accordance with Section 3.6, above.

**ARTICLE EIGHT**

**INDEMNIFICATION**

      8.1.    Indemnification.

      (a)    Indemnification by CBRE.  CBRE agrees to indemnify and defend Owner from and against all liability, damages, losses and expenses resulting from claims or causes of action by a third party (collectively, "Claims") based solely upon CBRE's wrongful act, failure to act, or misrepresentation.  Such obligation to defend and indemnify will not apply, however, if the claim or cause of action is based upon or arises in any way out of an act, failure to act or representation of any other person or entity, including, but not limited to, Owner providing to CBRE incorrect information or failing to disclose to CBRE information which should have otherwise been disclosed to such claimant or to CBRE.  CBRE will have the sole and absolute right to select and employ an attorney or attorneys to defend against such Claim and Owner will cooperate with CBRE and its attorneys in connection with the resolution of any Claims.

      (b)    Indemnification by Owners.  Owner agrees to indemnify and defend CBRE from and against all Claims by a third party based solely upon Owner's wrongful act, failure to act, or misrepresentation, including, but not limited to, Owner providing to CBRE incorrect information or failing to disclose to CBRE information which should have otherwise been disclosed to such claimant or to CBRE.  Owner will have the sole and absolute right to select and employ an attorney or attorneys to defend against such Claim and CBRE will cooperate with Owner and with their attorneys.

      8.2.    Procedure.  If either party (an "Indemnified Party") notifies the other party (the "Indemnifying Party") of any Claim for which the Indemnified Party is entitled to indemnification pursuant to his Article, the Indemnifying Party shall, within fifteen (15) days following receipt of such notice, notify the Indemnified Party whether it will assume defense of such Claim, assume defense of such Claim with a reservation of rights, or reject defense of such claim.  If the Indemnifying Party fails or refuses to defend such Claim or fails to timely give the notice required by this section, the Indemnified Party shall then have

8

the right to employ counsel at the expense of the Indemnifying Party.  If an Indemnifying Party assumes the defense with a reservation of rights, the Indemnified Party shall have the right to employ counsel at its expense and participate in the defense with the full cooperation of the Indemnifying Party.  With respect to any Claim for which an Indemnifying Party assumes defense without a reservation of rights, such Indemnifying Party shall have the right to defend such action, employ counsel of its choice, and negotiate and carry out any settlement of such action.  Notwithstanding the foregoing, an Indemnifying Party shall not, without the prior written consent of the Indemnified Party, (i) settle or compromise any Claim or consent to the entry of any judgment in which the Indemnifying Party receives a more comprehensive release or hold harmless than the Indemnified Party, provided that such settlement, compromise or judgment shall not affect the continuing obligation of the Indemnifying Party to indemnify the Indemnified Party hereunder; or (ii) settle or compromise any action, suit, proceeding or claim in any manner that may adversely affect the Indemnified Party or obligate the Indemnified Party to pay any sum or perform any obligation.

**ARTICLE NINE**

**NOTICES**

9.1.     <u>Notices</u>.  All notices or other communications required or permitted under this Agreement shall be in writing and shall be sent by a nationally recognized courier service or personally delivered (including by means of professional messenger service), or sent by registered or certified mail, postage prepaid, return receipt requested, or sent by facsimile or electronic transmission and promptly confirmed in writing, to the addresses set forth below, and shall be deemed received when actually received.

|  |  |
|---|---|
| To Owner: | Salem Pointe Capital, LLC<br>Attn: Gary M. Murphey, Chapter 11 Trustee<br>3330 Cumberland Blvd., Suite 500, Atlanta, GA 30339<br>Telephone: (770) 933-6855<br>Email: murphey@rfslimited.com |
| To CBRE: | CBRE, Inc.<br>5790 Fleet Street, Suite 130<br>Carlsbad, CA 92008<br><br>Attn:   <u>Jeff Woolson, Managing Director</u><br>Telephone: <u>(760) 438 8530</u><br>Facsimile: <u>(760) 438 8592</u><br>Email: jeff.woolson@cbre.com |

9.2.     <u>Change of Notice</u>.  Notice of a change in address shall be given by notice in the manner set forth in this Article.

**ARTICLE TEN**

**GENERAL PROVISIONS**

10.1.     <u>Governing Law</u>.  This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State in which the office executing this Agreement is located, without regard to its conflicts of laws principles, except where a dispute relates solely to one or more properties

9

located within a single state, in which instance this Agreement shall be governed by and construed and interpreted in accordance with the laws of the State where that Property is located, without regard to its conflict of laws principles.

10.2.    Disputes. Any claim, controversy or dispute, whether sounding in contract, statute, tort, fraud, misrepresentation or other legal theory, related directly or indirectly to this Agreement, whenever brought and whether between the parties to this Agreement or between one of the parties to this Agreement and the employees, agents or affiliated businesses of the other party, shall be resolved by the Bankruptcy Court.  In any such proceeding or dispute, the prevailing party shall be entitled, in addition to all other forms of relief or recovery, to obtain as part of any award its reasonable attorney's fees and costs incurred.

10.3.    Amendment, Modification and Termination.  This Agreement may be amended, modified or terminated only by written agreement of CBRE and Owner.

10.4.    Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other party.

10.5.    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.6.    Headings.  The headings of the Sections and Articles of this Agreement are inserted for convenience only and shall not constitute a part hereof or affect in any way the meaning or interpretation of this Agreement.

10.7.    Due Authority.  Subject to the approval of the Bankruptcy Court in the case of Owner, each individual signing this Agreement on behalf of a party warrants and represents to the other party that he has the authority to execute this Agreement on such party's behalf and to bind such party to the terms hereof.

10.8.    Severability.  In the event any term or provision of this Agreement shall be determined by a court of competent jurisdiction to be illegal, invalid or unenforceable for any reason whatsoever, that provision shall be severed from this Agreement and shall not affect the validity of the remainder of the Agreement.

10.9.    Third Parties.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the parties hereto and their successors or assigns, any rights or remedies under or by reason of this Agreement.

10.10.  Entire Agreement.  This Agreement, including the Exhibits hereto, sets forth the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein, and supersedes all prior agreements, promises, covenants, arrangements, communications, representations and warranties, whether oral or written, by any officer, employee or representative of any party hereto.  This Agreement shall be construed neutrally, neither for nor against either party, regardless of which party is deemed to have drafted the Agreement.

10.11.  Foreclosure.  In the event that the Property becomes the subject of foreclosure proceedings prior to the expiration of this Agreement, then CBRE may, in its sole and absolute discretion (i) suspend this Agreement until such time as CBRE may elect, in its sole and absolute discretion, to reinstate this Agreement, or (ii) terminate this Agreement and be free to enter into a listing agreement with any receiver,

10

the party initiating the foreclosure, the party purchasing the Property at a foreclosure sale, or any other person having an interest in the Property.

IN WITNESS WHEREOF, this Agreement has been executed by Owner and CBRE, through their duly authorized representatives, as of the day and year first above written.

**SALEM POINT CAPITAL , LLC**                    **CBRE, INC.,**

By:_____

Name: Gary M. Murphey                             By:_____

Title: Chapter 11 Trustee                         Name: Jeff Woolson

                                         Title: Managing Director

50216345.3