# **EXHIBIT C**

*[Different first page setting changed from on in original to off in modified.].*

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT ("**Agreement**") is made and entered into as of the _____ day of _____, 2026, by and between _____, a _____ ("**Purchaser**") and Gary Murphey, in his capacity as chapter 11 trustee ("**Trustee**") of Salem Pointe Capital, LLC, a Tennessee limited liability company ("**Seller**" or "**Debtor**").  Purchaser and Seller are collectively referred to hereinafter as the "**Parties**"

### WITNESSETH:

WHEREAS, Seller owns and operates the Rarity Bay Country Club (the "**Business**") and the real property and amenities located at the address commonly known as 403 Rarity Bay Parkway, Vonore, TN 37885 (the "**Real Property**"), The Seller in operating the Business operates The Bay Bistro, the golf course, the golf pro shop, clubhouse, tennis courts, pickleball courts, swimming pools and the community docking facilities all located at the Real Property; and

WHEREAS, Seller owns certain other real property in Monroe and Loudon County, Tennessee, including but not limited to, real property commonly known as lots in Phases 1 – 16 of the Rarity Bay Development, lots listed on Seller's Bankruptcy Schedules (the "**Lots**"), and other real property that is not annexed into or that is adjacent to the Rarity Bay Development (collectively, the "**Vacant Land**"); and

WHEREAS, Seller in the ordinary course of business has entered into and remains obligated under certain executory contracts and unexpired leases of personal property (collectively, the "**Contracts and Leases**").  Seller further manages the Business pursuant to a contract with a golf and country club management company, Hampton Golf, located at 7845 Baymeadows Way, Jacksonville, FL 32256 (the "**Management Company**").  Seller further has entered into a management contract with the Management Company dated the 11th day of February, 2026, which is an executory contract of Seller (the "**Management Contract**").  The Management Contract and Contracts and Leases are to be assumed and assigned to the Purchaser as part of the Proposed Transaction described in this Agreement (collectively, the "**Assumed Contracts and Leases****");

WHEREAS, the Parties hereto, on the terms and conditions set forth in this Agreement, desire to enter into an agreement whereby, among other things, Seller will transfer to Purchaser, and Purchaser will acquire from Seller all of Seller's right, title and interest in, to and under the various assets, property and further described herein as the "**Purchased Assets**," which includes, but is not limited to, the Business, Real Property, Vacant Land, Lots, the Assumed Contracts and Leases, other certain assets associated with the Business operated by Seller, in each instance, free and clear of liens, encumbrances and claims;

*[Different first page setting changed from on in original to off in modified.].*

1

*[Different first page setting changed from on in original to off in modified.].*

DRAFT

WHEREAS, in order to be a member of the Club, a social membership initiation fee must be paid in ~~an~~the current amount ~~not less than~~of $~~5,000.00~~15,000.00;

WHEREAS, the rights of Rarity Bay Partners ("**RBP**") under the Assignment of Right ~~to Purchase Real Property~~ ~~between RBP and Debtor~~ will remain RBP's rights and the Club and Business are being sold subject to RBP's rights thereunder, which is the subject of pending litigation and might or might not be altered by such litigation;

WHEREAS, the Club and the Business are being sold with whatever rights are presently available to impose mandatory social memberships, which are the subject of pending litigation, and which litigation may or may not affect the ongoing viability of some social memberships;

WHEREAS, the Parties acknowledge that in every respect, the proposed transaction herein has been negotiated at arm's length and in good faith and without the intent to hinder, delay or defraud the creditors of the Seller.

NOW, THEREFORE, for and in consideration of the above premises, the mutual covenants hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties do hereby agree as follows:

1.    **Incorporation of Recitals and Definitions**

**1.1**    ~~(a)~~As used in this Agreement each of the words and phrases that are capitalized and in bold shall have the meaning ascribed to them in Schedule 1.1.

**1.2**    ~~(b)~~The recitals set forth above are incorporated by this reference.

2.    **Purchase, Sale and Transfer of the Assets of the Seller.**

**2.1**    ~~(a)~~**Terms of Transfer**.  Subject to the terms and conditions set forth herein, Seller agrees to sell, convey, assign, transfer and deliver to Purchaser and Purchaser agrees to purchase all of Seller's rights, title and interest in and to and under all of the tangible and intangible real and personal property, assets and rights, as set forth below in Section 2.2 as the same exists on the Closing Date excepting only those assets specifically identified as "**Excluded Assets**" in Section 2.3 herein.  All of the Purchased Assets shall be delivered free and clear of any liens, claims, pledges, security interests, mortgages or encumbrances of any kind.  The sale, conveyance, assignment, transfer and delivery of the Purchased Assets shall be effected by bills of sale, deeds, endorsements, assignments, drafts, checks, or other instruments in such reasonable or customary form for a sale of this nature as shall be requested by Purchaser and its counsel and are reasonably satisfactory to Seller and its counsel.

**2.2**    ~~(b)~~**Purchased Assets** include the following:

**(a)**    ~~(i)~~All of Seller's right, title and interest in trademarks, trade names, service marks, recipes, formulas, copyrights, methods, licenses, processes and

*[Different first page setting changed from on in original to off in modified.].*

2

*[Different first page setting changed from on in original to off in modified.].*

know-how relating to the Business, whether owned, used or licensed by Seller including those trademarks and trade names set forth on Schedule 2.2(a) and the goodwill of the Business as a going concern value (collectively, the "**Intangible Rights**");

**(b)** ~~(ii) The~~ All of Seller's rights, title and interest in the name "Rarity Bay," "Rarity Bay Country Club," and "Rarity Bay on Tellico Lake" and any associated logos or marks;

**(c)** ~~(iii)~~ All of Seller's rights, title and interest in and to the Real Property as more particularly described in Schedule 2.2(c), including, but not limited to, all buildings, fixtures, appurtenances and other improvements located at the Real Property and maps, reports, plans, easements, access rights, parking spaces, title documents, surveys, construction contracts, warranties, reports, drawings including the drawings that show the information technology, data recording and retrieval, electrical, mechanical, heating, ventilating, air conditioning and plumbing systems that serve the buildings, site plans, as-built plans, permits and other materials having to do with the Real Property and the Business;

**(d)** ~~(iv)~~ All of the fixed and tangible assets owned by Seller and used in the maintenance and operation of the Business, including the machinery, equipment, apparatus, appliances, furniture, fixture, trade fixtures, signage, computers, computer hardware, computer software, information technology systems and servers and any other physical assets including tangible assets listed on Schedule 2.2(d) and located or stored at the Real Property;

**(e)** ~~(v)~~ All inventory of goods, supplies, fuel, parts, and other tangible assets of every kind, nature and description used, held for use or stored in connection with the Business and related to the assets described on Schedule 2.2(e) (collectively, the "**Inventory**");

**(f)** ~~(vi)~~ All warranties and similar rights in favor of Seller in respect to the Purchased Assets;

**(g)** ~~(vii)~~ Originals, if available, or copies of all member lists and supplier lists to the extend related to the Business and/or the Purchased Assets;

**(h)** ~~(viii)~~ All of Seller's rights, title and interest in and to the lots and to unannexed and/or adjacent land (collectively as the "**Vacant Land**"), as more particularly described in Schedule 2.2(h), together with all tax credits, benefits or incentives or the like that have accrued or are related or incidental to the Vacant Land;

**(i)** ~~(ix)~~ All of Seller's rights and obligations under the Assumed Contracts and Leases as Purchaser may, at least ten (10) days before entry of the Approval Order, elect to assume as set forth on Schedule 2.2(i) (subject to the right to update such schedule to remove any Assumed Contract and Leases then no longer to be assumed). In each instance, Purchaser shall be obligated to cure any defaults under the Assumed Contracts and Leases, and shall provide adequate assurances of future performance to the extent determined by the Bankruptcy Court; and

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

**2.3** ~~(c)~~ **Excluded Assets.** Purchaser is acquiring from Seller only the Purchased Assets, and the following assets ("**Excluded Assets**") are specifically excluded from the Purchased Assets:

**(a)** ~~(i)~~ Cash or cash equivalents, including bank accounts and the Purchase Price defined herein;

**(b)** Debtor's interest in the Declarant Rights under the Master Declaration;

**(c)** ~~(ii)~~ Tax returns and other records which are not directly related to or reasonably necessary to conduct the Business;

**(d)** ~~(iii)~~ All utility, security and other deposits and prepaid items;

**(e)** ~~(iv)~~ Any tax credits, tax refunds, tax benefits or other benefits relating to periods prior to the Closing Date, which are and shall remain exclusively the property of Seller;

**(f)** ~~(v)~~ All contracts and leases that are not assumed contracts and leases;

**(g)** ~~(vi)~~ The Bobcat T740 Compact Track Loaders S/N B3CA22857 and Bobcat E42 T4 Mini Excavator – Compact S/N B4GM16170;

**(h)** ~~(vii)~~ All causes of action, demands, judgments, claims, indemnity rights, setoffs, recoupments or other similar rights of Seller including all avoidance or other claims of the Seller of its bankruptcy estate including without limitation those that may exist against Seller's prior management pursuant to any provision of the Bankruptcy Code or pursuant to applicable state law, except for those claims arising under express or implied warranties from suppliers or other third parties with response to the Purchased Assets;

**(i)** ~~(viii)~~ All avoidance actions under Chapter 5 of the Bankruptcy Code (including, without limitation, state law claims applicable under Chapter 5), all of which actions are preserved for the Trustee for the benefit of the Bankruptcy Estate.

**2.4** ~~(d)~~ **Assumed Liabilities.** On the terms and subject to the conditions set forth in this Agreement, at the Closing, in consideration for the sale, assignment, conveyance, transfer and delivery of the Purchased Assets to the Purchaser, the Purchaser shall assume from the Seller and agree to pay, perform and discharge when due in accordance with their respective terms and subject to the respective conditions thereof, only the following liabilities and obligations of the Seller (collectively, the "**Assumed Liabilities**"):

**(a)** ~~(i)~~ All liabilities and obligations arising from the ownership, possession or use of the Purchased Assets and the operation of the Business in each case from and after the Closing;

*[Different first page setting changed from on in original to off in modified.].*

4

*[Different first page setting changed from on in original to off in modified.].*

**(b)** ~~(ii)~~ All liabilities and obligations arising under the Management Contract arising after the Closing;

**(c)** ~~(iii)~~ All cure costs; and

**(d)** ~~(iv)~~ All liabilities and obligations relating to the employment or termination of the Transferred Employees arising after the Closing;

**(e)** ~~(v) Only~~Liabilities and obligations arising from the litigation listed on Schedule 5.3 – LITIGATION, but only to the extent ~~of remedial action, if any, based on~~the litigation results in liabilities and/or obligations: (1) to remedy the alleged nuisance ~~claim;~~, or (2) to pay the costs of remedying the alleged nuisance; (provided however, any timely filed prepetition damage claim arising from the alleged nuisance will remain ~~a~~an unsecured claim against ~~the~~Seller's bankruptcy estate).

The transactions contemplated by this Agreement shall in ~~now~~no way expand the rights or remedies of any third party against the Purchaser or Seller as compared to the rights and remedies that such third party would have had against Seller absent the Bankruptcy Case, had the Purchaser not assumed such Assumed Liabilities.

**2.5** ~~(e)~~**Excluded Liabilities.** Notwithstanding anything contained in this Agreement to the contrary, Purchaser shall not assume, be obligated to assume, be deemed to have assumed, or be obligated to pay, perform, or otherwise discharge, and the Seller shall be solely and exclusively liable with respect to any liabilities or obligations (or any nature, and whether based on common law or statute or arising under written contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, asserted or unasserted) of the Seller other than the Assumed Liabilities (such liabilities and obligations other than Assumed Liabilities are the "**Excluded Liabilities**"). Without limiting the foregoing, Purchaser does not assume or agree to pay, perform or otherwise discharge the liabilities or obligations (whether known or unknown, fixed or contingent, accrued or unaccrued, liquated or unliquidated, asserted or unasserted) of the Seller with respect to, arising out of or relating to, the following Excluded Liabilities:

**(a)** ~~(i)~~Except as otherwise expressly set forth in this Agreement, any liability arising out of facts or circumstances in existence prior to the Closing and from or related to any breach, default under, failure to perform, torts related to the performance of, violations of law, infringements or indemnities under, guaranties pursuant to and overcharges, underpayments or penalties on the party of the Seller under any contract, agreement, arrangements or understanding to which Seller are a party prior to the Closing;

**(b)** ~~(ii)~~Except as other expressly set forth in this Agreement, any liability arising from or related to any action against Seller, or related to the Business, the Purchased Assets or the Assumed Liabilities, pending or threatened or based on facts, actions, omissions, circumstances or conditions existing, occurring or accruing before the Closing including, but not limited to, any alleged claim by Bald Eagle Ventures, LLC or BEP Rarity Bay, LLC (collectively, "BEP") as to only the Debtor, provided however, this is not intended to

*[Different first page setting changed from on in original to off in modified.].*

5

*[Different first page setting changed from on in original to off in modified.].*

DRAFT

affect any right of BEP to seek or increase its unsecured indemnification claim against Debtor in the Bankruptcy Case;

**(c)** (iii) All Indebtedness of the Seller (other than any obligations under the Management Contract).

**(d)** (iv) All guarantees of third party Indebtedness made by the Seller and reimbursement obligation to guarantor of the Seller's obligations or under letters of credit or similar agreements or instruments.

**(e)** (v) All liabilities or obligations to any current or former owner of equity interests of the Seller, any current or former holder of indebtedness for borrowed money of the Seller or in respect of obligations for indemnification or advance of expenses, any current or former officer or director of the Seller;

**(f)** (vi) All drafts or checks outstanding at the Closing under which the Seller is obligated;

**(g)** (vii) All liabilities or obligations ~~to the extent~~ relating to the ownership, possession or use of the Excluded Assets;

**(h)** (viii) All fees, charges, expenditures, and costs incurred or otherwise payable by the Seller in connection with the administration of the Bankruptcy Case, including the fees and expenses of financial advisors, accountants and legal counsel, whether incurred, accrued or payable on, prior to, or after the date of this Agreement or the Closing;

**(i)** (ix) All liabilities or obligations under Environmental Laws to the extent relating to (1) the transportation, off-site storage or off-site disposal of any hazardous substances generated by or on behalf of the Seller on or before the Closing or (2) property not acquired under this Agreement, including any real property formerly owned, operated or leased by Seller prior to the Closing and for toxic torts arising as a result of or in connection with loss of life or injury to Persons whether or not such loss or injury was made manifest on or after the Closing;

**(j)** (x) All intercompany accounts payable, liabilities and obligations that are owed or payable to Seller as to which Seller is an obligor or is otherwise responsible or liable, only to the extent that there are any affiliated, parent or subsidiary companies.

**2.6** (f) **Permitted Encumbrances.**  All liens and encumbrances on or relating to the permitted encumbrances listed on Schedule 2.6 are preserved in full, are not released, discharged, avoided, stripped, subordinated, or otherwise affected by this Agreement, the Approval Order, and the consummation of the transactions herein, and shall continue to attach as permitted encumbrances to the same extent, validity, priority, and enforceability as existed immediately prior to the Closing.

**2.7** (g) **Method of Conveyance.**  The sale, transfer, conveyance, assignment and delivery by Seller of the Purchased Assets shall occur at the Closing by Seller's execution and delivery to Purchaser of one or more bills of sale, assignments,

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

DRAFT

and special warranty deeds in the form and scope reasonably satisfactory to Purchaser in a transaction of this nature. At the Closing, Seller shall transfer, assign convey and deliver good, valid and indefeasible title to the Purchased Assets free and clear of all liens, encumbrances and claims.

**2.8 Reservation of Certain Rights and Obligations in Pending Litigation.** No provision in this Agreement is intended to affect the rights or obligations of parties in any pending litigation, unless specifically stated herein; provided however, consummation of the Sale contemplated by this Agreement may affect obligations of Debtor to provide a remedy in certain pending litigation.

3. **Consideration**.

**3.1** ~~(a)~~ **Purchase Price**. The purchase price is _____ ("**Purchase Price**").

**3.2** ~~(b)~~ **Payment of Purchase Price**. Purchaser shall pay the Purchase Price to Seller, in cash, certified funds or wire transfer, at the option of Seller, at the Closing.

**3.3** ~~(c)~~ **Earnest Money Deposit**. Purchaser shall pay an ~~earnest money deposit~~Earnest Money Deposit of $500,000, which shall be held in escrow by Trustee's counsel and credited against the Purchase Price (or any successful bid by Purchaser at the Auction) at closing. In the event Purchaser is outbid at the Auction for the Property (such that Purchaser is not the Successful Bidder or Back-Up Bidder at the Auction), the Earnest Money Deposit shall be refunded ~~within 5~~no later than the earlier of: (a) three (3) business days following the ~~conclusion~~entry of the Sale Approval Order, or (b) ten (10) business days following the end of the Auction.

~~(d) **Break-Up Fee**. In the event of an auction, Purchaser shall be entitled to a Break-Up fee of 3% of the Purchase Price, which shall be included in any overbid above the Purchase Price at the Auction.~~

4. **Closing**. The closing ("**Closing**") of the sale contemplated herein shall take place at Bass, Berry & Sims located at 900 S. Gay Street, Suite 1700, Knoxville, Tennessee 37902 at 9:00 a.m. Eastern Time on _____, 2026; provided, however, that if the Closing does not take place on such date it shall take place on the date following the date on which all conditions precedent to the Closing have been met or on such other date ("**Closing Date**"), at such other place, or at such other time as the parties may mutually agree upon. The transactions contemplated by this Agreement shall be effective as of the close of business on the Closing Date.

**4.1** ~~(a)~~**Prorations and Adjustments.** Purchaser and Seller agree that the following items shall be prorated with the Seller to be responsible for the same through and including the Closing Date and Purchaser to be responsible for the same after the Closing Date:

*[Different first page setting changed from on in original to off in modified.].*

7

*[Different first page setting changed from on in original to off in modified.].*

**(a)** ~~(i)~~ All real and personal property taxes and assessments related to the Purchased Assets, provided however, that if the amount of taxes or assessments for the year in which Closing occurs is unknown at the time of Closing, such taxes or assessments shall be prorated based on the rate and valuation shown on the prior year's tax bill. The Parties shall, promptly upon request of either Party, reprobate taxes and assessments when the figures for the year in which Closing occurs is known; and

**(b)** ~~(ii)~~ Any charges for water, electric, oil, gas, telephone and other utilities.

**4.2** ~~(b)~~ **Utilities**. Seller shall cause any and all services for water, electric, oil, gas, telephone and any other utilities to take a final reading in respect of the Business as of the Closing to cause the charges therefor incurred through the Closing to be paid by Seller and to notify such utilities to transfer such services to Purchaser from and after the Closing without interruption of service.

**4.3** ~~(c)~~ **Expenses**. Purchaser shall be solely liable for and shall pay on the Closing Date all documentary or transfer taxes recording charges and similar taxes and charges with respect to the transfer of the Purchased Assets as well as the cost of recording all curative title documents. Each Party shall be responsible for its own attorneys' fees and costs.

**5.** **Representations and Warranties of Seller**. Seller hereby represents, warrants, and agrees as follows:

**5.1** ~~(a)~~ **Title to Tangible Property; Absence of Liens**. To the best of Seller's knowledge, but without warranty or representation, Seller is the owner of and has good and marketable title to the Purchased Assets to be transferred hereunder, after entry of the Sale Approval Order, free and clear of all liens, restrictions, pledges, mortgages, security interests, conditional sales agreements, charges, prior assignments or leases, and encumbrances of any kind.

**5.2** ~~(b)~~ **Brokerage**. Except for CBRE being entitled to commissions per approval of the Bankruptcy Court, no third party shall be entitled to receive any brokerage commissions, finder's fees, fees for financial advisory services or similar compensation in connection with the transactions contemplated by this Agreement for which Purchaser could become liable based on any arrangement or agreement made by or on behalf of Seller.

**5.3** ~~(c)~~ **Litigation.** Other than as disclosed on Schedule 5.3, there is no litigation, proceeding or investigation pending, or to the best of Seller's knowledge, threatened, nor is there any basis known to Seller for any litigation, proceeding or investigation against Seller or relating to the Purchased Assets which would (i) affect the title of Seller to the Purchased Assets, (ii) affect Seller's right to convey the Purchased Assets, (iii) adversely impair or affect in any way the use and enjoyment of the

*[Different first page setting changed from on in original to off in modified.].*

8

*[Different first page setting changed from on in original to off in modified.].*

Purchased Assets, or (iv) question the validity of any action to be taken pursuant to or in connection with this Agreement.

**5.4** ~~(d)~~ **Organization; Good Standing.** Subject to entry of the Approval Order, Seller has the full power and authority, corporate or otherwise, to enter into this Agreement, to carry out its obligations hereunder and to consummate the respective transactions contemplated to be consummated hereunder. The execution, delivery and consummation of this Agreement has been duly and validly authorized by Seller.

**5.5** ~~(e)~~ **Authorization.** Subject to the entry of the Approval Order, this Agreement constitutes a valid and binding obligation of Seller enforceable in accordance with its terms.

**5.6** ~~(f)~~ **Non-contravention.** Except as otherwise contemplated this Agreement, Seller's execution and delivery of this Agreement and compliance with and fulfillment of the terms of this Agreement do not (1) violate or conflict with any of the terms, conditions or provisions of any organization documents of Seller; (2) violate any Laws applicable to Seller or (3) materially impair the Purchaser's ability to operate the Business.

**5.7** ~~(g)~~ **Title to Purchased Assets.** To the best of Seller's knowledge, but without warranty or representation, Seller has good and valid legal title and beneficial ownership to the Purchased Assets. At Closing and pursuant to the Approval Order, the Seller shall convey to Purchaser good, valid, marketable, and insurable title to the Purchased Assets free and clear of all liens, encumbrances and claims pursuant to Section 363(b), 363(f) and 365 of the Bankruptcy Code. Seller will obtain and provide to Purchaser copies of the documents evidencing transfer of the ownership to Debtor of the four properties listed on Schedule 2.2(h) identified as "deed executed, but not recorded."

**5.8** ~~(h)~~ **Condition of Purchased Assets.** All of the Purchased Assets are being sold "AS IS," "WHERE IS" WITH ALL FAULTS AND WITHOUT ANY REPRESENTATION OR WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EXCEPT AS EXPRESSLY SET FORTH HEREIN. IN ADDITION, THE EXISTENCE OF PENDING LITIGATION HAS BEEN DISCLOSED TO PURCHASER, THE RESULTS OF WHICH COULD AFFECT MANDATORY SOCIAL MEMBERSHIP INITIATION FEES AND/OR THE EXISTENCE OF SOME SOCIAL MEMBERSHIPS.

**5.9** ~~(i)~~ **Governmental Authorizations.** To Seller's knowledge, Seller has all material Governmental Authorizations that are required in connection with the operation of the Business as presently conducted.

**5.10** ~~(j)~~ **Contracts.** To Seller's knowledge, true and correct originals or, where originals are not available, copies of all material contracts and agreements of Seller relating to the Purchased Assets have been made available by Seller to Purchaser

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

DRAFT

or will be made available to Purchaser within a reasonable time after a request from the Purchaser.  ~~If requested,~~ Seller shall disclose to Purchaser the Seller's good faith estimate of the Cure Costs.

**5.11** ~~(k)~~ **Compliance with Laws.**  Except as previously disclosed to Purchaser, the Debtor has been in material compliance with any Laws applicable to it or the Business.

**5.12** ~~(l)~~ **Real Property and Vacant Land.**  Seller has not been informed or received any notice of any condemnation proceeding involving the Real Property or Vacant Land; there are no parties with a right of occupancy to the Real Property or Vacant Land other than Seller, and there are no parties other than Seller in possession of the Real Property or Vacant Land.

**5.13** ~~(m)~~ **Environmental Matters.**  To Seller's knowledge, in its operation of the Business, the Debtor has materially complied with all Environmental Laws applicable to it, has not discharged any Hazardous Substances and has not used any above ground storage tanks or underground storage tanks.

**5.14** ~~(n)~~ **Labor Relations Matters.**  To Seller's knowledge with respect to the Business the Debtor is not a party to any collective bargaining agreement and has no relationship with any labor organization; to the knowledge of Seller, no labor organization has filed any representation position or made any oral or written demand for recognition; and to the knowledge of Seller, no union organizing efforts are underway of threatened.

**5.15** ~~(o)~~ **Taxes.**  To Seller's knowledge, all material Tax Returns required to be filed with respect to the Business, the Purchased Assets and Assumed Liabilities have been timely filed with the appropriate Taxing Authority in all jurisdictions in which such Tax Returns are required to be filed (after giving effect to any valid extensions of time in which to make such filings), and all such Tax Returns are true, complete and correct in all material respects; and all material amounts of Taxes payable with respect to the Business, the Purchased Assets and Assumed Liabilities have been timely paid.

**6.    Representations and Warranties of Purchaser**.  Purchaser represents and warrants as follows:

**6.1** ~~(a)~~ **Organization; Good Standing.**  Purchaser has all power and authority to enter and perform its obligations under this Agreement and to consummate the Proposed Transaction.

**6.2** ~~(b)~~ **Authorization.**  The execution, delivery and performance of this Agreement have been duly authorized by the partners of the Purchaser and no further authorization, approval or consent is required.  This Agreement constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms.

*[Different first page setting changed from on in original to off in modified.].*

10

*[Different first page setting changed from on in original to off in modified.].*

**6.3** ~~(c)~~ **Non-contravention.** Except as otherwise contemplated this Agreement, Purchaser's execution and delivery of this Agreement and compliance with and fulfillment of the terms of this Agreement do not (1) require any authorization, consent, approval, exemptions or other action by or notice to any governmental or other entity, or conflict with or result in a breach of the terms, conditions or provision of any applicable Articles of Incorporation or Bylaws of Purchaser, or any contract to which Purchaser is a party, or (2) constitute a default, or result in creation of any lien, security interest, charge or encumbrance upon the Purchased Assets.

**6.4** ~~(d)~~ **Litigation**. There is no litigation, proceeding or investigation pending, or to the best of Purchaser's knowledge, threatened, nor is there any basis known to Purchaser for any litigation, proceeding or investigation against Purchaser asserting Purchaser's inability to enter into the transactions contemplated by this Agreement.

**7.** **Conditions Precedent to Seller's Obligations**. All obligations of Seller under this Agreement are subject to the fulfillment, prior to Closing, of each of the following conditions:

**7.1** ~~(a)~~ **Bankruptcy Court Approval.** The transactions involving the Seller contemplated by this Agreement shall be approved by the Bankruptcy Court as described in Section 9 herein, and the Approval Order, as hereinafter defined, shall be in full force and effect and shall not have been ~~stated~~stayed by the Bankruptcy Court or any court of competent jurisdiction.

**7.2** ~~(b)~~ **Form of Documents**. The form of all documents required to be delivered to Seller hereunder shall be approved by counsel for Seller and there shall have been furnished to such counsel by Purchaser such corporate and other records, certificates of officers of Purchaser and other information as such counsel may reasonably request.

**7.3** ~~(c)~~ **No Material Adverse Change.** No Material Adverse Change shall have occurred between the Execution Date and Closing.

**7.4** ~~(d)~~ **Adverse Proceedings.** No action or proceeding by or before any court or Governmental Entity shall have been instituted by any court or Governmental Entity whatsoever which shall seek to restrain, prohibit or invalidate the transaction contemplated by this Agreement or which is likely to affect the right of the Purchaser to own or use the Purchased Assets after the Closing Date.

**7.5** ~~(e)~~ **Receipt of Purchase Price**. Seller shall receive at Closing the Purchase Price.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

**8.     Conditions Precedent to Purchaser's Obligations.**  All obligations of Purchaser under this Agreement are subject to the fulfillment, prior to Closing, of each of the following conditions:

**8.1**     ~~(a)~~ **Bankruptcy Court Approval.**  The transactions involving the Seller contemplated by this Agreement shall be approved by the Bankruptcy Court as described in <u>Section 9</u> herein, and the Approval Order, as hereinafter defined, shall be in full force and effect and shall not have been ~~stated~~<u>stayed</u> by the Bankruptcy Court or any court of competent jurisdiction.

**8.2**     ~~(b)~~ **Form of Documents**.  The form of all documents required to be delivered to Seller hereunder shall be approved by counsel for Seller and there shall have been furnished to such counsel by Purchaser such corporate and other records, certificates of officers of Purchaser and other information as such counsel may reasonably request.

**8.3**     ~~(c)~~ **No Material Adverse Change.**  No Material Adverse Change shall have occurred between the Execution Date and Closing.

**8.4**     ~~(d)~~ **Closing Deliveries.**  The Purchaser shall have received at or prior to the Closing Date each of the following documents:

**(a)**     ~~(i)~~ The Approval Order, in form and substance reasonably acceptable to the Purchaser and its counsel;

**(b)**     ~~(ii)~~ A bill of sale and assignment agreement executed and acknowledged by the Seller, in the form reasonably acceptable to the Purchaser, with respect to the Purchased Assets;

**(c)**     ~~(iii)~~ An assignment agreement executed by Seller assigning its rights to Purchaser in and to the Intangible Rights;

**(d)**     ~~(iv)~~ Special warranty deed in a form reasonably acceptable to Purchaser and its counsel conveying fee simple title to the Real Property and the Vacant Land to Purchaser or its designee;

**(e)**     ~~(v)~~ A closing statement in form and content reasonably acceptable to the Purchaser;<u> and,</u>

**(f)**     ~~(vi)~~ Possession of all of the Purchased Assets including, but not limited to, keys to the Real Property and keys to any buildings or amenities located on the Real Property or the Vacant Land and all computers, software and/or document access codes~~; and~~<u>.</u>

**9.     Bankruptcy Court Approval.**

**9.1**     ~~(a)~~ **The Agreement.**  Execution of this Agreement by Purchaser shall constitute Purchaser's bid for the Purchased Assets.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

DRAFT

**9.2**   (b)  **Approval Order.**   Seller has filed a motion (the "**Sale Motion**") with the Bankruptcy Court seeking approval of the Proposed Transaction.  It is a material inducement to Purchaser to be able to acquire the Purchased Assets pursuant to the provisions of Section 363 of the Bankruptcy Code, including in particular free and clear of all liens, encumbrances and claims pursuant to Section 363(f) of the Bankruptcy Code.  Therefore, any and all obligations of the Purchaser pursuant to this Agreement are subject to the entry of an Order of the Bankruptcy Court (the "**Approval Order**"), in form reasonably satisfactory to the Purchaser, approving this Agreement and the Proposed Transaction, and ordering, finding and concluding that among other things, (1) notice of the sale Motion and Proposed Transaction was proper and sufficient to all parties entitled to such notice; (2) the sale of the Purchased Assets to the Purchaser is approved pursuant to Section 363(b) of the Bankruptcy Code;  (3) the assumption and assignment of the Management Contract; (4) the sale of the Purchased Assets to the Purchaser pursuant to this Agreement will be free and clear of all liens, encumbrances and claims pursuant to Section 363(f) of the Bankruptcy Code with the Liens, if any, to attached the Purchase Price or proceeds of the sale; (5) Purchaser has acted in good faith within the context of and is entitled to the protections of Section 363(m) of the Bankruptcy Code; and (6) authorizing and approving this Agreement as the highest and best offer for the Purchased Assets.

**9.3**   (c)  **Appeal/Reconsideration.**   If an appeal is taken, or a stay pending appeal is requested or reconsideration sought, from any order approving bid procedures in connection herewith, the Approval Order, then Seller will immediately notify Purchaser of such appeal, stay or reconsideration and will provide to Purchaser within one (1) business day a copy of the related notice of appeal, order of stay or motion for reconsideration.  ~~The~~ Seller will also provide Purchaser with written notice and copies of any other or further notice of appeal, motion or application filed in connection with any appeal form, or application for reconsideration of, any of such orders and related briefs.

**9.4**   (d) **Bidding Procedures and Order.**  The purchase and sale of the Purchased Assets will be subject to competitive bidding in accordance with the terms of the Sale Procedures Order. ~~CBRE will get a marketing period through and including July 15, 2026 and all bidders will have to become qualified bidders.  Purchaser and Seller agree that Purchaser is a qualified bidder.  CBRE will be entitled to a five percent (5%) commission at Closing.  The Opening Bid to top the Stalking Horse Bid must be at least  $_____$~~, which sets forth several procedures and requirements for participation in the sale process.

## 10.   Termination.

**10.1**   (a)  **Termination of this Agreement.**   This Agreement may be terminated and the transactions contemplated hereby may be abandoned:

**(a)**   (i) By mutual written consent of the Purchaser and Seller;

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

**(b)** ~~(ii)~~ By Purchaser if there shall occur a material breach of any of the representations, warranties, covenants or agreements of the Seller, provided however that Purchaser agrees to provide notice thereof and a right to cure any such breach within ten (10) business days thereafter;

**(c)** ~~(iii)~~ By Purchaser if the Bankruptcy Case is converted for cause under Chapter 7 of the Bankruptcy Code;

**(d)** ~~(iv)~~ By Seller if there shall occur a material breach of any of the representations, warranties, covenants or agreements of Purchaser, provided however that Seller agree to provide notice thereof and a right to cure any such breach within ten (10) business days thereafter; and

**(e)** ~~(v)~~ By either party if the Sale Closing has not occurred ~~by August 14, 2026 and the Bankruptcy Court has approved the Sale~~<u>within twenty (20) business days after entry of the Approval Order</u>.

**10.2** ~~(b)~~ **Effect of Termination.**  If the Agreement is terminated pursuant to <u>Section 10.1</u> then this Agreement will become void and of no further force and effect, with no liability or obligation on the part of the Parties.

**11.   Miscellaneous**.

**11.1** ~~(a)~~ **Amendments**.  This Agreement may be amended or modified, only by a written instrument executed by Purchaser and Seller or their respective duly authorized officers or representatives.

**11.2** ~~(b)~~ **Parties Bound**.  This Agreement shall be binding upon and shall inure to the benefit of Seller and Purchaser and their respective successors and permitted assigns.

**11.3** ~~(c)~~ **Waivers**.  Investigations or examinations made by any party, its counsel, accountants, employees or representatives and information obtained as a result hereof shall not constitute a waiver of any representation, warranty, obligations, covenants or agreements of the other party.

**11.4** ~~(d)~~ **Notices**.  Any notices or other communications required or permitted hereunder shall be in writing and shall be considered to have been duly given, when received, if delivered by hand, email, facsimile or private courier:

**(a)** ~~(i)~~ If to Seller, to:

> Gary Murphey, in his capacity as chapter 11 trustee
> Resurgence Financial Services, LLC
> 3330 Cumberland Blvd., Suite 500
> Atlanta, GA 30339
> Email:  Murphey@rfslimited.com

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

<span style="float:right">DRAFT</span>

With a Copy (which shall not constitute notice) to:

> Paul Jennings, Esq.
> Bass, Berry & Sims PLC
> 21 Platform Way South, Suite 3500
> Nashville, TN 37203
> Email:  pjennings@bassberry.com

**(b)**   (ii) If to Purchaser, to

With a Copy (which shall not constitute notice) to:

**11.5**   (e) **Severability**.  The invalidity or unenforceability of any part of this Agreement, for any reason, shall not prejudice or affect the validity or enforceability of the remainder, and in such event the parties hereto shall use their best efforts to agree upon a replacement for such invalid or unenforceable provision in terms which correspond as closely as possible to the original provision.

**11.6**   (f) **Entire Agreement**.  This Agreement sets forth the entire understanding of the parties with respect to the subject matter hereof, and any previous agreements or understanding between the parties regarding the subject matter hereof, whether oral or written, are merged into and superseded by this Agreement.

**11.7**   (g) **Additional Documents.**  After the Closing Date, each Party shall, at the request of any other, furnish, execute and deliver such documents and instruments as the requesting Party shall reasonably require as necessary or desirable to carry out the transactions contemplated hereunder.

**11.8**   (h) **Headings**.  The headings of the sections of this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement.

**11.9**   (i) **Incorporation of Schedules**.  Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

**11.10**   (j) **Rights Cumulative**.  All rights and remedies of each of the parties under this Agreement will be cumulative, and the exercise of one or more rights or remedies will not preclude the exercise of any other right or remedy available under this Agreement or applicable law.

**11.11**   (k) **Time is of the Essence**.  Time is of the essence of each provision hereof.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

**11.12** ~~(l)~~ **Governing Law**.  This Agreement shall be governed by and interpreted and construed in accordance with the laws of the State of Tennessee without regard to rules or laws of conflicts of law.

**11.13** ~~(m)~~ **Further Assurances**.  From and after the Closing, the Parties agree to execute and deliver such additional documents, agreements, notices, acknowledgments and other instruments as are reasonably necessary or required to effectuate the intent and purpose of this Agreement and the documents to be delivered at the Closing.

**11.14** ~~(n)~~ **Counterparts**.   This Agreement may be executed in counterparts, each of which shall be deemed an original, but both of which when taken together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**PURCHASER:**

_____

By: _____

Its: _____

**SELLER:**

SALEM POINTE CAPITAL, LLC

By: _____
    Gary M. Murphey, Chapter 11 Trustee

*[Different first page setting changed from on in original to off in modified.].*

16

*[Different first page setting changed from on in original to off in modified.].*

## SCHEDULE 1.1 – DEFINED TERMS

For purposes of this Agreement, the following terms shall be defined as follows:

- "Actions" means any claim, hearing, charge, action, suit, arbitration, litigation, mediation, grievance, audit, examination, inquiry, proceeding or investigation by or before any Governmental Entity.

- "Agreement" has the meaning set forth in the Preamble.

- "Approval Order" has the meaning set forth in Section 9.2.

- "Assignment of Right" means that Assignment of Right to Purchase Real Property executed between Debtor and Salem Pointe Capital Partners dated May 18, 2015 and document recorded with the Monroe County Register of Deeds, BK/PG: M283/370-382.

- "Assumed Contracts and Leases" has the meaning set forth in the Recitals.

- "Bankruptcy Case" mans the case styled, *In re: Salem Pointe Capital, LLC;* Bank. Case No. 3:24-bk-31702-SHB pending in the United States Bankruptcy Court for the Eastern District of Tennessee – Knoxville Division.

- "Bankruptcy Code" means title 11 of the United States Code.

- "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Tennessee.

- ~~"Bidding Procedures Order" means the Bankruptcy Court's Order [_____] [Dkt. ___] entered on _____ by the Bankruptcy Court.~~

- "Business" has the meaning set forth in the Recitals.

- "Closing" has the meaning set forth in Section 4.

- "Closing Date" has the meaning set forth in Section 4.

- "Contracts and Leases" has the meaning set forth in the Recitals.

- "Cure Costs" means, with respect to any executory contract, the amount required to be paid under Section 365 of the Bankruptcy Code to effectuate the assumption and assignment of such executory contract by the Seller to the Purchaser, as determined by the agreement of the parties to such executory contractor by order of the Bankruptcy Court.

- "Earnest Money Deposit" has the meaning set forth in Section 3.3.

- "Environmental Laws" means any and all applicable laws which (i) regulate or related to the protection or clean-up of the environment, the use, treatment, storage, transportation,

*[Different first page setting changed from on in original to off in modified.].*

17

*[Different first page setting changed from on in original to off in modified.].*

<span style="color:blue">DRAFT</span>

handling disposal or release of Hazardous Substances, the preservation or protection of waterways, groundwater, drinking water, air, wildlife, plants or other natural resources or the health and safety of persons or property, including protection of the health and safety of employees or (ii) impose liability or responsibility with respect to any of the foregoing, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601, *et seq.*), or any other law of similar effect.

- "Excluded Assets" has the meaning set forth in Section 2.3.

- "Excluded Liabilities" has the meaning set forth in Section 2.5.

- "Government Authorization" means all applications, consents, approvals, licenses, permits, franchises, filings or authorizations, including certificates of occupancy.

- "Governmental Entity" means any public or governmental entity, department, bureau, commission, agency, and similar bodies or authorities.

- "Hazardous Substances" means any noxious, toxic, or hazardous substance, material or waste, and any contaminant, chemicals, pollutant or constituent thereof including petroleum, or petroleum products, asbestos or any asbestos containing material, or lead containing paint or coating material.

- "Indebtedness" means with respect to any persons, all obligations for borrowed monies.

- "Intangible Rights" has the meaning set forth in Section 2.2(a).

- "Inventory" has the meaning set forth in Section 2.2(e).

- "Laws" means any law—including common law, statute, requirement, code, rule, regulation, order, ordinance, judgment or decree or other pronouncement of any Governmental Entity.

- "Lien" or "Liens" means liens, security interests, pledges, charges and encumbrances of any kind, character or description whatsoever.

- "Management Company" has the meaning set forth in the Recitals.

- "Management Contract" has the meaning set forth in the Recitals.

- "Master Declaration" means the Master Declaration of Covenants, Conditions, and Restrictions for Rarity Bay, recorded on October 14, 1998 in Loudon County Register's Office in Trust Book 444, Page 248 (the "Master Declaration"), and all amendments and supplements thereto.

- "Material Adverse Change" means any state of facts, change, event, effect or occurrence that has, or reasonably expected to have, a material adverse effect on the business, financial condition or results of operation of the Seller taken as a whole, other than any state of facts,

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

DRAFT

change, event, effect or occurrence resulting from (i) economic, financial market or geopolitical conditions in general, (ii) changes in law or applicable accounting regulations or principles or interpretations thereof, (iii) any outbreak or escalation of hostilities, war or any act of terrorism (iv) any weather condition, earthquake or natural disaster, (v) epidemic, pandemic or disease outbreak, public health emergencies as declared by an applicable Governmental Authority or quarantine restrictions implemented by any applicable Governmental Authority, whether negatively affecting the Business specifically or negatively affecting economic conditions generally (vi) the execution of this Agreement, the announcement of this Agreement and the Transaction, (vii) actions taken or consented to by Purchaser pursuant to this Agreement and (viii) Seller's status as a debtor in bankruptcy and ordinary course of typical events taking place in Chapter 11 Bankruptcy Cases including the Bankruptcy Case, other than pending litigation or pending claims.

- "Proposed Transaction" means the terms and conditions set forth in this Agreement, the Purchaser's desire to purchase from Seller and Seller's desire to sell to Purchaser.

- "Purchase Price" has the meaning set forth in Section 3.1.

- "Purchased Assets" has the meaning set forth in the Recitals.

- "Purchaser" has the meaning set forth in the Preamble.

- "Real Property" has the meaning set forth in the Recitals and Schedule 2.2(c).

- "Sale Procedures Order" means the *Order: (I) Approving Sale Procedures; (II) Scheduling a Sale Approval Hearing; (III) Approving the Form of Notices of the Motion to Sell and Sale Approval Hearing and Objection Deadline; (IV) Approving Procedures and Notice to Establish Certain Cure Amounts For Executory Contracts and Unexpired Leases that may be Assumed and Assigned,* entered by the Bankruptcy Court on _____, 2026, at Dkt. ____.

- "Tax" or "Taxes" means any and all U.S. federal, state, local assessments, levies, duties, tariffs, imposts and other similar charges and fees imposed by any Governmental Entity, including income, franchise, windfall or other profits, gross receipts, property, sales, use, net worth, payroll, employment, social security, workers' compensation, unemployment compensation, excise, withholding, ad valorem, stamp, transfer, value-added, occupation, environmental, disability, real property, personal property, registration, alternative or add-on minimum, or estimated tax, including any interest, penalty, additions to tax and any additional amounts imposed with respect thereto.

- "Tax Return" means any report, return, certificate, claim for refund, election, estimated Tax filing or declaration filed or required to be filed with any Governmental Entity with respect to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

- "Taxing Authority" means any federal, state, local or foreign Governmental Entity or authority responsible for the imposition, collection or administration of any Tax.

*[Different first page setting changed from on in original to off in modified.].*

19

*[Different first page setting changed from on in original to off in modified.].*

- "Transferred Employees" means each employee with respect to whom the Purchaser is willing to offer employment and such employee has accepted such employment extended by the Purchaser.

- "Trustee" has the meaning set forth in the Recitals.

- "Vacant Land" has the meaning set forth in the Recitals, Section 2.2(h) and Schedule 2.2(h).

*[Different first page setting changed from on in original to off in modified.].*

DRAFT

## SCHEDULE 2.2(a) – INTANGIBLE RIGHTS

- Website:  https://raritybayliving.com;

- All social media accounts;

- All logos, trademarks and intellectual property;

- All member lists;

- All computer software licenses;

- All business licenses; and

- All business records.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

DRAFT

## SCHEDULE 2.2(c) – REAL PROPERTY EXCLUDING VACANT LAND ON SCHEDULE 2.2(h)

- Loudon County Golf Course Property: Approx. 36.91 acres;
  - Parcel ID: 078   05201 000
    - Rarity Bay Parkway

- Monroe County Golf Course Property: Approx. 165.68 acres; and
  - Parcel ID: 019   06506 000
    - 403 Rarity Bay Parkway, land
  - Parcel ID: 019   06506 001
    - 403 Rarity Bay Parkway, main clubhouse
  - Parcel ID: 019   06506 002
    - 403 Rarity Bay Parkway, enrichment center (snack bar, pool, locker room)

- Any and all right, title, and interest of Seller in and to any real property located in Monroe County or Loudon County, Tennessee, that is not otherwise identified above or in Schedule 2.2(h).

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

DRAFT

## SCHEDULE 2.2(d) – FIXED TANGIBLE ASSETS

- Lounge and corresponding furniture and fixtures;

- Restaurant and corresponding furniture and fixtures;

- Kitchen and corresponding furniture and fixtures;

- Swimming Pool and corresponding equipment, furniture and fixtures;

- Outdoor walkway/trails and corresponding furniture and fixtures;

- Seventeen Televisions;

- Fitness Equipment (26 pieces of Equipment);

- Golf Clubhouse's corresponding furniture and fixture;

- Pro Shop's corresponding fixtures;

- All equipment and materials used on the golf course;

- All equipment located and used on tennis courts;

- All equipment located at and used on pickleball courts;

- Toro Golf Equipment;

- All cleaning supplies; and

- All office furniture, fixtures, supplies and equipment

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

DRAFT

## SCHEDULE 2.2(e) – INVENTORY

- Raw Materials including food.

- Alcohol and beverages.

- Merchandise in Pro Shop.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

DRAFT

## SCHEDULE 2.2(h) – VACANT LAND

- Unplatted Excess Land:

  o Rarity Bay Pkwy. – Near 13th Hole: Approx. 3.34 acres;
    - Parcel ID: 078    05203 000
  o Rarity Bay Pkwy. – Near Gate House:  Approx. 11.2 acres;
    - Parcel ID: 019    06500 000
  o 288 Keeble Road and Maintenance Building located on property;
    - Parcel IDs:
      - 019    06505 000, land
      - 019    06505 001, maintenance buildings
  o Real Property Located at Turnstone Lane:  Approx. 10.82 acres; and
    - Parcel IDs:
      - 019L B 00500 000 – deed allegedly executed, but not recorded
      - 019L B 00600 000 – deed allegedly executed, but not recorded
      - 019L B 00700 000 – deed allegedly executed, but not recorded
      - 019L B 00800 000 – deed allegedly executed, but not recorded
      - 019L D 00100 000
      - 019L D 00200 000
      - 019L D 00300 000
      - 019L D 00400 000
      - 019L D 00500 000
      - 019L D 00600 000
      - 019L D 00700 000
      - 019L D 00800 000
      - 019L D 00900 000
      - 019L D 01000 000
      - 019L D 01100 000
      - 019L D 01200 000
      - 019L D 01300 000
      - 019L D 01400 000
      - 019L D 01500 000
      - 019L D 01600 000
      - 019L D 01700 000
      - 019L D 01800 000
      - 019L D 01900 000
      - 019L D 02000 000
      - 019L D 02100 000
      - 019L D 02200 000
      - 019L D 02300 000
      - 019L D 02400 000
      - 019L D 02500 000

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

DRAFT

- 019L D 02600 000
- 019L D 02700 000
- 019L D 02800 000
- 019L D 02900 000
- 019L D 03000 000
- 019L D 03100 000
- 019L D 03200 000
- 019L D 03300 000
- 019L D 03400 000
- 019L D 03500 000
- 019L D 03600 000
- 019L D 03700 000
- 019L D 03800 000
- 019L D 03900 000
- 019L D 04000 000
- 019L D 04100 000
- 019L D 04200 000
- 019L D 04300 000
- 019L D 04400 000
- 019L D 04500 000
- 019L D 04600 000
- 019L D 04700 000
- 019L D 04800 000
- 019L D 04900 000
- 019L D 05000 000
- 019L D 05100 000
- 019L D 05200 000
- 019L D 05300 000
- 019L D 05400 000
- o Real Property Located at Shearwater Drive: Approx. 1.79 acres
  - ▪ Parcel IDs:
    - 019L C 00100 000
    - 019L C 00101 000
    - 019L C 00200 000
    - 019L C 00201 000
    - 019L C 00300 000
    - 019L C 00301 000
    - 019L C 00400 000
    - 019L C 00500 000
- o Real Property Located at Osprey Circle: Approx. 0.48 acres
  - ▪ Parcel IDs:
    - 019E A 05700 000

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

DRAFT

- 019E A 06000 000


- Platted Lots:

  o 949 Rarity Bay Pkwy.;
    - Parcel ID: 078I B 00500 000
  o 969 Rarity Bay Pkwy.;
    - Parcel ID: 078I B 00600 000
  o 125 Mallard Dr.;
    - Parcel ID: 078H B 00300 000
  o 155 Hummingbird Dr.;
    - Parcel ID: 078G B 00600 000
  o 175 Hummingbird Dr.;
    - Parcel ID: 078G B 00800 000
  o 295 Hummingbird Dr.;
    - Parcel ID: 078G B 02000 000
  o 747 Wood Duck Dr.;
    - Parcel ID: 019D A 01100 000
  o 751 Wood Duck Dr.;
    - Parcel ID: 019D A 01200 000
  o 755 Wood Duck Dr.; and
    - Parcel ID: 019D A 01300 000
  o 761 Wood Duck Dr.
    - Parcel ID: 019D A 01400 000

- Miscellaneous

  o Golf Course Pump Station

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

## SCHEDULE 2.2(i) – ASSUMED CONTRACTS AND LEASES

- One lease covers 50 2022 E-Z-Go RXV Elite Golf carts with lithium batteries;
- One lease covers the Pace 7EX 7-inch GPS touchscreen and fleet management that provides fleet tracking, geofencing, 3d hole flyover, etc.;
- One lease of an 800XG Hauler; and
- The Management Contract
- Club Membership Contracts

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

## SCHEDULE 2.6 — PERMITTED ENCUMBRANCES

- Master Declaration ~~of Covenants, Conditions, and Restrictions for Rarity Bay and all amendments and supplements thereto; however, Debtor's interest in the Declarant Rights and the right to impose mandatory social memberships are excluded as assets being purchased.~~.

- Assignment of Right ~~to Purchase Real Property executed between Debtor and Salem Pointe Capital Partners dated May 18, 2015 and document recorded with the Monroe County Register of Deeds, BK/PG: M283/370 382.~~.  To clarify, Purchaser has the right to raise or lower social membership initiation fees and/or golf membership initiation fees so long as such fees do not drop below the minimums stated in the Assignment of Right.

- March 1, 2024 Order of the Monroe Chancery Court, Case No. 19943, regarding RBP's rights under the Assignment of Right ~~to Purchase Real Property~~.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

DRAFT

## SCHEDULE 5.3 — LITIGATION

*Taylors v. Salem Pointe Capital, LLC*, adversary proceeding no. 3:25-ap-03005 SHB in U.S Bankruptcy Court for the Eastern District of Tennessee.

50015659.4

51157149.1

*[Different first page setting changed from on in original to off in modified.].*

| Summary report: Litera Compare for Word 11.13.0.54 Document comparison done on 6/24/2026 6:34:47 AM | |
| --- | --- |
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://bassberry.cloudimanage.com/bbs/51157149/1 - SPC Trustee APA submitted on June 17.docx | |
| **Modified DMS:** iw://bassberry.cloudimanage.com/bbs/50015659/4 - SPC Draft APA.doc | |
| **Changes:** | |
| Add | 162 |
| Delete | 143 |
| Move From | 4 |
| Move To | 4 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 313 |

DRAFT

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT ("**Agreement**") is made and entered into as of the _____ day of _____, 2026, by and between _____, a _____ ("**Purchaser**") and Gary Murphey, in his capacity as chapter 11 trustee ("**Trustee**") of Salem Pointe Capital, LLC, a Tennessee limited liability company ("**Seller**" or "**Debtor**").  Purchaser and Seller are collectively referred to hereinafter as the "**Parties**"

## WITNESSETH:

WHEREAS, Seller owns and operates the Rarity Bay Country Club (the "**Business**") and the real property and amenities located at the address commonly known as 403 Rarity Bay Parkway, Vonore, TN 37885 (the "**Real Property**"), The Seller in operating the Business operates The Bay Bistro, the golf course, the golf pro shop, clubhouse, tennis courts, pickleball courts, swimming pools and the community docking facilities all located at the Real Property; and

WHEREAS, Seller owns certain other real property in Monroe and Loudon County, Tennessee, including but not limited to, real property commonly known as lots in Phases 1 – 16 of the Rarity Bay Development, lots listed on Seller's Bankruptcy Schedules (the "**Lots**"), and other real property that is not annexed into or that is adjacent to the Rarity Bay Development (collectively, the "**Vacant Land**"); and

WHEREAS, Seller in the ordinary course of business has entered into and remains obligated under certain executory contracts and unexpired leases of personal property (collectively, the "**Contracts and Leases**").  Seller further manages the Business pursuant to a contract with a golf and country club management company, Hampton Golf, located at 7845 Baymeadows Way, Jacksonville, FL 32256 (the "**Management Company**").  Seller further has entered into a management contract with the Management Company dated the 11th day of February, 2026, which is an executory contract of Seller (the "**Management Contract**").  The Management Contract and Contracts and Leases are to be assumed and assigned to the Purchaser as part of the Proposed Transaction described in this Agreement (collectively, the "**Assumed Contracts and Leases**");

WHEREAS, the Parties hereto, on the terms and conditions set forth in this Agreement, desire to enter into an agreement whereby, among other things, Seller will transfer to Purchaser, and Purchaser will acquire from Seller all of Seller's right, title and interest in, to and under the various assets, property and further described herein as the "**Purchased Assets**," which includes, but is not limited to, the Business, Real Property, Vacant Land, Lots, the Assumed Contracts and Leases, other certain assets associated with the Business operated by Seller, in each instance, free and clear of liens, encumbrances and claims;

WHEREAS, in order to be a member of the Club, a social membership initiation fee must be paid in the current amount of $15,000.00;

1

DRAFT

WHEREAS, the rights of Rarity Bay Partners ("**RBP**") under the Assignment of Right will remain RBP's rights and the Club and Business are being sold subject to RBP's rights thereunder, which is the subject of pending litigation and might or might not be altered by such litigation;

WHEREAS, the Club and the Business are being sold with whatever rights are presently available to impose mandatory social memberships, which are the subject of pending litigation, and which litigation may or may not affect the ongoing viability of some social memberships;

WHEREAS, the Parties acknowledge that in every respect, the proposed transaction herein has been negotiated at arm's length and in good faith and without the intent to hinder, delay or defraud the creditors of the Seller.

NOW, THEREFORE, for and in consideration of the above premises, the mutual covenants hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties do hereby agree as follows:

## 1.    Incorporation of Recitals and Definitions

**1.1**    As used in this Agreement each of the words and phrases that are capitalized and in bold shall have the meaning ascribed to them in Schedule 1.1.

**1.2**    The recitals set forth above are incorporated by this reference.

## 2.    Purchase, Sale and Transfer of the Assets of the Seller.

**2.1**    **Terms of Transfer**.  Subject to the terms and conditions set forth herein, Seller agrees to sell, convey, assign, transfer and deliver to Purchaser and Purchaser agrees to purchase all of Seller's rights, title and interest in and to and under all of the tangible and intangible real and personal property, assets and rights, as set forth below in Section 2.2 as the same exists on the Closing Date excepting only those assets specifically identified as "**Excluded Assets**" in Section 2.3 herein.  All of the Purchased Assets shall be delivered free and clear of any liens, claims, pledges, security interests, mortgages or encumbrances of any kind.  The sale, conveyance, assignment, transfer and delivery of the Purchased Assets shall be effected by bills of sale, deeds, endorsements, assignments, drafts, checks, or other instruments in such reasonable or customary form for a sale of this nature as shall be requested by Purchaser and its counsel and are reasonably satisfactory to Seller and its counsel.

**2.2**    **Purchased Assets** include the following:

**(a)**    All of Seller's right, title and interest in trademarks, trade names, service marks, recipes, formulas, copyrights, methods, licenses, processes and know-how relating to the Business, whether owned, used or licensed by Seller including those trademarks and trade names set forth on Schedule 2.2(a) and the goodwill of the Business as a going concern value (collectively, the "**Intangible Rights**");

2

DRAFT

**(b)**   All of Seller's rights, title and interest in the name "Rarity Bay," "Rarity Bay Country Club," and "Rarity Bay on Tellico Lake" and any associated logos or marks;

**(c)**   All of Seller's rights, title and interest in and to the Real Property as more particularly described in Schedule 2.2(c), including, but not limited to, all buildings, fixtures, appurtenances and other improvements located at the Real Property and maps, reports, plans, easements, access rights, parking spaces, title documents, surveys, construction contracts, warranties, reports, drawings including the drawings that show the information technology, data recording and retrieval, electrical, mechanical, heating, ventilating, air conditioning and plumbing systems that serve the buildings, site plans, as-built plans, permits and other materials having to do with the Real Property and the Business;

**(d)**   All of the fixed and tangible assets owned by Seller and used in the maintenance and operation of the Business, including the machinery, equipment, apparatus, appliances, furniture, fixture, trade fixtures, signage, computers, computer hardware, computer software, information technology systems and servers and any other physical assets including tangible assets listed on Schedule 2.2(d) and located or stored at the Real Property;

**(e)**   All inventory of goods, supplies, fuel, parts, and other tangible assets of every kind, nature and description used, held for use or stored in connection with the Business and related to the assets described on Schedule 2.2(e) (collectively, the "**Inventory**");

**(f)**   All warranties and similar rights in favor of Seller in respect to the Purchased Assets;

**(g)**   Originals, if available, or copies of all member lists and supplier lists to the extend related to the Business and/or the Purchased Assets;

**(h)**   All of Seller's rights, title and interest in and to the lots and to unannexed and/or adjacent land (collectively as the "**Vacant Land**"), as more particularly described in Schedule 2.2(h), together with all tax credits, benefits or incentives or the like that have accrued or are related or incidental to the Vacant Land;

**(i)**   All of Seller's rights and obligations under the Assumed Contracts and Leases as Purchaser may, at least ten (10) days before entry of the Approval Order, elect to assume as set forth on Schedule 2.2(i) (subject to the right to update such schedule to remove any Assumed Contract and Leases then no longer to be assumed).  In each instance, Purchaser shall be obligated to cure any defaults under the Assumed Contracts and Leases, and shall provide adequate assurances of future performance to the extent determined by the Bankruptcy Court; and

**2.3**   **Excluded Assets.**  Purchaser is acquiring from Seller only the Purchased Assets, and the following assets ("**Excluded Assets**") are specifically excluded from the Purchased Assets:

**(a)**   Cash or cash equivalents, including bank accounts and the Purchase Price defined herein;

3

DRAFT

**(b)** Debtor's interest in the Declarant Rights under the Master Declaration;

**(c)** Tax returns and other records which are not directly related to or reasonably necessary to conduct the Business;

**(d)** All utility, security and other deposits and prepaid items;

**(e)** Any tax credits, tax refunds, tax benefits or other benefits relating to periods prior to the Closing Date, which are and shall remain exclusively the property of Seller;

**(f)** All contracts and leases that are not assumed contracts and leases;

**(g)** The Bobcat T740 Compact Track Loaders S/N B3CA22857 and Bobcat E42 T4 Mini Excavator – Compact S/N B4GM16170;

**(h)** All causes of action, demands, judgments, claims, indemnity rights, setoffs, recoupments or other similar rights of Seller including all avoidance or other claims of the Seller of its bankruptcy estate including without limitation those that may exist against Seller's prior management pursuant to any provision of the Bankruptcy Code or pursuant to applicable state law, except for those claims arising under express or implied warranties from suppliers or other third parties with response to the Purchased Assets;

**(i)** All avoidance actions under Chapter 5 of the Bankruptcy Code (including, without limitation, state law claims applicable under Chapter 5), all of which actions are preserved for the Trustee for the benefit of the Bankruptcy Estate.

**2.4    Assumed Liabilities.**  On the terms and subject to the conditions set forth in this Agreement, at the Closing, in consideration for the sale, assignment, conveyance, transfer and delivery of the Purchased Assets to the Purchaser, the Purchaser shall assume from the Seller and agree to pay, perform and discharge when due in accordance with their respective terms and subject to the respective conditions thereof, only the following liabilities and obligations  of the Seller (collectively, the "**Assumed Liabilities**"):

**(a)** All liabilities and obligations arising from the ownership, possession or use of the Purchased Assets and the operation of the Business in each case from and after the Closing;

**(b)** All liabilities and obligations arising under the Management Contract arising after the Closing;

**(c)** All cure costs; and

**(d)** All liabilities and obligations relating to the employment or termination of the Transferred Employees arising after the Closing;

4

Case 3:24-bk-31702-SHB   Doc 1005-3   Filed 06/24/26   Entered 06/24/26 13:49:34
Desc Exhibit C - Asset Purchase Agreement   Page 37 of 62

DRAFT

**(e)**   Liabilities and obligations arising from the litigation listed on Schedule 5.3 – LITIGATION, but only to the extent the litigation results in liabilities and/or obligations: (1) to remedy the alleged nuisance, or (2) to pay the costs of remedying the alleged nuisance; (provided however, any timely filed prepetition damage claim arising from the alleged nuisance will remain an unsecured claim against Seller's bankruptcy estate).

The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any third party against the Purchaser or Seller as compared to the rights and remedies that such third party would have had against Seller absent the Bankruptcy Case, had the Purchaser not assumed such Assumed Liabilities.

**2.5**   **Excluded Liabilities.**   Notwithstanding anything contained in this Agreement to the contrary, Purchaser shall not assume, be obligated to assume, be deemed to have assumed, or be obligated to pay, perform, or otherwise discharge, and the Seller shall be solely and exclusively liable with respect to any liabilities or obligations (or any nature, and whether based on common law or statute or arising under written contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, asserted or unasserted) of the Seller other than the Assumed Liabilities (such liabilities and obligations other than Assumed Liabilities are the "**Excluded Liabilities**").   Without limiting the foregoing, Purchaser does not assume or agree to pay, perform or otherwise discharge the liabilities or obligations (whether known or unknown, fixed or contingent, accrued or unaccrued, liquated or unliquidated, asserted or unasserted) of the Seller with respect to, arising out of or relating to, the following Excluded Liabilities:

**(a)**   Except as otherwise expressly set forth in this Agreement, any liability arising out of facts or circumstances in existence prior to the Closing and from or related to any breach, default under, failure to perform, torts related to the performance of, violations of law, infringements or indemnities under, guaranties pursuant to and overcharges, underpayments or penalties on the party of the Seller under any contract, agreement, arrangements or understanding to which Seller are a party prior to the Closing;

**(b)**   Except as other expressly set forth in this Agreement, any liability arising from or related to any action against Seller, or related to the Business, the Purchased Assets or the Assumed Liabilities, pending or threatened or based on facts, actions, omissions, circumstances or conditions existing, occurring or accruing before the Closing including, but not limited to, any alleged claim by Bald Eagle Ventures, LLC or BEP Rarity Bay, LLC (collectively, "BEP") as to only the Debtor, provided however, this is not intended to affect any right of  BEP to seek or increase its unsecured indemnification claim against Debtor in the Bankruptcy Case;

**(c)**   All Indebtedness of the Seller (other than any obligations under the Management Contract).

**(d)**   All guarantees of third party Indebtedness made by the Seller and reimbursement obligation to guarantor of the Seller's obligations or under letters of credit or similar agreements or instruments.

5

DRAFT

**(e)**   All liabilities or obligations to any current or former owner of equity interests of the Seller, any current or former holder of indebtedness for borrowed money of the Seller or in respect of obligations for indemnification or advance of expenses, any current or former officer or director of the Seller;

**(f)**   All drafts or checks outstanding at the Closing under which the Seller is obligated;

**(g)**   All liabilities or obligations relating to the ownership, possession or use of the Excluded Assets;

**(h)**   All fees, charges, expenditures, and costs incurred or otherwise payable by the Seller in connection with the administration of the Bankruptcy Case, including the fees and expenses of financial advisors, accountants and legal counsel, whether incurred, accrued or payable on, prior to, or after the date of this Agreement or the Closing;

**(i)**   All liabilities or obligations under Environmental Laws to the extent relating to (1) the transportation, off-site storage or off-site disposal of any hazardous substances generated by or on behalf of the Seller on or before the Closing or (2) property not acquired under this Agreement, including any real property formerly owned, operated or leased by Seller prior to the Closing and for toxic torts arising as a result of or in connection with loss of life or injury to Persons whether or not such loss or injury was made manifest on or after the Closing;

**(j)**   All intercompany accounts payable, liabilities and obligations that are owed or payable to Seller as to which Seller is an obligor or is otherwise responsible or liable, only to the extent that there are any affiliated, parent or subsidiary companies.

**2.6**   **Permitted Encumbrances.**   All liens and encumbrances on or relating to the permitted encumbrances listed on Schedule 2.6 are preserved in full, are not released, discharged, avoided, stripped, subordinated, or otherwise affected by this Agreement, the Approval Order, and the consummation of the transactions herein, and shall continue to attach  as permitted encumbrances to the same extent, validity, priority, and enforceability as existed immediately prior to the Closing.

**2.7**   **Method of Conveyance.**   The sale, transfer, conveyance, assignment and delivery by Seller of the Purchased Assets shall occur at the Closing by Seller's execution and delivery to Purchaser of one or more bills of sale, assignments, and special warranty deeds in the form and scope reasonably satisfactory to Purchaser in a transaction of this nature.  At the Closing, Seller shall transfer, assign convey and deliver good, valid and indefeasible title to the Purchased Assets free and clear of all liens, encumbrances and claims.

**2.8**   **Reservation of Certain Rights and Obligations in Pending Litigation.**   No provision in this Agreement is intended to affect the rights or obligations of parties in any pending litigation, unless specifically stated herein; provided however, consummation of the Sale contemplated by this Agreement may affect obligations of Debtor to provide a remedy in certain pending litigation.

DRAFT

3.      **Consideration**.

      **3.1      Purchase Price**.      The purchase price is _____ ("**Purchase Price**").

      **3.2      Payment of Purchase Price**.   Purchaser shall pay the Purchase Price to Seller, in cash, certified funds or wire transfer, at the option of Seller, at the Closing.

      **3.3      Earnest Money Deposit**.   Purchaser shall pay an Earnest Money Deposit of $500,000, which shall be held in escrow by Trustee's counsel and credited against the Purchase Price (or any successful bid by Purchaser at the Auction) at closing. In the event Purchaser is outbid at the Auction for the Property (such that Purchaser is not the Successful Bidder or Back-Up Bidder at the Auction), the Earnest Money Deposit shall be refunded no later than the earlier of: (a) three (3) business days following the entry of the Sale Approval Order, or (b) ten (10) business days following the end of the Auction.

4.      **Closing**.  The closing ("**Closing**") of the sale contemplated herein shall take place at Bass, Berry & Sims located at 900 S. Gay Street, Suite 1700, Knoxville, Tennessee 37902 at 9:00 a.m. Eastern Time on _____, 2026; provided, however, that if the Closing does not take place on such date it shall take place on the date following the date on which all conditions precedent to the Closing have been met or on such other date ("**Closing Date**"), at such other place, or at such other time as the parties may mutually agree upon.   The transactions contemplated by this Agreement shall be effective as of the close of business on the Closing Date.

      **4.1      Prorations and Adjustments.**  Purchaser and Seller agree that the following items shall be prorated with the Seller to be responsible for the same through and including the Closing Date and Purchaser to be responsible for the same after the Closing Date:

      **(a)**   All real and personal property taxes and assessments related to the Purchased Assets, provided however, that if the amount of taxes or assessments for the year in which Closing occurs is unknown at the time of Closing, such taxes or assessments shall be prorated based on the rate and valuation shown on the prior year's tax bill.  The Parties shall, promptly upon request of either Party, reprobate taxes and assessments when the figures for the year in which Closing occurs is known; and

      **(b)**   Any charges for water, electric, oil, gas, telephone and other utilities.

      **4.2      Utilities**. Seller shall cause any and all services for water, electric, oil, gas, telephone and any other utilities to take a final reading in respect of the Business as of the Closing to cause the charges therefor incurred through the Closing to be paid by Seller and to notify such utilities to transfer such services to Purchaser from and after the Closing without interruption of service.

7

**4.3** **Expenses**.  Purchaser shall be solely liable for and shall pay on the Closing Date all documentary or transfer taxes recording charges and similar taxes and charges with respect to the transfer of the Purchased Assets as well as the cost of recording all curative title documents.  Each Party shall be responsible for its own attorneys' fees and costs.

**5.** **Representations and Warranties of Seller**.  Seller hereby represents, warrants, and agrees as follows:

**5.1** **Title to Tangible Property; Absence of Liens**.  To the best of Seller's knowledge, but without warranty or representation, Seller is the owner of and has good and marketable title to the Purchased Assets to be transferred hereunder, after entry of the Sale Approval Order, free and clear of all liens, restrictions, pledges, mortgages, security interests, conditional sales agreements, charges, prior assignments or leases, and encumbrances of any kind.

**5.2** **Brokerage**.  Except for CBRE being entitled to commissions per approval of the Bankruptcy Court, no third party shall be entitled to receive any brokerage commissions, finder's fees, fees for financial advisory services or similar compensation in connection with the transactions contemplated by this Agreement for which Purchaser could become liable based on any arrangement or agreement made by or on behalf of Seller.

**5.3** **Litigation.**  Other than as disclosed on Schedule 5.3, there is no litigation, proceeding or investigation pending, or to the best of Seller's knowledge, threatened, nor is there any basis known to Seller for any litigation, proceeding  or investigation against Seller or relating to the Purchased Assets which would (i) affect the title of Seller to the Purchased Assets, (ii) affect Seller's right to convey the Purchased Assets, (iii) adversely impair or affect in any way the use and enjoyment of the Purchased Assets, or (iv) question the validity of any action to be taken pursuant to or in connection with this Agreement.

**5.4** **Organization; Good Standing.**  Subject to entry of the Approval Order, Seller has the full power and authority, corporate or otherwise, to enter into this Agreement, to carry out its obligations hereunder and to consummate the respective transactions contemplated to be consummated hereunder.  The execution, delivery and consummation of this Agreement has been duly and validly authorized by Seller.

**5.5** **Authorization.**  Subject to the entry of the Approval Order, this Agreement constitutes a valid and binding obligation of Seller enforceable in accordance with its terms.

**5.6** **Non-contravention.**  Except as otherwise contemplated this Agreement, Seller's execution and delivery of this Agreement and compliance with and fulfillment of the terms of this Agreement do not (1) violate or conflict with any of the terms, conditions or provisions of any organization documents of Seller; (2) violate any

8

DRAFT

Laws applicable to Seller or (3) materially impair the Purchaser's ability to operate the Business.

**5.7    Title to Purchased Assets.** To the best of Seller's knowledge, but without warranty or representation, Seller has good and valid legal title and beneficial ownership to the Purchased Assets.  At Closing and pursuant to the Approval Order, the Seller shall convey to Purchaser good, valid, marketable, and insurable title to the Purchased Assets free and clear of all liens, encumbrances and claims pursuant to Section 363(b), 363(f) and 365 of the Bankruptcy Code. Seller will obtain and provide to Purchaser copies of the documents evidencing transfer of the ownership to Debtor of the four properties listed on Schedule 2.2(h) identified as "deed executed, but not recorded."

**5.8    Condition of Purchased Assets.**  All of the Purchased Assets are being sold "AS IS," "WHERE IS" WITH ALL FAULTS AND WITHOUT ANY REPRESENTATION OR WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EXCEPT AS EXPRESSLY SET FORTH HEREIN. IN ADDITION, THE EXISTENCE OF PENDING LITIGATION HAS BEEN DISCLOSED TO PURCHASER, THE RESULTS OF WHICH COULD AFFECT MANDATORY SOCIAL MEMBERSHIP INITIATION FEES AND/OR THE EXISTENCE OF SOME SOCIAL MEMBERSHIPS.

**5.9    Governmental Authorizations.**   To Seller's knowledge, Seller has all material Governmental Authorizations that are required in connection with the operation of the Business as presently conducted.

**5.10    Contracts.** To Seller's knowledge, true and correct originals or, where originals are not available, copies of all material contracts and agreements of Seller relating to the Purchased Assets have been made available by Seller to Purchaser or will be made available to Purchaser within a reasonable time after a request from the Purchaser.  Seller shall disclose to Purchaser the Seller's good faith estimate of the Cure Costs.

**5.11    Compliance with Laws.**   Except as previously disclosed to Purchaser, the Debtor has been in material compliance with any Laws applicable to it or the Business.

**5.12    Real Property and Vacant Land.**   Seller has not been informed or received any notice of any condemnation proceeding involving the Real Property or Vacant Land; there are no parties with a right of occupancy to the Real Property or Vacant Land other than Seller, and there are no parties other than Seller in possession of the Real Property or Vacant Land.

**5.13    Environmental Matters.** To Seller's knowledge, in its operation of the Business, the Debtor has materially complied with all Environmental Laws applicable to it, has not discharged any Hazardous Substances and has not used any above ground storage tanks or underground storage tanks.

9

DRAFT

**5.14   Labor Relations Matters.**  To Seller's knowledge with respect to the Business the Debtor is not a party to any collective bargaining agreement and has no relationship with any labor organization; to the knowledge of Seller, no labor organization has filed any representation position or made any oral or written demand for recognition; and to the knowledge of Seller, no union organizing efforts are underway of threatened.

**5.15   Taxes.**  To Seller's knowledge, all material Tax Returns required to be filed with respect to the Business, the Purchased Assets and Assumed Liabilities have been timely filed with the appropriate Taxing Authority in all jurisdictions in which such Tax Returns are required to be filed (after giving effect to any valid extensions of time in which to make such filings), and all such Tax Returns are true, complete and correct in all material respects; and all material amounts of Taxes payable with respect to the Business, the Purchased Assets and Assumed Liabilities have been timely paid.

**6.      Representations and Warranties of Purchaser**.   Purchaser represents and warrants as follows:

**6.1   Organization; Good Standing.**  Purchaser has all power and authority to enter and perform its obligations under this Agreement and to consummate the Proposed Transaction.

**6.2   Authorization.**  The execution, delivery and performance of this Agreement have been duly authorized by the partners of the Purchaser and no further authorization, approval or consent is required.  This Agreement constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms.

**6.3   Non-contravention.**   Except as otherwise contemplated this Agreement, Purchaser's execution and delivery of this Agreement and compliance with and fulfillment of the terms of this Agreement do not (1) require any authorization, consent, approval, exemptions or other action by or notice to any governmental or other entity, or conflict with or result in a breach of the terms, conditions or provision of any applicable Articles of Incorporation or Bylaws of Purchaser, or any contract to which Purchaser is a party, or (2) constitute a default, or result in creation of any lien, security interest, charge or encumbrance upon the Purchased Assets.

**6.4   Litigation**.   There is no litigation, proceeding or investigation pending, or to the best of Purchaser's knowledge, threatened, nor is there any basis known to Purchaser for any litigation, proceeding or investigation against Purchaser asserting Purchaser's inability to enter into the transactions contemplated by this Agreement.

Case 3:24-bk-31702-SHB   Doc 1005-3   Filed 06/24/26   Entered 06/24/26 13:49:34
Desc Exhibit C - Asset Purchase Agreement   Page 43 of 62

DRAFT

**7.** **Conditions Precedent to Seller's Obligations**.  All obligations of Seller under this Agreement are subject to the fulfillment, prior to Closing, of each of the following conditions:

**7.1** **Bankruptcy Court Approval.**  The transactions involving the Seller contemplated by this Agreement shall be approved by the Bankruptcy Court as described in Section 9 herein, and the Approval Order, as hereinafter defined, shall be in full force and effect and shall not have been stayed by the Bankruptcy Court or any court of competent jurisdiction.

**7.2** **Form of Documents**.  The form of all documents required to be delivered to Seller hereunder shall be approved by counsel for Seller and there shall have been furnished to such counsel by Purchaser such corporate and other records, certificates of officers of Purchaser and other information as such counsel may reasonably request.

**7.3** **No Material Adverse Change.**  No Material Adverse Change shall have occurred between the Execution Date and Closing.

**7.4** **Adverse Proceedings.**  No action or proceeding by or before any court or Governmental Entity shall have been instituted by any court or Governmental Entity whatsoever which shall seek to restrain, prohibit or invalidate the transaction contemplated by this Agreement or which is likely to affect the right of the Purchaser to own or use the Purchased Assets after the Closing Date.

**7.5** **Receipt of Purchase Price**.  Seller shall receive at Closing the Purchase Price.

**8.** **Conditions Precedent to Purchaser's Obligations.**  All obligations of Purchaser under this Agreement are subject to the fulfillment, prior to Closing, of each of the following conditions:

**8.1** **Bankruptcy Court Approval.**  The transactions involving the Seller contemplated by this Agreement shall be approved by the Bankruptcy Court as described in Section 9 herein, and the Approval Order, as hereinafter defined, shall be in full force and effect and shall not have been stayed by the Bankruptcy Court or any court of competent jurisdiction.

**8.2** **Form of Documents**.  The form of all documents required to be delivered to Seller hereunder shall be approved by counsel for Seller and there shall have been furnished to such counsel by Purchaser such corporate and other records, certificates of officers of Purchaser and other information as such counsel may reasonably request.

**8.3** **No Material Adverse Change.**  No Material Adverse Change shall have occurred between the Execution Date and Closing.

11

DRAFT

**8.4**   **Closing Deliveries.**  The Purchaser shall have received at or prior to the Closing Date each of the following documents:

**(a)**   The Approval Order, in form and substance reasonably acceptable to the Purchaser and its counsel;

**(b)**   A bill of sale and assignment agreement executed and acknowledged by the Seller, in the form reasonably acceptable to the Purchaser, with respect to the Purchased Assets;

**(c)**   An assignment agreement executed by Seller assigning its rights to Purchaser in and to the Intangible Rights;

**(d)**   Special warranty deed in a form reasonably acceptable to Purchaser and its counsel conveying fee simple title to the Real Property and the Vacant Land to Purchaser or its designee;

**(e)**   A closing statement in form and content reasonably acceptable to the Purchaser; and,

**(f)**   Possession of all of the Purchased Assets including, but not limited to, keys to the Real Property and keys to any buildings or amenities located on the Real Property or the Vacant Land and all computers, software and/or document access codes.

**9.**   **Bankruptcy Court Approval.**

**9.1**   **The Agreement.**  Execution of this Agreement by Purchaser shall constitute Purchaser's bid for the Purchased Assets.

**9.2**   **Approval Order.**  Seller has filed a motion (the "**Sale Motion**") with the Bankruptcy Court seeking approval of the Proposed Transaction.  It is a material inducement to Purchaser to be able to acquire the Purchased Assets pursuant to the provisions of Section 363 of the Bankruptcy Code, including in particular free and clear of all liens, encumbrances and claims pursuant to Section 363(f) of the Bankruptcy Code.  Therefore, any and all obligations of the Purchaser pursuant to this Agreement are subject to the entry of an Order of the Bankruptcy Court (the "**Approval Order**"), in form reasonably satisfactory to the Purchaser, approving this Agreement and the Proposed Transaction, and ordering, finding and concluding that among other things, (1) notice of the sale Motion and Proposed Transaction was proper and sufficient to all parties entitled to such notice; (2) the sale of the Purchased Assets to the Purchaser is approved pursuant to Section 363(b) of the Bankruptcy Code;  (3) the assumption and assignment of the Management Contract; (4) the sale of the Purchased Assets to the Purchaser pursuant to this Agreement will be free and clear of all liens, encumbrances and claims pursuant to Section 363(f) of the Bankruptcy Code with the Liens, if any, to attached the Purchase Price or proceeds of the sale; (5) Purchaser has acted in good faith within the context of and is entitled to the protections of Section 363(m) of the Bankruptcy Code; and (6) authorizing and approving this Agreement as the highest and best offer for the Purchased Assets.

12

DRAFT

**9.3    Appeal/Reconsideration.**  If an appeal is taken, or a stay pending appeal is requested or reconsideration sought, from any order approving bid procedures in connection herewith, the Approval Order, then Seller will immediately notify Purchaser of such appeal, stay or reconsideration and will provide to Purchaser within one (1) business day a copy of the related notice of appeal, order of stay or motion for reconsideration.  Seller will also provide Purchaser with written notice and copies of any other or further notice of appeal, motion or application filed in connection with any appeal form, or application for reconsideration of, any of such orders and related briefs.

**9.4    Bidding Procedures and Order.**  The purchase and sale of the Purchased Assets will be subject to competitive bidding in accordance with the terms of the Sale Procedures Order, which sets forth several procedures and requirements for participation in the sale process.

## 10.    Termination.

**10.1    Termination of this Agreement.**    This Agreement may be terminated and the transactions contemplated hereby may be abandoned:

**(a)**    By mutual written consent of the Purchaser and Seller;

**(b)**    By Purchaser if there shall occur a material breach of any of the representations, warranties, covenants or agreements of the Seller, provided however that Purchaser agrees to provide notice thereof and a right to cure any such breach within ten (10) business days thereafter;

**(c)**    By Purchaser if the Bankruptcy Case is converted for cause under Chapter 7 of the Bankruptcy Code;

**(d)**    By Seller if there shall occur a material breach of any of the representations, warranties, covenants or agreements of Purchaser, provided however that Seller agree to provide notice thereof and a right to cure any such breach within ten (10) business days thereafter; and

**(e)**    By either party if the Sale Closing has not occurred within twenty (20) business days after entry of the Approval Order.

**10.2    Effect of Termination.**  If the Agreement is terminated pursuant to Section 10.1 then this Agreement will become void and of no further force and effect, with no liability or obligation on the part of the Parties.

## 11.    Miscellaneous.

**11.1    Amendments**.  This Agreement may be amended or modified, only by a written instrument executed by Purchaser and Seller or their respective duly authorized officers or representatives.

13

DRAFT

**11.2    Parties Bound**.  This Agreement shall be binding upon and shall inure to the benefit of Seller and Purchaser and their respective successors and permitted assigns.

**11.3    Waivers**.  Investigations or examinations made by any party, its counsel, accountants, employees or representatives and information obtained as a result hereof shall not constitute a waiver of any representation, warranty, obligations, covenants or agreements of the other party.

**11.4    Notices**.    Any notices or other communications required or permitted hereunder shall be in writing and shall be considered to have been duly given, when received, if delivered by hand, email, facsimile or private courier:

**(a)**    If to Seller, to:

> Gary Murphey, in his capacity as chapter 11 trustee
> Resurgence Financial Services, LLC
> 3330 Cumberland Blvd., Suite 500
> Atlanta, GA 30339
> Email:  Murphey@rfslimited.com

With a Copy (which shall not constitute notice) to:

> Paul Jennings, Esq.
> Bass, Berry & Sims PLC
> 21 Platform Way South, Suite 3500
> Nashville, TN 37203
> Email:  pjennings@bassberry.com

**(b)**    If to Purchaser, to

With a Copy (which shall not constitute notice) to:

**11.5    Severability**.  The invalidity or unenforceability of any part of this Agreement, for any reason, shall not prejudice or affect the validity or enforceability of the remainder, and in such event the parties hereto shall use their best efforts to agree upon a replacement for such invalid or unenforceable provision in terms which correspond as closely as possible to the original provision.

**11.6    Entire Agreement**.    This Agreement sets forth the entire understanding of the parties with respect to the subject matter hereof, and any previous agreements or understanding between the parties regarding the subject matter hereof, whether oral or written, are merged into and superseded by this Agreement.

Case 3:24-bk-31702-SHB   Doc 1005-3   Filed 06/24/26   Entered 06/24/26 13:49:34
Desc Exhibit C - Asset Purchase Agreement   Page 47 of 62

DRAFT

**11.7   Additional Documents.**  After the Closing Date, each Party shall, at the request of any other, furnish, execute and deliver such documents and instruments as the requesting Party shall reasonably require as necessary or desirable to carry out the transactions contemplated hereunder.

**11.8   Headings**.  The headings of the sections of this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement.

**11.9   Incorporation of Schedules**.  Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

**11.10 Rights Cumulative**.  All rights and remedies of each of the parties under this Agreement will be cumulative, and the exercise of one or more rights or remedies will not preclude the exercise of any other right or remedy available under this Agreement or applicable law.

**11.11 Time is of the Essence**.  Time is of the essence of each provision hereof.

**11.12 Governing Law**.  This Agreement shall be governed by and interpreted and construed in accordance with the laws of the State of Tennessee without regard to rules or laws of conflicts of law.

**11.13 Further Assurances**.  From and after the Closing, the Parties agree to execute and deliver such additional documents, agreements, notices, acknowledgments and other instruments as are reasonably necessary or required to effectuate the intent and purpose of this Agreement and the documents to be delivered at the Closing.

**11.14 Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but both of which when taken together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**PURCHASER:**

_____

By: _____

Its: _____

15

DRAFT

**SELLER:**

SALEM POINTE CAPITAL, LLC

By: _____
Gary M. Murphey, Chapter 11 Trustee

16

DRAFT

## SCHEDULE 1.1 – DEFINED TERMS

For purposes of this Agreement, the following terms shall be defined as follows:

- "Actions" means any claim, hearing, charge, action, suit, arbitration, litigation, mediation, grievance, audit, examination, inquiry, proceeding or investigation by or before any Governmental Entity.

- "Agreement" has the meaning set forth in the Preamble.

- "Approval Order" has the meaning set forth in Section 9.2.

- "Assignment of Right" means that Assignment of Right to Purchase Real Property executed between Debtor and Salem Pointe Capital Partners dated May 18, 2015 and document recorded with the Monroe County Register of Deeds, BK/PG: M283/370-382.

- "Assumed Contracts and Leases" has the meaning set forth in the Recitals.

- "Bankruptcy Case" mans the case styled, *In re: Salem Pointe Capital, LLC;* Bank. Case No. 3:24-bk-31702-SHB pending in the United States Bankruptcy Court for the Eastern District of Tennessee – Knoxville Division.

- "Bankruptcy Code" means title 11 of the United States Code.

- "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Tennessee.

- "Business" has the meaning set forth in the Recitals.

- "Closing" has the meaning set forth in Section 4.

- "Closing Date" has the meaning set forth in Section 4.

- "Contracts and Leases" has the meaning set forth in the Recitals.

- "Cure Costs" means, with respect to any executory contract, the amount required to be paid under Section 365 of the Bankruptcy Code to effectuate the assumption and assignment of such executory contract by the Seller to the Purchaser, as determined by the agreement of the parties to such executory contractor by order of the Bankruptcy Court.

- "Earnest Money Deposit" has the meaning set forth in Section 3.3.

- "Environmental Laws" means any and all applicable laws which (i) regulate or related to the protection or clean-up of the environment, the use, treatment, storage, transportation, handling disposal or release of Hazardous Substances, the preservation or protection of waterways, groundwater, drinking water, air, wildlife, plants or other natural resources or the health and safety of persons or property, including protection of the health and safety of employees or (ii) impose liability or responsibility with respect to any of the foregoing,

17

DRAFT

including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601, *et seq.*), or any other law of similar effect.

- "Excluded Assets" has the meaning set forth in Section 2.3.

- "Excluded Liabilities" has the meaning set forth in Section 2.5.

- "Government Authorization" means all applications, consents, approvals, licenses, permits, franchises, filings or authorizations, including certificates of occupancy.

- "Governmental Entity" means any public or governmental entity, department, bureau, commission, agency, and similar bodies or authorities.

- "Hazardous Substances" means any noxious, toxic, or hazardous substance, material or waste, and any contaminant, chemicals, pollutant or constituent thereof including petroleum, or petroleum products, asbestos or any asbestos containing material, or lead containing paint or coating material.

- "Indebtedness" means with respect to any persons, all obligations for borrowed monies.

- "Intangible Rights" has the meaning set forth in Section 2.2(a).

- "Inventory" has the meaning set forth in Section 2.2(e).

- "Laws" means any law—including common law, statute, requirement, code, rule, regulation, order, ordinance, judgment or decree or other pronouncement of any Governmental Entity.

- "Lien" or "Liens" means liens, security interests, pledges, charges and encumbrances of any kind, character or description whatsoever.

- "Management Company" has the meaning set forth in the Recitals.

- "Management Contract" has the meaning set forth in the Recitals.

- "Master Declaration" means the Master Declaration of Covenants, Conditions, and Restrictions for Rarity Bay, recorded on October 14, 1998 in Loudon County Register's Office in Trust Book 444, Page 248 (the "Master Declaration"), and all amendments and supplements thereto.

- "Material Adverse Change" means any state of facts, change, event, effect or occurrence that has, or reasonably expected to have, a material adverse effect on the business, financial condition or results of operation of the Seller taken as a whole, other than any state of facts, change, event, effect or occurrence resulting from (i) economic, financial market or geopolitical conditions in general, (ii) changes in law or applicable accounting regulations or principles or interpretations thereof, (iii) any outbreak or escalation of hostilities, war or any act of terrorism (iv) any weather condition, earthquake or natural disaster, (v) epidemic, pandemic or disease

18

DRAFT

outbreak, public health emergencies as declared by an applicable Governmental Authority or quarantine restrictions implemented by any applicable Governmental Authority, whether negatively affecting the Business specifically or negatively affecting economic conditions generally (vi) the execution of this Agreement, the announcement of this Agreement and the Transaction, (vii) actions taken or consented to by Purchaser pursuant to this Agreement and (viii) Seller's status as a debtor in bankruptcy and ordinary course of typical events taking place in Chapter 11 Bankruptcy Cases including the Bankruptcy Case, other than pending litigation or pending claims.

- "Proposed Transaction" means the terms and conditions set forth in this Agreement, the Purchaser's desire to purchase from Seller and Seller's desire to sell to Purchaser.

- "Purchase Price" has the meaning set forth in Section 3.1.

- "Purchased Assets" has the meaning set forth in the Recitals.

- "Purchaser" has the meaning set forth in the Preamble.

- "Real Property" has the meaning set forth in the Recitals and Schedule 2.2(c).

- "Sale Procedures Order" means the *Order: (I) Approving Sale Procedures; (II) Scheduling a Sale Approval Hearing; (III) Approving the Form of Notices of the Motion to Sell and Sale Approval Hearing and Objection Deadline; (IV) Approving Procedures and Notice to Establish Certain Cure Amounts For Executory Contracts and Unexpired Leases that may be Assumed and Assigned*, entered by the Bankruptcy Court on _____, 2026, at Dkt. ____.

- "Tax" or "Taxes" means any and all U.S. federal, state, local assessments, levies, duties, tariffs, imposts and other similar charges and fees imposed by any Governmental Entity, including income, franchise, windfall or other profits, gross receipts, property, sales, use, net worth, payroll, employment, social security, workers' compensation, unemployment compensation, excise, withholding, ad valorem, stamp, transfer, value-added, occupation, environmental, disability, real property, personal property, registration, alternative or add-on minimum, or estimated tax, including any interest, penalty, additions to tax and any additional amounts imposed with respect thereto.

- "Tax Return" means any report, return, certificate, claim for refund, election, estimated Tax filing or declaration filed or required to be filed with any Governmental Entity with respect to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

- "Taxing Authority" means any federal, state, local or foreign Governmental Entity or authority responsible for the imposition, collection or administration of any Tax.

- "Transferred Employees" means each employee with respect to whom the Purchaser is willing to offer employment and such employee has accepted such employment extended by the Purchaser.

- "Trustee" has the meaning set forth in the Recitals.

19

DRAFT

- "Vacant Land" has the meaning set forth in the Recitals, Section 2.2(h) and Schedule 2.2(h).

20

DRAFT

## SCHEDULE 2.2(a) – INTANGIBLE RIGHTS

- Website:  https://raritybayliving.com;

- All social media accounts;

- All logos, trademarks and intellectual property;

- All member lists;

- All computer software licenses;

- All business licenses; and

- All business records.

DRAFT

## SCHEDULE 2.2(c) – REAL PROPERTY EXCLUDING VACANT LAND ON SCHEDULE 2.2(h)

- Loudon County Golf Course Property: Approx. 36.91 acres;
  - Parcel ID: 078   05201 000
    - Rarity Bay Parkway

- Monroe County Golf Course Property: Approx. 165.68 acres; and
  - Parcel ID: 019   06506 000
    - 403 Rarity Bay Parkway, land
  - Parcel ID: 019   06506 001
    - 403 Rarity Bay Parkway, main clubhouse
  - Parcel ID: 019   06506 002
    - 403 Rarity Bay Parkway, enrichment center (snack bar, pool, locker room)

- Any and all right, title, and interest of Seller in and to any real property located in Monroe County or Loudon County, Tennessee, that is not otherwise identified above or in Schedule 2.2(h).

22

DRAFT

## SCHEDULE 2.2(d) – FIXED TANGIBLE ASSETS

- Lounge and corresponding furniture and fixtures;

- Restaurant and corresponding furniture and fixtures;

- Kitchen and corresponding furniture and fixtures;

- Swimming Pool and corresponding equipment, furniture and fixtures;

- Outdoor walkway/trails and corresponding furniture and fixtures;

- Seventeen Televisions;

- Fitness Equipment (26 pieces of Equipment);

- Golf Clubhouse's corresponding furniture and fixture;

- Pro Shop's corresponding fixtures;

- All equipment and materials used on the golf course;

- All equipment located and used on tennis courts;

- All equipment located at and used on pickleball courts;

- Toro Golf Equipment;

- All cleaning supplies; and

- All office furniture, fixtures, supplies and equipment

23

DRAFT

**SCHEDULE 2.2(e) – INVENTORY**

- Raw Materials including food.

- Alcohol and beverages.

- Merchandise in Pro Shop.

24

## SCHEDULE 2.2(h) – VACANT LAND

- Unplatted Excess Land:

  - Rarity Bay Pkwy. – Near 13th Hole: Approx. 3.34 acres;
    - Parcel ID: 078    05203 000
  - Rarity Bay Pkwy. – Near Gate House:  Approx. 11.2 acres;
    - Parcel ID: 019    06500 000
  - 288 Keeble Road and Maintenance Building located on property;
    - Parcel IDs:
      - 019    06505 000, land
      - 019    06505 001, maintenance buildings
  - Real Property Located at Turnstone Lane:  Approx. 10.82 acres; and
    - Parcel IDs:
      - 019L B 00500 000 – deed allegedly executed, but not recorded
      - 019L B 00600 000 – deed allegedly executed, but not recorded
      - 019L B 00700 000 – deed allegedly executed, but not recorded
      - 019L B 00800 000 – deed allegedly executed, but not recorded
      - 019L D 00100 000
      - 019L D 00200 000
      - 019L D 00300 000
      - 019L D 00400 000
      - 019L D 00500 000
      - 019L D 00600 000
      - 019L D 00700 000
      - 019L D 00800 000
      - 019L D 00900 000
      - 019L D 01000 000
      - 019L D 01100 000
      - 019L D 01200 000
      - 019L D 01300 000
      - 019L D 01400 000
      - 019L D 01500 000
      - 019L D 01600 000
      - 019L D 01700 000
      - 019L D 01800 000
      - 019L D 01900 000
      - 019L D 02000 000
      - 019L D 02100 000
      - 019L D 02200 000
      - 019L D 02300 000
      - 019L D 02400 000
      - 019L D 02500 000
      - 019L D 02600 000
      - 019L D 02700 000

DRAFT

- 019L D 02800 000
- 019L D 02900 000
- 019L D 03000 000
- 019L D 03100 000
- 019L D 03200 000
- 019L D 03300 000
- 019L D 03400 000
- 019L D 03500 000
- 019L D 03600 000
- 019L D 03700 000
- 019L D 03800 000
- 019L D 03900 000
- 019L D 04000 000
- 019L D 04100 000
- 019L D 04200 000
- 019L D 04300 000
- 019L D 04400 000
- 019L D 04500 000
- 019L D 04600 000
- 019L D 04700 000
- 019L D 04800 000
- 019L D 04900 000
- 019L D 05000 000
- 019L D 05100 000
- 019L D 05200 000
- 019L D 05300 000
- 019L D 05400 000
- o Real Property Located at Shearwater Drive: Approx. 1.79 acres
  - ▪ Parcel IDs:
    - 019L C 00100 000
    - 019L C 00101 000
    - 019L C 00200 000
    - 019L C 00201 000
    - 019L C 00300 000
    - 019L C 00301 000
    - 019L C 00400 000
    - 019L C 00500 000
- o Real Property Located at Osprey Circle: Approx. 0.48 acres
  - ▪ Parcel IDs:
    - 019E A 05700 000
    - 019E A 06000 000

26

- Platted Lots:

  - 949 Rarity Bay Pkwy.;
    - Parcel ID: 078I B 00500 000
  - 969 Rarity Bay Pkwy.;
    - Parcel ID: 078I B 00600 000
  - 125 Mallard Dr.;
    - Parcel ID: 078H B 00300 000
  - 155 Hummingbird Dr.;
    - Parcel ID: 078G B 00600 000
  - 175 Hummingbird Dr.;
    - Parcel ID: 078G B 00800 000
  - 295 Hummingbird Dr.;
    - Parcel ID: 078G B 02000 000
  - 747 Wood Duck Dr.;
    - Parcel ID: 019D A 01100 000
  - 751 Wood Duck Dr.;
    - Parcel ID: 019D A 01200 000
  - 755 Wood Duck Dr.; and
    - Parcel ID: 019D A 01300 000
  - 761 Wood Duck Dr.
    - Parcel ID: 019D A 01400 000

- Miscellaneous

  - Golf Course Pump Station

DRAFT

## SCHEDULE 2.2(i) – ASSUMED CONTRACTS AND LEASES

- One lease covers 50 2022 E-Z-Go RXV Elite Golf carts with lithium batteries;
- One lease covers the Pace 7EX 7-inch GPS touchscreen and fleet management that provides fleet tracking, geofencing, 3d hole flyover, etc.;
- One lease of an 800XG Hauler; and
- The Management Contract
- Club Membership Contracts

28

DRAFT

### SCHEDULE 2.6 — PERMITTED ENCUMBRANCES

- Master Declaration.

- Assignment of Right.  To clarify, Purchaser has the right to raise or lower social membership initiation fees and/or golf membership initiation fees so long as such fees do not drop below the minimums stated in the Assignment of Right.

- March 1, 2024 Order of the Monroe Chancery Court, Case No. 19943, regarding RBP's rights under the Assignment of Right.

29

DRAFT

## SCHEDULE 5.3 — LITIGATION

*Taylors v. Salem Pointe Capital, LLC*, adversary proceeding no. 3:25-ap-03005 SHB in U.S Bankruptcy Court for the Eastern District of Tennessee.