**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED THIS DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF TENNESSEE**
**KNOXVILLE DIVISION**

In re:

SALEM POINTE CAPITAL, LLC,                Case No. 3:24-bk-31702-SHB
    Debtor.                                      Chapter 11

**DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN OF REORGANIZATION**
**FOR SALEM POINTE CAPITAL, LLC**

**June 25, 2026**

**MARY D. MILLER, PLLC**

/s/ Mary D. Miller
Mary D. Miller (013209)
P.O. Box 5339
Knoxville, TN 37928
(865) 934-4000
mmillerservice@millerlaw.solutions
*Attorneys for The Club at Rarity Bay, Inc.*

and

**BUTLER SNOW LLP**

/s/ William R. O'Bryan, Jr.
William R. O'Bryan, Jr. (005433)
C.E. Hunter Brush (031046)
1320 Adams Street, Suite 1400
Nashville, TN 37208
(615) 651-6724
Bill.OBryan@butlersnow.com
Hunter.Brush@butlersnow.com

and

R. Campbell Hillyer (22124)
6075 Poplar Avenue, Suite 500
Memphis, TN 38119
(901) 680-7326
cam.Hillyer@butlersnow.com
*Attorneys for BEP Rarity Bay, LLC*

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

THE PLAN PROPONENT IS PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE CHAPTER 11 PLAN OF REORGANIZATION FOR SALEM POINTE CAPITAL, LLC (THE "DEBTOR"), WHICH PLAN IS BEING PROPOSED BY THE CLUB AT RARITY BAY, INC. ("TCRB") AND BEP RARITY BAY, LLC ("BEP"), COLLECTIVELY, AS "PLAN PROPONENT." NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY PERSON OR ENTITY FOR ANY OTHER PURPOSE.

BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN.

THE PLAN PROPONENT URGES EACH HOLDER TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, ACCOUNTING, BUSINESS OR OTHER ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN, AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN, OR THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASE. SUMMARIES OF THE PLAN AND THE OTHER STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.

WITH RESPECT TO A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE RELEVANT PROVISIONS OF THE APPLICABLE DOCUMENT WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE PLAN PROPONENT DOES NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE PLAN PROPONENT IS UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT. IN PREPARING THIS DISCLOSURE STATEMENT, THE PLAN PROPONENT RELIED ON PUBLICLY FILED DATA DERIVED FROM THE DEBTOR'S FILINGS IN THE BANKRUPTCY CASE. THE PLAN PROPONENT HAS SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE ANY INDEPENDENT AUDITORS. WHILE THE PLAN PROPONENT BELIEVES THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS, IN ALL MATERIAL RESPECTS, THE FINANCIAL CONDITION OF THE DEBTOR AS OF THE DATE HEREOF, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE PROPOSED REORGANIZED DEBTOR OR THE GUC TRUSTEE MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE PLAN PROPONENT HAS NOT AUTHORIZED ANY PERSON OR ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. NEITHER THE PLAN PROPONENT NOR THE DEBTOR HAS AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO VOTE TO REJECT THE PLAN, OR THOSE HOLDERS OF CLAIMS OR INTERESTS WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY OTHER FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF UNITED STATES SECURITIES LAWS. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A STATEMENT OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "WILL," "SHOULD," "EXPECT," "ANTICIPATE," "ESTIMATE," "BELIEVE," "DESIGNED," "INTEND," "PLAN," "GOAL," OR "CONTINUE," OR THE NEGATIVE THEREOF, OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. YOU ARE CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS, INCLUDING THE ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTOR MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASE; EXPOSURE TO LITIGATION; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN DOMESTIC LAWS AND REGULATIONS; TRADE BALANCE; NATURAL DISASTERS; GEOPOLITICAL INSTABILITY; THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTOR'S BUSINESS; AND THOSE ADDITIONAL RISKS SET FORTH IN THIS DISCLOSURE STATEMENT IN THE SECTION ENTITLED "RISK FACTORS".

TO THE EXTENT THE PLAN PROVIDES FOR INJUNCTIVE RELIEF, EXCULPATIONS, AND RELEASES AS TO THE DEBTOR AND CERTAIN OTHER PARTIES. THE PERMANENT INJUNCTIONS, EXCULPATIONS, AND RELEASES SET FORTH IN THE PLAN WILL APPLY TO HOLDERS OF ANY CLAIM, INTEREST, LIEN, ENCUMBRANCE OR DEBT, WHETHER SECURED OR UNSECURED, GRANTED PRIORITY STATUS, INCLUDING PRIORITY TAX (FEDERAL OR STATE), NONPRIORITY UNSECURED STATUS OR ANY INTERESTS IN THE DEBTOR. CREDITORS AND HOLDERS OF AN INTEREST WILL BE BOUND BY THE INJUNCTIVE RELIEF, EXCULPATIONS, AND RELEASES AS PROVIDED FOR UNDER THE PLAN AND DESCRIBED HEREIN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO BECOME EFFECTIVE WILL BE SATISFIED (OR WAIVED). YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING BUT NOT LIMITED TO THE PLAN AND ARTICLE VIII OF THIS DISCLOSURE STATEMENT ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE TO ACCEPT OR REJECT THE PLAN.

**TABLE OF CONTENTS**

I.    Executive Summary ..................................................................................................7
      A.  Chapter 11 Overview and This Disclosure Statement ......................................7
      B.  Voting on the Plan ...........................................................................................8
          1. Holders of Claim and Interests Entitled to Vote on the Plan ......................8
          2. Ballots Not Counted....................................................................................8
          3. Voting Instructions .....................................................................................9
      C.  Summary of Treatment of Claims and Interests and Description of
          Recoveries under the Plan.................................................................................9
      D.  Confirmation Hearing.....................................................................................15

II.   Debtor's Corporate History, Structure and Business Overview...............................16
      A.  The Debtor's Corporate Structure and History...............................................16
      B.  The Debtor's Business ...................................................................................17
      C.  The Debtor's Managemesnt Team..................................................................19
      D.  The Debtor's Prepetition Corporate and Capital Structure.............................19
          1.  Organization Structure and Equity.............................................................19
          2.  Assets ......................................................................................................19
              a.  The Debtor's Schedules.......................................................................19
              b.  Monthly Operating Report Values .......................................................21
              c.  Potential Litigation Claims
          3.  Liabilities.................................................................................................23
              a.   The Debtor's Schedules......................................................................23
              b.  Monthly Operating Reports..................................................................23
              c.  Litigation Claims.................................................................................24
                  i.   Litigation with RBP .......................................................................24
                  ii.  Declarant Rights and Governance Litigation ..................................26
                  iii. Membership Obligation Litigation..................................................27
                  iv.  Community Association Litigation...................................................28

III.  Events Leading to the Chapter 11 Filing...............................................................28

IV.   Material Developments and Anticipated Events of the Chapter 11 Case...............29
      A.  Commencement of the Chapter 11 Case..........................................................29
      B.  Schedules and Statements...............................................................................29
      C.  Claim Bar Dates.............................................................................................29
      D.  Section 341 Meeting of Creditors...................................................................30
      E.  No Formation of a Creditors' Committee.........................................................30
      F.  Appointment of Trustee..................................................................................30
      G.  Proposed Sale of Assets under Section 363 of the Bankruptcy Code..........30
      H.  Motion to Dismiss Chapter 11 Case ..............................................................30
      I.  Renewed Proposed Sale of Assets under Section 363 ....................................30
      J.  Motion for Relief from the Automatic Stay filed by RBP ...........................31
      K.  Filing of Plan ................................................................................................31

V.    The Plan.................................................................................................................31
      A.  Purpose and Effect of the Plan.......................................................................31
      B.  Summary of Key Provisions of the Plan.........................................................40
      C.  Analysis of Recoveries to Holders of Claims und the Plan and
          Recommendation of Plan Proponent ..............................................................40

D.  Plan Confirmation and Consummation.................................................................40
    1.  The Confirmation Hearing ..............................................................40
    2.  Objection to Confirmation................................................................40
    3.  Requirements for Confirmation of the Plan .......................................41
       a.  Acceptance by Impaired Classes ..............................................41
       b. Best Interest of Creditors........................................................41
       c.  Feasibility of the Plan.............................................................42
          i.   Effective Date Payments ..............................................43
          ii.  Plan Payments ..........................................................44
             A.  Payments to Holders of Allowed Secured Claims ...............44
             B.  Class 10 and Class 13 Guaranteed Payment ......................44
          iii.  Post-Effective Date Management ...................................44
       d.  No Unfair Discrimination ........................................................45
       e.  Fair and Equitable .................................................................45
          i.  Class of Secured Claims ..............................................45
          ii.  Class of Unsecured Claims ..........................................45
          iii. Class of Interests ......................................................45

VI.    Risk Factors...................................................................................45
    A.  Bankruptcy Law Considerations........................................................45
    B.  Risks Related to Recoveries under the Plan...........................................48
    C.  Other Risks .................................................................................51

VII.   Certain Securities Law Matters ...............................................................51

VIII.  Recommendation................................................................................52

**EXHIBITS**

1.  Plan
2.  Proposed Disclosure Statement Order
3.  Avoidance Actions
4.  Liquidation Analysis
5.  Financial Projections

**INTRODUCTION**

The Club at Rarity Bay, Inc.[1] and BEP Rarity Bay, LLC (collectively the "<u>Plan Proponent</u>") submit this disclosure statement (the "<u>Disclosure Statement</u>"), pursuant to section 1125 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), to Holders of Claims against and Interests in the Debtor in connection with the solicitation of votes for acceptance of the Chapter 11 Plan of Reorganization for Salem Pointe Capital, LLC (as may be amended, the "<u>Plan</u>"), dated June [●] 2026, which has been filed with the United States Bankruptcy Court for the Eastern District of Tennessee (the "<u>Bankruptcy Court</u>")[2]. A copy of the Plan is attached hereto as **Exhibit 1** and is incorporated herein by reference.

YOU ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**I.       EXECUTIVE SUMMARY**

**A.       Chapter 11 Overview and this Disclosure Statement**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession." In this case, a chapter 11 trustee was appointed on August 13, 2025. Upon the appointment of the chapter 11 trustee, the debtor was displaced as debtor-in-possession and, by operation of section 1121(c) of the Bankruptcy Code, any creditor or party in interest may file a plan for the reorganization or liquidation of the Debtor.

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

The Plan Proponent is seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the that a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan be transmitted to all Holders of Claims or Interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

---

[1] The Club at Rarity Bay, Inc. is a Tennessee not-for-profit corporation comprised of members who are current lot owners and homeowners in the Rarity Bay development and present members and user of the Club and golf club.

[2] Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

**B.**      **Voting on the Plan**

This Disclosure Statement is being distributed to Holders of Claims entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the *Order (I) Approving Adequacy of Disclosure Statement, (II) Approving Solicitation and Notice Procedures for Confirmation of the Chapter 11 Plan of Reorganization, (III) Approving Ballot and Notice Forms in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. [●] (the "Disclosure Statement Order"). A proposed Disclosure Statement Order is attached hereto as **Exhibit 2**.

The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.

THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY. PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

**1.**      **Holders of Claims and Interests Entitled to Vote on the Plan**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold. Each category of Holders of Claims and Interests, as set forth in Article 2 of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The table in Section C of this Article I provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table,  the Plan Proponent is soliciting votes to accept or reject the Plan only from Holders of Claims in Classes 2 through 13 . Holders of Claims in Class 1 are deemed to accept the Plan and, accordingly, will not receive a ballot to vote on the Plan. Holders of Class 14 Interests are conclusively presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

**2.**      **Ballots Not Counted**

No ballot will be counted toward Confirmation unless the Plan Proponent agrees otherwise if, among other things: (1) it was not timely submitted on or prior to the Voting Deadline (as the same may be extended by the Plan Proponent in its sole discretion); (2) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (3) it was transmitted by means other than as specifically set forth in the Disclosure Statement Order and/or ballot; (4) it was cast by a Person or Entity that is not entitled to vote on the Plan; (5) it was cast for a Claim listed in the Debtor's Schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no Proof of Claim was timely Filed; (6) it was cast for a Claim that is subject to an objection that was filed with the Bankruptcy Court on or prior to seven (7) days before the Voting Deadline (unless a Resolution Event (as such term is defined in the Disclosure Statement Order) occurs); (7) it was sent to the Debtor, the Debtor's agents/representatives or the Debtor's financial or legal advisors instead of the Plan Proponent (unless otherwise agreed to by the Plan Proponent in its sole discretion); (8) it is unsigned; or (9) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.

> THE CLAIMS VOTING DEADLINE IS [●], 2026 AT 4:00 P.M.
> (PREVAILING EASTERN TIME).

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL NOT BE COUNTED.**

### 3. Voting Instructions

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot including your vote is actually received by the Plan Proponent by the Voting Deadline.

To vote, complete, sign, and date your ballot and return it promptly to the below address:

William R. O'Bryan
Butler Snow LLP
1320 Adams Street, Suite 1400
Nashville, TN 37208

### C. Summary of Treatment of Claims and Interests and Description of Recoveries under the Plan

The following table provides a summary of the estimated recovery to Holders of Claims or Interests under the Plan.[3] Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed. Your ability to receive distributions under the Plan depends upon the Debtor's distributable assets and their ability to obtain Confirmation and meet the conditions necessary to consummate the Plan.

After the Effective Date, the GUC Trustee and the Reorganized Debtor shall have the sole authority to: (1) file, withdraw, or litigate to judgment, objections to Claims or Interests (with any objections to be Filed on or before the Claims Objection Bar Date (as such date may be extended upon presentment of an order to the Bankruptcy Court by the Liquidating Trustee)); (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Reorganized Debtor and/or the GUC Trustee on or after the Effective Date.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

---

[3] The recoveries set forth below may change based upon, among other things, the amount of the recoveries, if any, by the GUC Trustee and changes in the dollar amount of Claims that are Allowed.

| Class | Claims/ Interests | Plan Treatment | Voting Rights | Projected Amount of Allowed Claims | Projected Plan Recovery |
|---|---|---|---|---|---|
| 1 | All Allowed Claims entitled to priority under § 507(a) of the Bankruptcy Code (except administrative expense claims under § 507(a)(2) and priority tax claims under § 507(a)(8)) | Each holder of an Allowed Administrative Claim will be paid in cash, in full on the Effective Date of this Plan, or upon such other terms as may be agreed upon by the holder of such claim and the Reorganized Debtor | Unimpaired/ not entitled to vote. | TBD | 100% of Allowed Claim |
| 2 | The Secured Claim of Rarity Bay Partners (f/k/a Salem Pointe Capital Partners) ("RBP") to the extent such Claim becomes an Allowed Secured Claim | The Secured Claims of RBP in the approximate collective amount of $7,042,000, if and when such Claims becomes Allowed Claims, shall be paid as follows:<br><br>To the extent the RBP Claims becomes an Allowed Secured Claims, such Allowed Secured Claims shall, on the Effective Date, be reduced by the following:<br><br>(a) $1,000,000, representing the amount of the BEP Purchase Price (as defined below);<br><br>(b) $1,000,000 representing the BEP Additional Funds as defined in Section 7.07 below;<br><br>(c) $500,000, representing the proceeds of the 2019 Settlement; and<br><br>(d) $200,000, representing escrowed funds consisting of social membership initiation | Impaired/ Entitled to Vote | TBD | 100% of Allowed Claim |

| | | fees in the Club ("SMIFs"). | | | |
|---|---|---|---|---|---|
| | | The above referenced funds shall be applied to pay Claim No. 5 and Claim No. 16 in full first and then toward reduction in Claim No. 4 to the extent such Claims become Allowed Secured Claims. The remaining Allowed Secured Claim balance of with interest at 6.65% amortized over 240 months with a balloon in 120 months. RBP shall retain its security interests in and liens upon the Reorganized Debtor's assets in the same priority as they existed on the Petition Date; provided, however, upon payment of the BEP Purchase Price (as defined below), the BEP Sale Property (as defined below) shall be released from any all liens, claims and interests of RBP including, but without limitation, all claims of liens lis pendens, restrictive covenants. There shall be no prepayment penalty. All existing loan documents evidencing the RBP Secured claim shall remain in full force and effect provided, however, that the Reorganized Debtor shall not be required to comply with any financial performance covenants, including without limitation the covenants or terms described in 2(d), 2(g), 2(j), 2(m), 7(j), 7(l), 13, 14, 15(h), or 16(g) of the existing loan documents.<br><br>In the case of *Salem Pointe Capital Partners (n/k/a Rarity Bay Partners) v. Salem Pointe Capital, LLC, et al.,* Adv. Proc. No. 2:25-ap-03006-SHB (the "RBP AP") (formerly pending in the Chancery Court of Monroe County, Tennessee at Case No. 19943) certain orders and judgments were entered. RBP recorded six (6) order and/or judgments. Five (5) of these were not final judgments as contemplated by TENN. CODE ANN. | | | |

11

| | | | | | |
|---|---|---|---|---|---|
| | | § 25-5-101 *et. seq.* The recordation of non-final judgments is ineffective to create a lien upon real property. The one Order of Final Judgment entered on September 23, 2024 and recorded on September 24, 2024 was recorded five (5) days before the Petition Date.  Accordingly, the recordation of the Final Judgment is indisputably an avoidable preferential transfer under section 547(b) of the Bankruptcy Code. RBP has not filed a claim asserting that any of the amounts arising out of the judgments entered by the Chancery Court in the RBP AP are secured. To the extent that RBP asserts any claims arising out of the judgments entered by the Chancery Court in the RBP AP, such claims shall be treated as Class 13 Claims and the Confirmation Order shall provide that any and all orders and/or judgments of the Chancery Court recorded by RBP are avoided, void, and of no force effect. | | | |
| 3 | Secured Claim of U.S. Small Business Administration | The Allowed Secured Claim of the U.S. Small Business Administration ("SBA") in the approximate amount of $150,000, if and when such Claim becomes Allowed Claim, shall be paid as follows:<br><br>Allowed Secured Claim as of the Effective Date with interest at 3.75% amortized over 270 months.  SBA shall retain its security interests in and liens upon the Reorganized Debtor's assets in the same priority as they existed on the Petition Date until such time as the Class 3 Allowed Secured Claim is satisfied. | Impaired/ Entitled to Vote | TBD | 100% of Allowed Claim |
| 4 | Secured Claim of Deere Finance | Class 4 is Impaired by this Plan. The Allowed Secured Claim of Deere in the approximate amount of $48,510, if and when such Claim becomes Allowed Claim, shall be paid as follows: | Impaired/ Entitled to Vote | TBD | 100% of Allowed Claim |

12

| | | | | | |
|---|---|---|---|---|---|
| | | Allowed Secured Claim as of the Effective Date with interest at 8.75% amortized over 60 months. Deere shall retain its security interests in and liens upon the Reorganized Debtor's assets in the same priority as they existed on the Petition Date until such time as the Class 4 Allowed Secured Claim is satisfied. | | | |
| 5 | Secured Claim of Wells Fargo Equipment Finance | The Allowed Secured Claim of Wells Fargo in the approximate amount of $103,200 if and when such Claim becomes Allowed Claim, shall be paid as follows:<br><br>Allowed Secured Claim as of the Effective Date with interest at 2.9% amortized over 60 months.  Wells Fargo shall retain its security interests in and liens upon the Reorganized Debtor's assets in the same priority as they existed on the Petition Date until such time as the Class 5 Allowed Secured Claim is satisfied. | Impaired/ Entitled to Vote | TBD | 100% of Allowed Claim |
| 6 | Secured Claim of US Bank Equipment Finance | The Allowed Secured Claim of US Bank in the approximate amount of $103,631, if and when such Claim becomes Allowed Claim, shall be paid as follows:<br><br>Allowed Secured Claim as of the Effective Date with interest at 8.75% amortized over 60 months. US Bank shall retain its security interests in and liens upon the Reorganized Debtor's assets in the same priority as they existed on the Petition Date until such time as the Class 6 Allowed Secured Claim is satisfied. | Impaired/ Entitled to Vote | TBD | 100% of Allowed Claim |
| 7 | Secured Claim of Kapitus Servicing | The Allowed Secured Claim of Kapitus in the approximate amount of $137,800, if and when such Claim becomes Allowed Claim, shall be paid as follows: | Impaired/ Entitled to Vote | TBD | 100% of Allowed Claim |

13

| | | | | | |
|---|---|---|---|---|---|
| | | Allowed Secured Claim as of the Effective Date with interest at 8.75% amortized over 60 months. Kapitus shall retain its security interests in and liens upon the Reorganized Debtor's assets in the same priority as they existed on the Petition Date until such time as the Class 7 Allowed Secured Claim is satisfied. | | | |
| 8 | Secured Claim of PNC Bank | The Allowed Secured Claim of PNC in the approximate amount of $272,000, if and when such Claim becomes Allowed Claim, shall be paid as follows:<br><br>Allowed Secured Claim as of the Effective Date with interest at 8.75% amortized over 60 months. PNC shall retain its security interests in and liens upon the Reorganized Debtor's assets in the same priority as they existed on the Petition Date until such time as the Class 8 Allowed Secured Claim is satisfied. | Impaired/ Entitled to Vote | TBD | 100% of Allowed Claim |
| 9 | Secured Claim of HOA | The HOA shall receive the Class 9 Settlement Consideration (as defined in the Plan), in full and complete satisfaction of the Allowed Class 9 Secured Claim. | Impaired/ Entitled to Vote | | 100% of Allowed Claim |
| 10 | General Unsecured Claims | Each holder of an Allowed Class 10 Claim will be paid in Cash, in annual distributions, its pro rata share of (a) the Class 10 Guaranteed Payment from the Reorganized Debtor; and (b) the distribution of funds held in the GUC Trust from the GUC Trustee on the Distribution Date in accordance with the provisions of the GUC Trust. | Impaired/ Entitled to Vote | | TBD |
| 11 | Hoban AP Unsecured Claims | Class 11 is Impaired by this Plan. Each holder of an Allowed Class 11 Claim shall receive its proportionate share of the Class 11 Settlement Consideration (as defined in the Plan), in full and complete | Impaired/ Entitled to Vote | | Resolved by Settlement |

14

| | | | | | |
|---|---|---|---|---|---|
| | | satisfaction of the Allowed Class 11 Unsecured Claims. | | | |
| 12 | Hinkle AP and Lorts AP | Class 12 is Impaired by this Plan. Each holder of an Allowed Class 12 Claim shall receive its proportionate share of the Class 12 Settlement Consideration (as defined in the Plan), in full and complete satisfaction of the Allowed Class 12 Unsecured Claim. | Impaired/ Entitled to Vote | | Resolved by Settlement |
| 13 | RBP Unsecured Claims | Class 13 is Impaired by this Plan. Each holder of an Allowed Class 13 Claim will be paid in Cash, in annual distributions, its pro rata share of the Class 10 Guaranteed Payment from the Reorganized Debtor. Class 13 shall not receive any distribution of funds held in the GUC Trust from the GUC Trustee until such time as all Class 10 Claims have been paid in full. | Impaired/ Entitled to Vote | | TBD |
| 14 | Equity Security Holders | Class 14 is Impaired by this Plan and is deemed to reject the Plan. The existing Equity Security Interests in the Debtor will be canceled on the Effective Date and the holders of Equity Security Interests in the Debtor shall not receive or retain any property or interest in the Debtor on account of their existing Equity Security Interests. For the avoidance of doubt, no member of TCRB shall be liable individually or personally for any of the debts of the Reorganized Debtor under the Plan. | Impaired/ Presumed to Reject/Not Entitled to Vote | N/A | 0.00% |

**D.      Confirmation Hearing**

The Bankruptcy Court has scheduled the Confirmation Hearing for [●], **2026 at [●]:[●] [●].m. (prevailing Eastern Time)**. The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation must be Filed and served on the Debtor, and certain other parties, by no later than [●], **2026 at 4:00 p.m. (prevailing Eastern Time)** in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order.

15

The Confirmation of the Plan by the Bankruptcy Court will bind the Debtor, any Person or Entity acquiring property under the Plan, any Holder of a Claim against or Interest in any of the Debtor, and any other Person or Entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.

Copies of the Plan, this Disclosure Statement, and any other publicly Filed documents in the Chapter 11 Case are available through the Bankruptcy Court's CM/ECF Noticing System (https://ecf.tneb.uscourts.gov) or upon written request to the Plan Proponent at the addresses above.

## II. THE DEBTOR'S CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.      The Debtor's Corporate Structure and History

The Debtor is a Tennessee limited liability company that was organized in 2014. According to the List of Equity Security Holders filed with the Petition, Michael Ayers and Amy Ayers jointly own 100% of the equity interest in the Debtor. The Debtor's principal office is located at 403 Rarity Bay Parkway, Vonore, Tennessee. Mr. Ayers is its registered agent and shares the same address as the principal office.

The Debtor owns, operates, manages, and develops real estate, recreational, golf, country club, hospitality, and development assets associated with the Rarity Bay master-planned residential community and country club located in Loudon and Monroe Counties, Tennessee ("Rarity Bay"). The Debtor's involvement in Rarity Bay began in 2015 through the acquisition of assets from a federal receivership case – *Community Development Partners, LLC, et al. v. Rarity Bay Partners, et al.*, Case No. 3:12-cv-00625 (E.D. Tenn. 2015). In May 2015, the District Court approved the sale of the right, to the extent they existed in substantially all of the Rarity Bay assets to Debtor for approximately $5.75 million. These assets included:

- the Rarity Bay Country Club;
- the Rarity Bay Golf Course;
- recreational amenities;
- residential inventory;
- undeveloped development parcels;
- membership-related contractual rights; and
- Declarant Rights under the Master Declaration governing the community.

The acquisition resulted in the Debtor making the claim that it was the successor developer for substantial portions of the Rarity Bay project and established the Debtor as one of the principal economic stakeholders within the community.

Among the assets acquired by the Debtor were the Declarant Rights under the governing documents of the Rarity Bay development. Following the receivership acquisition, the Debtor asserted ownership of those rights as successor Declarant. The ownership, scope, and exercise of those Declarant Rights became the subject of substantial litigation involving homeowners, community association members, and RBP. The disputes relating to those Declarant Rights are discussed in greater detail in Section D. 2. below.

A significant aspect of the Debtor's  history involves its relationship with RBP.  While the Debtor was the actual court-approved purchaser that acquired title to the Rarity Bay assets, RBP (through its principals and affiliated entities) contributed substantial acquisition capital for Debtor's court approved receivership purchase and was part of the original transaction structure. Accordingly, following the receivership acquisition, the Debtor and RBP entered into various agreements intended to facilitate operation of the club and amenities by the Debtor and redevelopment of the community by RBP. The

16

pertinent agreements between RBP and the Debtor that governed their post-receivership partnership include:

- the Assignment of Right to Purchase Real Property dated May 18, 2015 ("AOR" or "Assignment Agreement");
- Partnership Agreement effective January 1, 2016; and
- the Agreement and Assignment of BEP Rarity Bay Collection Rights dated May 12, 2017 ("Collection Agreement").

Under the Assignment Agreement, the Debtor purported to assign significant development related rights and fee exemptions to RBP. Under the Partnership Agreement, the parties delineated their roles, with the Debtor owning and operating the club and golf course and holding the Declarant Rights, and RBP providing capital toward the acquisition, owning residential lots and sharing in future development related revenues.  The Collection Agreement allowed RBP to share in any recoveries that the Debtor realized in enforcing collection actions against lot owners BEP Rarity Bay, LLC and Bald Eagle Ventures, LLC (collectively, "BEP").  RBP has maintained that through these agreements and the common law it has been a general partner in the Debtor since 2015.

Although the Debtor and RBP initially cooperated in redevelopment and collection efforts and although RBP maintains that a partnership still exists under common law and the other agreements, the Debtor purports to have terminated the formal Partnership Agreement on June 1, 2017. Immediately, disputes arose concerning ownership interests, settlement authority, collection rights, initiation fees, development rights, and Declarant Rights. The resulting litigation became one of the most significant factors affecting the Debtor's financial condition prior to the commencement of the chapter 11 case.

**B.      The Debtor's Business**.

Rarity Bay is situated on approximately 250 acres in Loudon and Monroe Counties on the banks of Tellico Lake. It contains a country club, an 18-hole golf course, tennis facilities, pickleball courts, fitness center, swimming pool, community docks, horseback riding and other luxury amenities.  Rarity Bay has approximately 900 existing homeowners and over 400 undeveloped lots owned by a combination of the Debtor and third parties. In addition, the Debtor owns almost 30 acres that consists of existing parcels and undeveloped land within or adjacent to the Rarity Bay community.

Following the receivership acquisition in 2015, the Debtor, as the successor Declarant and owner of certain real estate parcels, operated as a developer and realized some revenue through lot sales. As the developer, the Debtor's business operations include:
- administration of Declarant Rights;
- architectural review functions;
- governance-related rights under community documents;
- amendment rights under governing documents;
- annexation rights;
- development planning; and
- various rights relating to future development.

These functions by the Debtor have been hotly contested and are the subject of multiple legal proceedings. While the development side of the Debtor's business often took center stage because of the numerous disputes, the Debtor's primary function is to own and operate the Rarity Bay Country Club and Community. In this regard, the Debtor's business is more accurately described as a country club, golf course, hospitality, and amenity operator.

17

To own and operate Rarity Bay, the Debtor employees approximately twenty (20) people.  It also maintains numerous contractual relationships with residents, members, vendors, service providers, and other stakeholders associated with the golf club and community. It is responsible for administering recreational amenities and activities including swimming facilities, social events, member events, and other entertainment activities for members and guests. It is responsible for maintaining and administering all golf-related activities and events. The Debtor also conducts membership administration requiring it to administer social memberships, golf memberships, member dues, initiation fees, transfer fees, member accounts and related contractual rights.

According to the Trustee's monthly operating reports, the Debtor's ownership and operation of the club require expenditures for:

- restaurant food purchases;
- beverage inventory;
- liquor purchases;
- entertainment;
- clubhouse maintenance;
- janitorial services;
- internet and communications;
- pest control;
- facility repairs;
- course maintenance;
- equipment maintenance;
- golf cart fleet management;
- irrigation systems;
- groundskeeping;
- landscaping;
- golf shop operations; and
- tournament and event management.

An analysis of the Postpetition Operations of the Debtor from the filed Monthly Operating Reports[4] shows that the Debtor's average monthly expenses for the period March 2025 through May 2026 are $389,768 with a high in May 2026 of $615,299 and a low in January 2026 of $213,377.

Ultimately, through its ownership and operation of the club, the Debtor derives revenue from:

- golf operations;
- country club operations;
- food and beverage services;
- golf and social membership dues;
- initiation fees; and
- recreational amenities.

An analysis of the Postpetition Operations of the Debtor from the filed Monthly Operating Reports for the period March 2025 through May 2026 shows that the Debtor's average monthly gross income of $463,437 with a high in May 2026 of $782,156 and a low in January 2026 of $120,407.

---

[4] The Monthly Operating Reports are found at Doc. Nos. 295, 454, 530, 573, 677, 678, 680, 684, 729, 736, 769, 770, 867, 934, and 960.

The Monthly Operating Reports reflect the following average monthly gross income, expenses and net income:

Gross Income   $463,437
Expenses        $389,768
Net Income       $73,670

**C.      The Debtor's Management Team**

Prior to appointment of the Chapter 11 Trustee, the Debtor was managed by Michael Ayres, who served as the Debtor's principal manager and representative in connection with operation of the Rarity Bay Country Club, golf course, amenity operations, development activities, financing transactions, and litigation matters. Following appointment of the chapter 11 Trustee on August 12, 2025, management and control of the Debtor's operations transferred to Gary M. Murphey, chapter 11 Trustee. Day-to-day country club and golf operations are currently administered with the assistance of Hampton Golf pursuant to management and operational service arrangements.

**D.      The Debtor's Prepetition Corporate and Capital Structure**

**1.      Organizational Structure and Equity.**

As of the Petition Date, Michael Ayers and Amy Ayers were the holders of an undivided 100% interest in the membership interests in the Debtor:

Michael Ayers
Amy Ayers

**2.      Assets.**

**a.   The Debtor's Schedules.**

The Debtor filed its schedules and statement of financial affairs on or about October 22, 2024 (Doc. Nos. 75 - 86).  In the Debtor's schedules, it attributes certain values to assets presumably as of the Petition Date.  The Plan Proponent does not endorse or adopt these values and believes that the values are, in some instances, overstated and in all instances not necessarily the current value of these same assets as of the date hereof.  Nevertheless, as a matter of disclosure, the Plan Proponent provides this information inasmuch as it is objective data which is part of the record in the Chapter 11 Case.

| ASSETS | Value of Debtor's Interest | Valuation Method |
|---|---|---|
| **Cash** | | |
| Old National Bank | 4,274 | |
| **Total** | **4,274** | |
| **Accounts Receivable** | | |
| <90 | 17,921 | |
| >90 | 262,528 | |
| **Total** | **280,449** | |

19

**Inventory**

| | | |
|---|---|---|
| Food | 5,664 | Purchase price |
| Merchandise Pro Shop | 66,272 | Purchase price |
| Alcohol | 18,998 | Purchase price |
| **Total** | **90,934** | |

**Office Furniture**

| | | |
|---|---|---|
| Lounge, Restaurant, Pool Outdoor | 148,000 | CMV[5] |
| Golf Pro Shop Fixtures | 20,000 | CMV |
| Golf,Kitchen, Office, TVs (17), Fitness | 241,000 | CMV |
| **Total** | **409,000** | |

**Machinery, Equipment, Vehicles**

| | | |
|---|---|---|
| Toro Golf Equipment | 250,000 | CMV |
| Bobcat Equipment | 127,000 | CMV |
| **Total** | **377,000** | |

**Real Property**

| | | |
|---|---|---|
| Golf Course Pump Station | 206,397 | |
| Golf Course and Club House | 10,000,000 | CMV |
| Rarity Bay Declarant Rights | 7,000,000 | CMV |
| Various Parcels | 11,985,000 | CMV |
| **Total** | **29,191,397** | |

**Other Assets**

| | |
|---|---|
| ERTC Credit | 801,122 |
| Interest in $500,000 Escrow RBP AP | 250,000 |
| Amount Due from RBCAI under CSA | 18,880 |
| Leasehold Interest in 50 EZ-GoGolf Carts | 547,500 |
| Leasehold Interest in John Deere Equipment | 630,000 |
| **Total** | **2,247,502** |

| | |
|---|---|
| **TOTAL** | **32,600,556** |

---

[5] Denotes "Current Market Value" according to Debtor.

20

b.  **Monthly Operating Report Values**

The latest Monthly Operating Report and accompanying notes filed by the Trustee in the Chapter 11 Case on June 15, 2026 for the time period ending May 30, 2026 (Doc. No. 960), reflects the following assets and values:

*Current Assets*

| | |
|---|---:|
| Cash -Bank Accounts | 756,415 |
| Cash On-Site | 1,600 |
| Accounts Receivable < 90 Days | 46,091 |
| Accounts Receivable > 90 Days | 456,027 |
| Inventory | 95,131 |
| Funds Held by Third Parties (Note 1) | 767,632 |
| Contingent ERTC Refund (Note 2) | 500,000 |
| **Current Assets** | **2,622,896** |

*Long Term Assets*

| | |
|---|---:|
| Building and Other Deprciable Assets (Note 3) | 3,843,380 |
| Land (Note 3) | 1,379,859 |
| Estimated Tax Refund | 9,000 |
| **Total Long-Term Assets** | **5,232,239** |
| **Total Assets** | **7,855,135** |

**Note 1 - Funds Held by Third Parties**

Funds related to dispute and on going litigation are being held by various parties. The ultimate resolution of the disposition of these funds has not been determined. These funds may or may not be available to certain parties that have filed claims against the Debtor. A summary of those funds as follows:

| | |
|---|---:|
| Chancery Court | 102,000 |
| Attorney Escrow - Wolf McClane | 160,000 |
| Rarity Bay Partners Escrow Account | 505,632 |
| Total Funds Held by Third Parties | 767,632 |

**Note 2 Contingent ERC Refund**

The Debtor entered into a contract with Innovation Refunds, LLC in May of 2023 with respect to Innovation Refunds assisting the Debtor in applying for one or more employee retention tax credits ("ERCs"). The terms consist of Innovation Refunds earning a 25% contingent fee based on the ERCs received by the Debtor. Innovation Refunds has filed a proof of claim (claims #12) estimating their fee at $200,280. Accodingly, the Debtor has included this contingent fee as a liabilty and the associated ERC refund of $800,000 as an asset in the accompanying financial statements. In May of 2026 the Debtor recieved approximately $300,000 or ERC funds. Additional amounts may be forthcoming.

**Note 3 Buildings, Land and Other Depreciable Assets**

Certain assets, including Buildings, Land and Other Depreciable Assets are being listed at amounts based on the Debtor's 2024 Federal tax returns which carries these assets on a cost basis. This is a change from the basis upon which the Debtor previously valued assets in its operating reports. The Trustee has changed the basis for valuations in its operating reports prepared and filed since his appointment given current uncertainty around fair market valuations. The Trustee fully expects that the value of these assets is understated using this cost basis and reserves all rights to take positions in any forum or circumstance that are inconsistent with or higher than the valuations included in this operating report.

The Plan Proponent does not endorse or adopt these values but, as a matter of disclosure, the Plan Proponent provides this information inasmuch as it is objective data which is part of the record in the Chapter 11 Case.

**c.   Potential Litigation Claims.**

The Plan Proponent believes that the Debtor may possess certain claims against certain third parties these are as follows:

i.   all Claims and Causes of Action (including, but not limited to, all claims, defenses, crossclaims and counterclaims) against Person(s) that are party to or that may become party to litigation, arbitration or other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial, including, but not limited to the following actions currently pending or pending as of the Petition Date:

A.   All claims the Debtor may have against partners of a general partnership, including, without limitation RBP and its successors and predecessors in interest and affiliates, for a general partnership's debts including, without limitation, claims arising under TENN. CODE ANN. § 61-1-306, the Tennessee Revised Uniform Partnership Act (TENN. CODE ANN. § 61-1-101, *et seq.*) its and predecessor enactments, or any other similar applicable state statutory or common law cause of action or remedy;

B.   all Claims and Causes of Action asserted or capable of being asserted in *Salem Pointe Capital Partners (n/k/a Rarity Bay Partners) v. Salem Pointe Capital, LLC, et al.,* Adv. Proc. No. 2:25-ap-03006-SHB (the "RBP AP")

C.   The Claims or Causes of Action asserted or capable of being asserted in *Taylor v. Salem Pointe Capital, LLC,* Adv. Proc. No. 3:25-ap-03005-SHB;

ii.   all Rights of Action, claims or Causes of Action against any Person, including specifically but without limitation, ORNL Credit Union and RBP, arising under but not limited to Sections 506(c), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), 553 or 724 of the Bankruptcy Code including any such Right of Action, claim or Cause of Action for which complaint asserting any of the foregoing was pending on the Effective Date or whether such Right of Action, claim or Cause of Action may be commenced after the Effective Date (collectively, the "Avoidance Actions").  In addition to the foregoing and, for the avoidance of doubt, the Debtor listed the certain Persons who received transfers within the 90 days immediately preceding the Petition Date and within the one (1) year before the Petition Date. These transfers are set forth on **Exhibit 3**, attached hereto.  Each of ORNL Credit Union, RBP and the Persons listed on Exhibit 3 are advised that the potential Avoidance Actions are Preserved Actions under the Plan which are being conveyed to the GUC Trustee who may pursue such claims.

The Plan Proponent notes that pursuant to section 546 of the Bankruptcy Code, the statute of limitations for commencing avoidance actions appears to be September 29, 2026.

3.      **Liabilities**

a.   **The Debtor's Schedules.**

As of the Petition Date, the Debtor scheduled $8,156,392 in secured debt, $3,623 in unsecured priority claims, and $4,543,667 in unsecured non-priority claims, consisting primarily of accounts payable to various trade creditors.

b.   **Monthly Operating Reports**

The latest Monthly Operating Report and accompanying notes filed by the Trustee in the Chapter 11 Case on June 15, 2026 for the time period ending May 30, 2026 (Doc. No. 960), reflects the following prepetition claims:

**Note 4 Prepetition Claims**

The Trustee is now including in the operating reports as liabilities all scheduled debts as well as all filed proofs of claim. By including these amounts in the operating reports, the Trustee is not recognizing any filed claim as a valid obligation of the debtor. The Trustee will review and investigate all scheduled as well as all filed claims for accuracy and validity. The Trustee reserves all rights and remedies to object to any filed claims and to amend any scheduled debt or obligation until his investigation of the foregoing is complete.

**Related Parties and litigation claims**

| | | |
|---|---|---|
| Rarity Bay Partners | POC 271 | $15,094,296 |
| BEP Rarity Bay/Bald Eagle | POC 264 | 1,603,043 |
| BEP Rarity Bay/Bald Eagle | POC 267 | 1,225,950 |
| BEP Rarity Bay/Bald Eagle | POC 268 | 5,997,300 |
| BEP Rarity Bay/Bald Eagle | POC 269 | 500,000 |
| BEP Rarity Bay/Bald Eagle | POC 278 | 4,557,712 |
| Rarity Bay Community Association | POC 275 | 109,376 |
| Rarity Bay Community Association | POC 276 | 3,197 |
| Rarity Bay Community Association | POC 274 | 3,197 |

**Finance Payments**

| | | |
|---|---|---|
| PNC Bank (Note 5) | POC 225 | 272,292 |
| PNC Bank (Note 5) | POC 226 | 44,591 |
| PNC Bank (Note 5) | POC 227 | 6,417 |
| Wells Fargo (Loader and Excavator) | POC 11 | 35,400 |
| Wells Fargo (Stump Grinder) | POC 10 | 9,888 |
| US Bank (pump) | POC 15 | 105,968 |

**All Other Claims**

| | | |
|---|---|---|
| American Express | Schedules Credit Card | 29,872 |
| Bank of America | Schedules Credit Card | 17,424 |
| Beard Equipment Company | Schedules Trade | 2,300 |
| Fisher Russel PLLC | Schedules Prof. Servs. | 32,928 |
| Golfco | Schedules Trade | 801 |
| JS Held | Schedules Prof. Servs. | 59,908 |
| Kramer Rayson | Schedules Prof. Servs. | 583,341 |
| Loudon Utilities | Schedules Utilities | 7,000 |

23

| | | |
|---|---|---:|
| Mountain Commerce Bank | Schedules Credit Card | 23,069 |
| Short Mountain Silica | Schedules Trade | 4,186 |
| Simplot Birmingham | Schedules Trade | 18,325 |
| Traver Distributing | Schedules Trade | 260 |
| Taylor Made | Schedules Trade | 16,000 |
| Tennessee Turf | Schedules Services | 6,850 |
| US Foods | Schedules Services | 13,246 |
| Various (primarily club members) | POCs | 2,930,423 |
| **Total Unsecured Claims** | | **$33,314,560** |

### c.   Litigation Claims

Since acquiring the Rarity Bay assets through the federal receivership in 2015, the Debtor has been involved in extensive litigation arising from its role as successor developer, owner and operator of the Rarity Bay Country Club and related amenities, holder of Declarant Rights, and participant in numerous contractual and development relationships.

The litigation history of Debtor is significant to understanding both the Debtor's financial condition and the circumstances that ultimately resulted in the commencement of this Chapter 11 case. The principal litigation matters generally fall into the following categories:

1.      disputes with RBP;
2.      membership dues and initiation fee litigation;
3.      Declarant Rights and homeowners' association governance litigation;
4.      membership obligation litigation;
5.      community association litigation; and
6.      bankruptcy-related contested matters.

The Plan Proponent believes that the cumulative burden of these proceedings materially affected the Debtor's liquidity, management resources, professional expenses, and restructuring efforts.

### i.   Litigation with RBP

*1.   Rarity Bay Partners v. Salem Pointe Capital, LLC, Monroe County Chancery Court (No. 19943)*

One of the most significant disputes affecting the Debtor involved litigation initiated by RBP.  On June 1, 2017, RBP initiated suit and alleged claims arising from the partnership relationship between the Debtor and RBP and subsequent transactions, including those arising from:
- the AOR;
- the Sixth Amendment to the Master Declaration;
- a partnership agreement concerning certain development activities; and
- related agreements governing lot sales, membership rights, development activities, and collection of initiation fees.

RBP sought various forms of relief, including:
- unpaid initiation fees;
- diminution-in-value damages;
- equitable relief;
- extension of the AOR;
- attorney fees; and

24

- declaratory relief regarding the Debtor's Declarant status.

Following years of discovery and motion practice, the parties tried their dispute before Chancellor Bryant from December 5 through 11, 2023. On March 1, 2024, Chancellor Bryant made the following decisions:

- The Debtor lost standing to continue serving as the Declarant as of no later than June 1, 2017 and was required to relinquish control to the homeowner's association;
- Because the AOR prohibited amendments without RBP consent, the Debtor lacked authority to annex additional property without RBP's approval and the Debtor's attempted annexation of Phase 16 and Phase 17 of Rarity Bay was ineffective;
- The Debtor further breached the AOR by waiving or discounting golf initiation fees, entering into multiple-property-owner arrangements, extending membership discount programs and otherwise reducing initiation fees below contractual levels.
- RBP was entitled to diminution in value damages in the amount of $3,266,598.00.
- RBP was entitled to $241,500.00 for social membership initiation fees allegedly not collected or remitted.
- RBP was entitled to attorney's fees in an amount to be determined.

The Debtor appealed the trial court's ruling and argues that it is still the Declarant, it was entitled to annex property through supplemental declarations without RBP's consent, and RBP should not be awarded monetary damages and attorney's fees. The appeal remains pending before the Tennessee Court of Appeals as Case No. No. E2024-01479-COA-R3-CV.  Because the judgment is on appeal, no assurance can be given regarding:

- whether the trial court judgment will be affirmed, reversed, modified, or remanded;
- the ultimate amount of any liability;
- the final determination concerning Declarant Rights; or
- the impact of the litigation on the Debtor, the Reorganized Debtor, or creditors.

2. *Salem Pointe Capital, LLC v. BEP Rarity Bay, LLC and Bald Eagle Ventures, LLC, United States District Court, Eastern District of Tennessee, Case Nos. 3:18-cv-00443 and 3:18-cv-00444 (consolidated)*

This action was a lien enforcement and collection action that originated in Monroe and Loudon Counties before being removed and consolidated in the United States District Court, Eastern District of Tennessee. The Debtor initiated these suits against BEP. Bald Eagle Ventures acquired approximately 102 lots in the Rarity Bay development in 2012-2013 and later conveyed them to affiliated entity BEP Rarity Bay, LLC. The Debtor claimed BEP and Bald Eagle owed substantial club membership dues, initiation fees, and related charges associated with 65 of those lots. The Bald Eagle entities defended on the basis that the Sixth Amendment to the Master Declaration, which the Debtor relied upon to allege that the dues and fees were owed, was void and unenforceable.

In 2019, the Debtor and BEP settled their dispute, culminating in a Settlement Agreement dated September 30, 2019, which required BEP to pay $500,000 in exchange for lien releases on its lots. The Debtor also agreed to waive certain social membership fees, discount golf memberships, and provide certain development related approvals to BEP so it could develop its lots and bring more members into the community.  The Debtor also agreed to indemnify BEP for any disputes arising from the parties' settlement.

Almost immediately, RBP – relying on the Collection Agreement – attempted to intervene in the case to prevent its dismissal and reverse the settlement. RBP alleged that the Collection Agreement required

25

mutual agreement between SPC and RBP for any settlement. The District Court denied RBP's intervention and upheld dismissal of the case as did the Sixth Circuit, which found that RBP's remedy was a breach of contract action in state court.

3. *Rarity Bay Partners v. Salem Pointe Capital, LLC, et al., Knox County Circuit Court (Case No. 2-355-19)*

RBP initiated this action immediately after the federal courts denied RBP's intervention to set aside the settlement reached between the Debtor and BEP. RBP caused liens lis pendens to be placed on BEP's 65 lots at the same time it initiated this suit in 2019. From that point forward, BEP has been unable to sell or develop these lots.

As to the Debtor, RBP claims that it breached the Collection Agreement as well as the AOR by settling with BEP. As to the BEP Defendants, RBP claims that BEP wrongfully induced the Debtor to breach the Collection Agreement and AOR, which it claims BEP knew about. RBP also alleged against BEP claims of tortious interference, fraud, and civil conspiracy. BEP asserted counterclaims and alleged that:

- RBP never owned the claims;
- RBP never owned the liens;
- RBP lacked standing to challenge the settlement;
- RBP's only remedy was against the Debtor;
- the settlement was valid;
- RBP was abusing litigation to interfere with BEP's property sales.

BEP also maintains that the Debtor is responsible for indemnifying it against RBP's claims.

Despite years of discovery and motion practice, this case was still pending at the time the Debtor filed this chapter 11 case. This case was removed to the Bankruptcy Court and is AP No. 3:25-ap-03005 (the "RBP AP").

### ii.  Declarant Rights and Governance Litigation

1. *Michael Frisbey and Jamie Frisbey v. Salem Pointe Capital, LLC, Michael Ayres, and Rarity Bay Community Association, Inc., Monroe County Chancery Court (No. 21,579) – Appeal: Tennessee Court of Appeals, Case No. E2023-01233-COA-R3-CV (June 24, 2024)*

This dispute arose when the Debtor and Michael Ayres relied upon provisions added through the Sixth Amendment to the governing documents and purported to remove Michael Frisbey from the RBCAI Board of Directors through exercise of Declarant authority. The Sixth Amendment had been recorded by the Debtor shortly after acquiring the Declarant Rights and purported to grant the Declarant authority to remove directors and approve replacement directors.

Michael and Jamie Frisbey filed suit in Monroe County Chancery Court seeking injunctive and declaratory relief. The Frisbeys alleged, among other things, that:
- the Debtor improperly exercised Declarant authority to remove Mr. Frisbey from the HOA Board;
- the Sixth Amendment provisions relied upon by the Debtor conflicted with Tennessee law governing nonprofit corporations;
- the HOA Board removal process violated the Tennessee Nonprofit Corporation Act;
- the Debtor lacked authority to remove directors through unilateral Declarant action; and
- Mr. Frisbey was entitled to reinstatement to the Board.

In response, the Debtor asserted that it was the Declarant and had authority to act as it did in removing Mr. Frisbey.

The trial court ruled in favor of Plaintiffs and found that the Debtor lacked authority to remove Mr. Frisbey and ordered him to be reinstated. On appeal by the Debtor and Ayers, the Tennessee Court of Appeals ultimately upheld Mr. Frisbey's reinstatement on the ground that the bylaw relied upon to remove him was in conflict with Tennessee Nonprofit law. However, in reaching this decision, the Court of Appeals found that the Debtor was the Declarant following the federal receivership.

2. *Rick Hoban, Ed Harless, Donna Harless, Julia Misslin, Peter Misslin, John Wood, Kim Wood, Bart Whitman, Michael Guido, and J. Carey McHugh v. Salem Pointe Capital, LLC, Michael Ayres, and Rarity Bay Community Association, Inc, Monroe County Chancery Court (No. 21643)*

In this action, the Plaintiffs are homeowners and the related homeowner association that seek declaratory and injunctive relief against the Debtor to have its declarant rights terminated and the governance of the community transferred to the association.  In support, Plaintiffs allege that the development is mature and substantially complete and, therefore, according to *Innerimages, Inc. v. Newman*, No. E2018-00375-COA-R3-CV (Tenn. Ct. App. Mar. 26, 2019), control should transfer to the homeowners association.

The Debtor disputes Plaintiff's contentions and maintains that it validly acquired and retained Declarant Rights through the 2015 federal receivership transaction.

Following commencement of this chapter 11 case, the action was removed to the Bankruptcy Court for the Eastern District of Tennessee as Adversary Proceeding No. 3:24-ap-03032 (the "Hoban AP")

### iii.  Membership Obligation Litigation

1. *Eric Hinkle and Karen Hinkle v. Salem Pointe Capital, LLC, Monroe County Chancery Court (No. 21734)*

On March 22, 2023, the Hinkles filed suit against the Debtor after the Debtor SPC placed a lien on the Hinkles' property for unpaid club dues. The Hinkles assert six causes of action against the Debtor and ultimately seek declarations that the Mandatory Social Membership covenant is unenforceable, that they are not obligated to pay membership dues to the Debtor, that the Debtor's lien should be removed from their property, and that the Debtor is liable for damages arising from its alleged conduct. In response, the Debtor asserts that the mandatory social membership covenant in the Hinkles' deed is enforceable along with the Sixth Amendment.

In September 2023, the Hinkles filed a Motion for Partial Summary Judgment and argued that the original Club Membership Plan terminated when the club was sold, that the Debtor repudiated the prior membership plan, and that the Debtor could not simultaneously disclaim obligations under the plan while enforcing dues obligations against owners. The Debtor substantively opposed this motion and argues that disputed issues of fact precluded summary judgment. The trial court ultimately denied the motion.

On June 27, 2025, the Debtor removed the Hinkle litigation to the United States Bankruptcy Court for the Eastern District of Tennessee as Adversary Proceeding No. 3:25-ap-03024 (the "Hinkle AP").

27

2.  *Russell and Traci Lorts, et al. v. Salem Pointe Capital, LLC, United States Bankruptcy Court for the Eastern District of Tennessee, Adversary Proceeding No. 3:26-ap-03006*

This Adversary Proceeding (the "Lorts AP") was brought by over 200 homeowners in Rarity Bay and challenges mandatory membership deed covenants, the Sixth Amendment and the Debtor's authority to impose and collect mandatory club membership dues, transfer fees, and other obligations associated with the Rarity Bay. The Plaintiffs seek declarations that

- mandatory club membership obligations are invalid and unenforceable;
- transfer fees are invalid and unenforceable;
- portions of the Sixth Amendment are invalid;
- invalidate liens securing transfer fees, initiation fees, and club dues; and
- SPC may not exempt favored parties from homeowners association assessments.

The Plaintiffs also seek to recover improper transfer fees, improper club membership dues and damages for the Debtor's breach of fiduciary duty. The Debtor has not filed an answer and the litigation remains pending.

### iv.  Community Association Litigation

1.  *Rarity Bay Community Association, Inc. v. Rarity Bay Partners, et al., Monroe County Chancery Court (No. 20489)*

This litigation arose from disputes concerning homeowners association assessments and dues allegedly owed by RBP on a substantial number of lots owned by it within the Rarity Bay development. Rarirty Bay Community Association, Inc. ("HOA") ultimately filed suit seeking unpaid HOA assessments, charges and fees as well as interest and attorney's fees. RBP responded by making third party claims against others including the Debtor and Mr. Ayers. Specifically, RBP alleged that the Debtor and Mr. Ayers wrongfully directed the HOA's suit against it despite the Debtor's agreements to exempt RBP from such obligations.

After extensive and expensive discovery and motion practice, the matter was tried in August 2024. On April 1, 2025, the trial court dismissed all claims by all parties but awarded RBP attorneys' fees against the HOA.

## III.    EVENTS LEADING TO THE CHAPTER 11 FILING

Following its acquisition of the Rarity Bay assets through the federal receivership in 2015, the Debtor operated an integrated golf, hospitality, recreational, and development business. The Debtor's operations included ownership and operation of the Rarity Bay Country Club, golf course, food and beverage facilities, membership programs, recreational amenities, and related development assets. To support operations, development activities, equipment acquisitions, and capital expenditures, the Debtor incurred various secured financing obligations.

The Debtor continued to operate through the Petition Date and, according to the Debtor's Statement of Financial Affairs, gross revenues were approximately $3.35 million in 2022 and approximately $4.19 million in 2023. For calendar year 2024 through the Petition Date, the Debtor reported gross revenues of approximately $3.65 million. Moreover, throughout the Chapter 11 Case, the Debtor and subsequently the chapter 11 Trustee have continued operating the business as a going concern. Trustee-filed Monthly Operating Reports reflect recurring monthly revenues generally ranging between approximately $380,000 and $500,000 and continued employment of approximately 22–24 employees.

28

As of May 30, 2026, the estate reported approximately $756,000 in cash, approximately $502,000 in accounts receivable, and approximately $7.85 million in total reported assets. During May 2026, the estate generated approximately $782,000 in receipts (including approximately $300,000 as an ERTC Refund) and reported net positive operating cash flow of approximately $166,000. The estate employed approximately 22 full-time employees and remained current on post-petition tax obligations, insurance obligations, and U.S. Trustee fees.[6]

Ultimately, the Plan Proponent does not believe the chapter 11 filing resulted from a collapse in operating revenues nor from any burden associated with Debtor's secured debt. Rather, the Debtor faced increasing liquidity pressures arising from multi-forum litigation, governance disputes, and uncertainty regarding Declarant Rights, collection rights, membership obligations, and related contractual rights. Indeed, the extensive litigation caused substantial professional expenses and required significant management resources to address these matters.

## IV. MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASE

The Plan Proponent is seeking to confirm the Plan and for the Plan to become effective in the fourth quarter of 2026. No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable contemplated by the Plan Proponent.

### A. Significant Events in the Chapter 11 Case

On September 29, 2024 ("Petition Date") the Debtor filed the instant voluntary chapter 11 case (the "Chapter 11 Case").

### B. Schedules and Statements

The Debtor Filed its Schedules and Statements with the Bankruptcy Court on October 22, 2024 (Doc. Nos. 75-83).

### C. Claim Bar Dates

The Bankruptcy Court set deadlines for filing proofs of claims (Doc. No. 12) and set the following Bar Dates:

• *General Bar Date*: May 21, 2025. The General Bar Date is the last date for Persons or Entities, other than governmental units, to File Proofs of Claim against the Debtor on account of claims (as defined in section 101(5) of the Bankruptcy Code) arising, or deemed to have arisen, prior to the Petition Date, including, for the avoidance of doubt, claims arising under section 503(b)(9) of the Bankruptcy Code.

• *Government Bar Date*: March 28, 2025. The Governmental Bar Date is the last date for governmental units, as defined in section 101(27) of the Bankruptcy Code, to File Proofs of Claim against the Debtor on account of claims arising, or deemed to have arisen, prior to the Petition Date.

---

[6] The Trustee has advised that the reported asset values are based primarily on tax-basis cost accounting rather than estimated fair-market-value methodologies previously used by the Debtor and that the reported liabilities include filed proofs of claim that remain subject to investigation, reconciliation, and objection.

**D.      Section 341 Meeting of Creditors**

On November 4, 2024, the U.S. Trustee conducted a of creditors (the "341 Meeting") at which the U.S. Trustee and creditors had the opportunity to question the Debtor under oath concerning the Debtor's acts, conduct, property, and the administration of the Chapter 11 Case.

**E.      No Formation of a Creditors' Committee**

The Office of the United States Trustee (the "U.S. Trustee") has not appointed an official committee of unsecured creditors pursuant to section 1102(a)(1) of the Bankruptcy Code.

**F.      Appointment of Trustee**

On August 11, 2025, the Bankruptcy Court order a chapter 11 trustee be appointed. (Doc. No. 622). The United States Trustee appointed Gary M. Murphey ("Trustee") as chapter 11 trustee. (Doc. No. 625).

**G.      Proposed Sale of Assets under Section 363 of the Bankruptcy Code**

On March 24, 2026, the Trustee filed a motion styled "*Motion by Chapter 11 Trustee Pursuant to 11 U.S.C. §§ 363(B), (F), (K), and (M), and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006, to (A) Approve the Sale Transaction Pursuant to the Asset Purchase Agreement  with Rarity Bay Partners Free and Clear of Claims, Liens,  Encumbrances, and Other Interests; (B) Approve the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Approve Procedures to Establish Certain Cure Amounts for Executory Contracts and Unexpired Leases to be Assumed Under the APA; (D) Approve Sale and Bidding Procedures; and (E) Schedule a Sale Approval Hearing*" (Doc. No. 774) (the "First Sale Motion"), requesting approval for the sale to RBP of the business known generally as the Rarity Bay Golf Club, the real property and amenities located at 403 Rarity Bay Parkway, Vonore, Tennessee, intangible rights, fixed tangible assets, inventory, assumed contracts, and vacant land for a purchase price consisting of a credit bid of $7,042,000, plus $150,000 to payoff the U.S. Small Business Administration and $1,000,000.

Several creditors and parties-in-interest objected to the proposed sale and on May 5, 2026, the Trustee withdrew the First Sale Motion.  (Doc. No. 901).

**H.      Motion to Dismiss Chapter 11 Case**

On May 11, 2026, RBP filed a motion styled "*Motion to Dismiss the Chapter 11 Case*" (Doc. No. 915) (the "Motion to Dismiss") alleging, among other things, that the Debtor's estate is suffering substantial loss and diminution, and there is no reasonable likelihood of reorganization and that the Debtor is administratively insolvent. Numerous parties filed objections to the Motion to Dismiss. The Bankruptcy Court held a status hearing on the Motion to Dismiss on June 18, 2026 and continued the status hearing to September 24, 2026. (Doc. No. 988).

**I.      Renewed Proposed Sale of Assets under Section 363**

On June 4, 2026, the Trustee filed a motion styled "*Second Motion by Chapter 11 Trustee Pursuant to 11 U.S.C. §§ 363(B), (F), (K), and (M), and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006, to: (A) Approve Sale Procedures, (B) Schedule a Sale Approval Hearing and Objection Deadline, (C) Approve the Form of Notices of the Motion to Sell, the Sale Approval Hearing, and Objection Deadline, and (D) Approve Procedures to Establish Certain Cure Amounts for Executory Contracts and Unexpired Leases that May Be Assumed and a Notice Related Thereto; (E) Approve the Sale of Certain Assets Free and Clear of*

*Claims, Liens, Encumbrances, and Other Interests; (F) Approve the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases*" (Doc. No. 938) (the "Second Sale Motion").  Numerous parties have filed objections to the Second Sale Motion. The Bankruptcy Court held a preliminary hearing on the Second Sale Motion on June 18, 2026 and continued the hearing to June 25, 2026. (Doc. No. 989).

**J.      Motion for Relief from Automatic Stay filed by RBP.**

On June 9, 2026, RBP filed a motion styled "*Rarity Bay Partners' Motion for Relief from the Automatic Stay with Respect to its Lien on the Declarant Rights*" (Doc. No. 945) (the "Declarant Rights Stay Relief Motion") asserting, among other things, that it is the holder of a security interest in certain declarant rights, that the Debtor cannot establish that there is a possibility of a feasible reorganization, and that the declarant rights are not necessary to an effective reorganization, if reorganization is possible. Numerous parties filed objections to the Declarant Rights Stay Relief Motion. The Bankruptcy Court conducted a preliminary hearing on the Declarant Rights Stay Relief Motion on June 18, 2026 and set a final pretrial conference for September 24, 2026. (Doc. No. 990).

**K.      Filing of Plan**

On June 17, 2026, the Plan Proponent filed the Plan.

**V.      THE PLAN**

**THIS ARTICLE V OF THE DISCLOSURE STATEMENT IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE KEY TERMS, STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ENTIRE PLAN AND EXHIBITS TO THE PLAN. ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL RELATED TERMS AND PROVISIONS AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. INSTEAD, REFERENCE IS MADE TO THE PLAN AND ALL SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS. THE PLAN ITSELF (INCLUDING ANY ATTACHMENTS) AND THE PLAN SUPPLEMENT WILL CONTROL THE TREATMENT OF HOLDERS OF CLAIMS AND INTERESTS UNDER THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS ARTICLE V AND THE PLAN (INCLUDING ANY ATTACHMENTS TO THE PLAN) THE PLAN SHALL GOVERN.**

**A.      Purpose and Effect of the Plan.**

Chapter 11 of the Bankruptcy Code allows a debtor to reorganize or to liquidate and wind up its affairs for the benefit of the debtor and its creditors.  Upon the commencement of a chapter 11 case, an estate is created comprised of all the legal and equitable interests of a debtor as of the date the petition is filed.  A debtor will typically remain in control of its estate as a debtor-in- possession during the chapter 11 case.

Pursuant to section 362 of the Bankruptcy Code, the filing of a chapter 11 petition imposes an automatic stay of all attempts by creditors or third-parties to collect or enforce prepetition claims against a

31

debtor or otherwise interfere with its property or business, unless relief from the automatic stay is obtained from the Bankruptcy Court.

The Bankruptcy Code is designed to encourage the parties-in-interest in a chapter 11 proceeding to negotiate the terms of a chapter 11 plan so that it may be confirmed.  A chapter 11 plan is the vehicle for satisfying or otherwise addressing the claims against and the interests in the debtor.  Confirmation of a chapter 11 plan makes it binding on the debtor and all of its creditors and the prior obligations owed by the debtor to such parties are compromised in exchange for the obligations specified in the plan.

B.      **Summary of Key Provisions of the Plan.**

**THIS SUMMARY OF THE PLAN IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN. WITH RESPECT TO A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN ANY INCONSISTENCY BETWEEN THIS SUMMARY OF THE PLAN AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN FOR ALL PURPOSES.  YOU SHOULD READ THE PLAN IN ITS ENTIRETY.**

**MEANS FOR IMPLEMENTATION OF THE PLAN**

**Sale of Certain Property**

For the fair value cash sum of one million dollars ($1,000,000) (the "BEP Purchase Price") and the BEP Settlement Consideration set forth in Section 14.05 of the Plan, the Reorganized Debtor shall convey to BEP that certain real property owned by the Debtor listed on Schedule 7.01 attached to the Plan (the "BEP Sale Property") generally consisting of fifty one (51) lots situated in Phase 17 and located near Turnstone Lane (the "Phase 17 Lots"), eight (8) lots located near Shearwater Drive (the "Shearwater Lots"), approximately three (3) acres situated near the community garden and dog park (the "3 Acres"), and approximately 11.2 acres located near Keeble Road (the "11.2 Acres").

For the BEP Additional Funds (as defined below), the Reorganized Debtor and TCRB shall provide one million two hundred fifty thousand dollars ($1,250,000) in credits that may be applied by BEP (or conveyed by BEP to subsequent purchasers of any lot owned by BEP) to the then current value/price for membership certificates, initiation fees, dues, or like charge necessary to apply or maintain a golf or social membership marketed by the Reorganized Debtor.

The BEP Purchase Price and BEP Additional Funds are conditioned upon the negotiation, execution, and delivery of (a) an agreement (the "Use Agreement"), satisfactory to BEP in its sole and absolute discretion, permitting the Phase 17 Lots or other property not previously annexed into the Rarity Bay development, to enjoy the rights to access, utility connection and use of the amenities afforded properties withing the Rarity Bay development (which such rights shall be fully transferrable upon a sale by BEP of such property); and (b) an agreement (the "ARG Agreement"), satisfactory to BEP, in its sole and absolute discretion, governing the architectural design process for certain of BEP's existing lots and the BEP Sale Property.

If and when such the RBP Secured Claim becomes and Allowed Secured Claim, the BEP Purchase Price and the BEP Additional Funds shall be delivered to RBP for a credit against and reduction in its Allowed Secured Claim. The BEP Sale Property shall be free and clear of all liens, claims, interests, and encumbrances, including, specifically but without limitation, all claims of liens lis pendens, and, solely as to the Phase 17 Lots, any restrictive covenants. In respect of the property identified on Schedule 14.02 attached to the Plan, the liens of HOA against such properties shall continue to exist in the same priority as they existed on the Petition Date.

32

The Reorganized Debtor shall convey to HOA an easement over the property described in Schedule 7.01(b) to the Plan for the location of an approximately 1,800 square foot building and for a parking area for said building (the "RBCAI Easement"), the size and location of such parking area to be mutually agreed to by the Reorganized Debtor and HOA.  Such building and parking area shall be utilized for the storage of maintenance materials and equipment utilized for the maintenance of common areas and other property of HOA.  The conveyance of the RBCAI Easement shall be granted  in consideration for the payment of approximately $30,000 by HOA (the "RBCAI Purchase Price"). If and when the RBP Secured Claim becomes an Allowed Secured Claim, the RBCAI Purchase Price shall be delivered to RBP for a credit against and reduction in its Class 2 Allowed Secured Claims. Upon payment of the RBCAI Purchase Price, the RBCAI Easement shall be free and clear of all liens, claims, interests, and encumbrances.

**Restructuring of RBP Secured Claim**

The RBP Secured Claim, to the extent such Claim becomes an Allowed Claim, after the reduction by the BEP Purchase Price, shall be paid in accordance with the provisions of Section 4.01 of the Plan.

**Cancelation of Equity Interests in The Debtor**

As provided in Section 4.01 of the Plan, existing Equity Security Interests in the Debtor shall be canceled on the Effective Date.

**Infusion of New Equity**

Upon the occurrence of the Effective Date, TCRB shall infuse the sum of one million five hundred thousand dollars ($1,500,000) (the "TCRB Equity Infusion") which amount shall be used first toward the satisfaction the Allowed unclassified claims in Sections 3.01 through 3.05 of the Plan. Any surplus of the TCRB Equity Infusion after satisfaction of the Allowed unclassified claims in Sections 3.01 through 3.05 of the Plan shall be utilized to make the payments to the holders of Allowed Claims in Class 10.

**Issuance of New Equity Security Interests in Reorganized Debtor**

Upon the occurrence of the Effective Date, and the receipt by the Reorganized Debtor of the TCRB Equity Infusion, TCRB shall be issued one hundred percent (100%) of the Equity Security Interests in the Reorganized Debtor.

**Sale of Club Credits**

TCRB intends to market and sell membership certificates in TCRB to third parties, and in addition thereto, the Reorganized Debtor shall charge initiation fees along with monthly dues for the use of and membership in the club and the golf course to generate revenue for the operation of the club and golf course and to fund the repayment of the debts under the Plan.  For the BEP Additional Funds, TCRB and the Reorganized Debtor will establish a credit account in the amount of one million two hundred fifty thousand dollars ($1,250,000) from which BEP or any subsequent purchaser of a lot owned by BEP that is identified by BEP may draw against until exhausted (the "Club Credit Account") for the payment of membership certificates in TCRB, the initial membership fees, initiation fees, dues, and any other fees or assessments of like nature for the use of and/or membership in the Club and the golf course (the "Club Credits") with such Club Credits to be applied, charged, and assessed on the then current cost or charge for such membership certificate, initiation fee, dues, fees, or assessments. By way of example, but without limitation, a membership certificate in TCRB costs $12,500.00 as of the date of the filing of the proposed Plan. In the event that the cost of a membership certificate increases to $15,000.00 in 2027, then BEP would be charged $15,000.00 for such membership certificate and that amount would be deducted from the Club Credits that

33

BEP holds. Where BEP identifies a subsequent purchaser that may draw on the Club Credit Account, BEP shall also identify the amount of credit allocated to such subsequent purchaser. Any subsequent purchaser identified by BEP and allocated funds shall not be permitted to subsequently transfer any portion of their credit allocation.

**BEP Additional Funds**

BEP shall, subject to the provisions of Section 7.01 of the Plan, provide additional funds of $1,000,000 (the "BEP Additional Funds") which shall be delivered to the Reorganized Debtor in exchange for the sum of $1,250,000 in Club Credits which such credits may be parceled by BEP and sold to and used by prospective purchasers of lots from BEP.

**Corporate Governance**

Upon the occurrence of the Effective Date, the settlements set forth in Article 14 of the Plan shall be implemented. The net result of the approval of the settlements in this Plan will be 1) to fully and finally resolve the Hoban AP, the Hinkle AP, the Lorts AP, resolve certain of the claims in the RBP AP, 2) provide the HOA with certain real property which will be beneficial and which use and ownership will add value to the Rarity Bay subdivision as a whole; 3) provide the Reorganized Debtor with certain real property which will be useful and beneficial to the operation of the golf course; and 4) limit the Reorganized Debtor's ongoing indemnity obligations to BEP.

**Assumption of Executory Contracts**

Upon the occurrence of the Effective Date, the executory contracts to be assumed by the Debtor set forth in Article 6 of the Plan shall be implemented.  The net result of the assumption of the assumed executory contracts will be to implement certain of the settlements provided for in this Plan such that ongoing litigation and indemnification claims may be resolved.

**Pursuit of Avoidance Actions, Causes of  Action, and Rights of Action**

All Preserved Actions, Avoidance Actions, Causes of Action, and Rights of Action shall be conveyed to the GUC Trust as set forth in Article 8 of the Plan.  For purposes of clarity but without limiting the foregoing, the following include specific types of Causes of Action, Avoidance Actions, and Rights of Action that comprise the Preserved Actions:

(a) Causes of Action related to insurance policies.  Unless otherwise released by the Plan or order of the Bankruptcy Court, the Debtor expressly reserves all Causes of Action based in whole or in part upon any and all insurance contracts, insurance policies, occurrence policies and occurrence contracts to which the Debtor is a party or pursuant to which the Debtor has any rights whatsoever. The Causes of Action reserved include Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement or any other matters.

(b) Claims, defenses, crossclaims and counterclaims related to litigation and possible litigation. Unless otherwise released by the Plan or order of the Bankruptcy Court, the Debtor expressly reserves all Causes of Action (including, but not limited to, all claims, defenses, crossclaims and counterclaims) against Person(s) that are party to or that may become party to litigation, arbitration or other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial, including, but not limited to the following actions currently pending or pending as of the Petition Date:

34

i.  All claims the Debtor may have against partners of a general partnership, including, without limitation RBP and its successors and predecessors in interest and affiliates, for a general partnership's debts including, without limitation, claims arising under TENN. CODE ANN. § 61-1-306, the Tennessee Revised Uniform Partnership Act (TENN. CODE ANN. § 61-1-101, *et seq.*) its and predecessor enactments, or any other similar applicable state statutory or common law cause of action or remedy;

ii.  RBP AP (as defined above); and

iii.  *Taylor v. Salem Pointe Capital, LLC,* Adv. Proc. No. 3:25-ap-03005-SHB (the "<u>Taylor AP</u>").

For the avoidance of doubt, the Hoban AP, the Hinkle AP, and the Lorts AP (each as defined below) are being settled in accordance with the provisions of Article 14 of this Plan.

(c) <u>Causes of Action related to accounts receivable and accounts payable</u>. Unless otherwise released by the Plan or order of the Bankruptcy Court, the Debtor expressly reserves all Causes of Action against or related to all entities or individuals that owe or that may in the future owe money to the Debtor. Further, unless otherwise released in the Plan, the Debtor expressly reserves all Causes of Action against or related to all entities or individuals that assert or may assert that the Debtor owes money to them.

(d) <u>Causes of Action related to tax refunds and taxes</u>. Unless otherwise released by the Plan or order of the Bankruptcy Court, the Debtor expressly reserves all Causes of Action against or related to all entities that owe or that may in the future owe money related to tax refunds of the Debtor. Further, the Debtor expressly reserves all Causes of Action against or related to all entities that assert or that may in the future assert the Debtor owes taxes to them.

(e) <u>Causes of Action related to contracts and/or leases</u>. Unless otherwise released by the Plan or order of the Bankruptcy Court, the Debtor expressly reserves all Causes of Action, based in whole or in part upon any and all contracts and leases, including, but not limited to those identified in the Debtor's Schedule G, as may be amended, to which the Debtor has any right whatsoever. The Causes of Action reserved include Causes of Actions against vendors, suppliers of goods or services, or any other parties: (i) for overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (ii) for wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (iii) for failure to fully perform or to condition such performance on additional requirements under contracts with the Debtor before the assumption or rejection, if applicable; (iv) for payments, deposits, holdbacks, reserves or other amounts owed by any creditor, utility, supplier, vendor, insurer, lender, lessor, or other party; (v) for any liens held by the Debtor; (vi) counter-claims and defenses related to any contractual obligations; (vii) turnover actions; and (viii) for unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property, or any business tort claim.

(f) <u>Causes of Action related to deposits, adequate assurance postings and other collateral postings</u>. Unless otherwise released by the Plan or order of the Bankruptcy Court, the Debtor expressly reserves all Causes of Action based in whole or in part upon any and all postings of security deposits, adequate assurance payments or any other type of deposit or collateral

35

(g) <u>Causes of Action related to Avoidance Actions</u>. Unless otherwise released by the Plan or order of the Bankruptcy Court, the Debtor expressly reserves any and all potential claims or causes of action for Avoidance Actions, including potential claims or causes of action against the Debtor's current or former directors, officers, or insiders (as defined in the Bankruptcy Code) under chapter 5 of the Bankruptcy Code and those related to transfers identified in the Debtor's statement of financial affairs, as may be amended.

(h) <u>Causes of Action related to commercial tort claims</u>. Unless otherwise released by the Plan or order of the Bankruptcy Court, the Debtor expressly reserves all commercial tort claims against any individual or entity, including, but not limited to, claims and causes of action of the Debtor against any of the Debtor's current or former directors, officers, insiders or affiliates, including claims against the Debtor's current or former directors and officers for (i) wrongful acts such as gross mismanagement, material misrepresentations, misstatements, errors, neglect, or breach of duty in connection with the Debtor's operations, practices, financial condition, or otherwise, including the Debtor's financial health and financial projections and (ii) acts, errors, misstatements, misleading statements, omissions or breaches of duty in connection with the purchase or sale of, or offer to purchase or sell, securities issued by the Debtor.

(i) <u>Causes of Action related to recharacterization</u>. Unless otherwise released by the Plan or order of the Bankruptcy Court, the Debtor expressly reserves all Causes of Action against any Holder of a Claim to recharacterize any asserted Claim as equity in the Debtor.

(j) <u>Causes of Action related to subordination</u>. Unless otherwise released by the Plan or order of the Bankruptcy Court, the Debtor expressly reserves all Causes of Action against RBP and its successors and predecessors in interest and affiliates for the subordination of any of its or their claims in this Chapter 11 Case.

**PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**Assumed Executory Contracts and Unexpired Leases**

The Debtor shall assume the following executory contracts and unexpired leases as of the Effective Date:

(a) The 2019 Settlement Agreement (as modified by Section 14.05 of this Plan) (the "2019 Settlement Documents"); and
(b) Such other executory contracts and unexpired leases as the Plan Proponent may identify prior to confirmation in any supplement or amendment to this Plan.

**Rejected Executory Contracts and  Unexpired Leases**

The Debtor shall reject the following executory contracts and unexpired leases as of the Effective Date:

(a) The Collection Rights Agreement;
(b) The Assignment of Right to Purchase Real Property dated as of May 18, 2015 by and between the Debtor and Salem Pointe Capital Partners, as predecessor in interest to RBP;
(c) All agreements of any kind or nature between the Debtor and RBP;
(d) All Club Membership Agreements, including, without limitation, any rights of first offer or refusal to purchase the Club;

(e)      The Community Services Agreement dated as of April 18, 2018 and effective as of November 1, 2017, by and between Rarity Bay Community Association and Salem Pointe Capital, LLC; and

(f)      Such other executory contracts and unexpired leases as the Plan Proponent may identify prior to confirmation in any supplement or amendment to this Plan.

**Effect of Non-assumption.**

Except for executory contracts and unexpired leases that have been assumed, and, if applicable, assigned, before the Effective Date or under section 6.01 of this Plan, or that are the subject of a pending motion to assume, and if applicable assign, the Debtor will be conclusively deemed to have rejected all executory contracts and unexpired leases as of the Effective Date.

**Effect of Rejection of Collection Rights Agreement and Assumption of 2019 Settlement Agreement.**

Upon rejection of the Collection Rights Agreement and assumption of the 2019 Settlement Agreement, there shall be no continuing basis for the assertion of any liens lis pendens upon any lots owned by BEP and, accordingly, the Confirmation Order shall provide that (a) all liens lis pendens shall be released upon the Effective Date and (b) the Confirmation Order may be recorded in the appropriate county land records to effectuate the release of all such liens lis pendens and the Bankruptcy Court shall enter an order in *Salem Pointe Capital Partners (n/k/a Rarity Bay Partners) v. Salem Pointe Capital, LLC, et al.*, Adv. Proc. No. 2:25-ap-03006-SHB (the "RBP AP") terminating and declaring that all liens lis pendens are void and of no further force or effect.

**Claims arising From Rejection.**

Any Claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than sixty (60) days after the date of the entry of the Confirmation Order and any such Claim, to the extent it is or becomes an Allowed Claim, shall be treated as a Class 10 Claim hereunder.

**Survival of Restrictive Covenants.**

The covenants, agreements, terms, conditions, and representations contained in the restrictive covenants and declarations governing the Rarity Bay Subdivision shall remain in full force and effect, except as otherwise provided in the Plan and specifically, except for the Sixth Amendment of Master Declaration of Covenants, Conditions, and Restrictions for Rarity Bay and Amendment of Bylaws for Rarity Bay Community Association, Inc., which Sixth Amendment is being declared void, ineffective, and avoided pursuant to Section 14.04 of the Plan and except for the termination of the Declarant Rights as provided for in Section 14.03 of the Plan.

## COMPROMISES AND SETTLEMENTS

**Effect of Confirmation Order**

Pursuant to Bankruptcy Rule 9019 and applicable provisions of the Bankruptcy Code, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Equity Security Interests, liens and controversies resolved pursuant to the Plan, including, without limitation, all liens, Claims and interests arising prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, arising out of, relating to or in connection with the business or affairs of, or transactions with,

37

the Debtor. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtor, the Estate, Creditors and other parties in interest, and are fair, equitable and within the range of reasonableness.

**Class 9 Settlement and Settlement Consideration**

The holder of the Allowed Class 9 Claim and the Plan Proponent have reached the following compromise and settlement and have agreed to the following provisions which shall constitute the Class 9 Settlement Consideration:

(a) Upon delivery of the Use Agreement and the ARG Agreement, BEP shall

(i)    convey by quitclaim deed HOA that certain real property set forth on Schedule 14.02(a) attached hereto; and

(ii)    at the election of HOA either (A) convey by quitclaim deed to HOA that certain real property set forth on Schedule 14.02(b) attached to the Plan; or (B) cooperate with and agree not to oppose in any fashion HOA's foreclosure upon the real property set forth on Schedule 14.02(b) to the Plan.

(b) HOA and the Reorganized Debtor have agreed to settle HOA's rejection damages claim arising from the rejection of the Community Services Agreement as provided herein.  Said rejection damages claim shall be settled by HOA waiving any claim for rejection damages and the Reorganized Debtor waiving any claim for damages against the HOA for any alleged sums due and owing under the Community Services Agreement to the date of rejection.

**Class 11 Settlement and Settlement Consideration**

The holders of Allowed Class 11 Claims and the Plan Proponent have reached the following compromise and settlement and have agreed to the following provisions which shall constitute the "Class 11 Settlement Consideration" to be provided in full satisfaction of the Allowed Class 11 Claims:

(a)    An order shall be entered in Adv. Proc. No. 3:24-ap-03032, *Rick Hoban, Ed Harless, Julia & Pete Misslin, John & Kim Wood, Bart Whitman, Michael Guido, and J Carey McHugh v. Salem Pointe Capital, LLC, Michael Ayres, and Rarity Bay Community Association, Inc.* (the "Hoban AP"), (i) declaring that (A) the developer or declarant rights, as provided for in the restrictive covenants of record in trust book 444, page 248, and book no. V, page 232, in the Register's Office for Loudon County, Tennessee and in the restrictive covenants of record in book M112, pages 323-362, in the Register's Office for Monroe County, Tennessee, as amended, (collectively, the "Declarant Rights"), have been terminated, relinquished, and are no longer of any force or effect; and (B) to the extent that the Declarant Rights were held by the Debtor as of the Petition Date, the Debtor terminates, relinquishes, and ratifies and confirms that such Declarant Rights are, or shall no longer be, of any force or effect; (ii) dismissing with prejudice plaintiffs' remaining claims for relief in the Hoban AP; and (iii) upon the Effective Date, plaintiffs shall withdraw any proofs of claims filed in the Chapter 11 Case to the extent such proofs of claims assert damages arising from the operative facts alleged in the Hoban AP; provided, however, that this settlement shall not affect the right of any holder of a Class 11 Claim from asserting entitlement to any other claim which such holder may assert against the Debtor.

**(b) IN ADDITION TO THE PROVISIONS OF THE ABOVE-REFERENCED SETTLEMENT,THE ORDER CONFIRMING THIS PLAN SHALL CONSTITUTE A DETERMINATION, BINDING UPON ALL PARTIES, SUCCESSORS AND ASSIGNS TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, INCLUDING BANKRUPTCY CODE SECTION 1141, THAT THE DECLARANT RIGHTS HAVE BEEN TERMINATED, RELINQUISHED AND ARE NO LONGER OF ANY FORCE OR EFFECT.**

**Class 12 Settlement and Settlement Consideration**

The holders of Allowed Class 12 Claims and the Plan Proponent have reached the following compromise and settlement and have agreed to the following provisions which shall constitute the "Class 12 Settlement Consideration" to be provided in full satisfaction of the Allowed Class 12 Claims:

(a) An order shall be entered in Adv. Proc. No. 3:25-ap-03024, *Eric Hinkle and Karen Hinkle v. Salem Pointe Capital, LLC* (the "Hinkle AP"), and in Adv. Proc. No. 26-ap-03006, *Russell and Traci Lorts, et al. v. Salem Pointe Capital, LLC* (the "Lorts AP"), (i) declaring that the following are invalid and unenforceable: (A) any provision in any deed ("Mandatory Membership Deed") purporting to require a grantee to be a "Social Member" of the Club; (B) the Sixth Amendment to the Restrictive Covenants and Amendment to Bylaws recorded at Book M249, Page 374 in the Register's Office for Monroe County, Tennessee and at Book T1248, Page 517 in the Register's Office for Loudon County, Tennessee (together, "Sixth Amendment"); and (C) any other document, deed, or instrument, including any plat or survey, purporting to require the holder to be members of, or pay mandatory membership dues to, the Club; and (ii) dismissing with prejudice plaintiffs' remaining claims for relief in the Hinkle AP and Lorts AP. Upon the Effective Date, plaintiffs shall withdraw any proofs of claims filed in the Chapter 11 Case to the extent such proofs of claims assert damages arising from the operative facts alleged in the Hinkle AP and Lorts AP; provided, however, that this settlement shall not affect the right of any holder of a Class 12 Claim from asserting entitlement to any other claim which such holder may assert against the Debtor.

**(b) IN ADDITION TO THE PROVISIONS OF THE ABOVE-REFERENCED SETTLEMENT, THE ORDER CONFIRMING THIS PLAN SHALL CONSTITUTE A DETERMINATION, BINDING UPON ALL PARTIES, SUCCESSORS AND ASSIGNS TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, INCLUDING BANKRUPTCY CODE SECTION 1141, THAT THE FOLLOWING ARE INVALID AND UNENFORCEABLE: ANY PROVISION IN ANY MANDATORY MEMBERSHIP DEED PURPORTING TO REQUIRE A GRANTEE TO BE A "SOCIAL MEMBER" OF THE CLUB; (B) THE SIXTH AMENDMENT; AND (C) ANY OTHER DOCUMENT, DEED, OR INSTRUMENT PURPORTING TO REQUIRE THE HOLDER OF AN ALLOWED CLASS 12 CLAIM, THEIR SUCCESSORS OR ASSIGNS, TO BE MEMBERS OF, OR PAY MANDATORY MEMBERSHIP DUES TO, THE CLUB.**

**BEP Settlements**

In consideration of the entry into the Use Agreement and ARG Agreement as part of the consideration for the various other agreements and settlements contained in the Plan:

(a) Upon delivery of the Use Agreement and the ARG Agreement, BEP shall, at the election of HOA either (i) convey by quitclaim deed to HOA that certain real property set forth on Schedule 14.02 attached to the Plan; or (ii) cooperate with and agree not to oppose in any fashion HOA's foreclosure upon the real property set forth on Schedule 14.02 to the Plan.

(b) BEP and the Reorganized Debtor agree that the indemnification provision of Section 6 of the 2019 Settlement Agreement shall be and hereby is modified to provide that from and after the Effective

39

Date, the Reorganized Debtor shall have no further indemnification obligation to BEP under the 2019 Settlement Agreement and that the Reorganized Debtor shall have no obligation or liability to pay BEP any amounts under Section 6 of the 2019 Settlement Agreement except for any payments or rights it may to payment of any Allowed Unsecured Claim as a member of Class 10 under the terms of the Plan. BEP agrees that any of its claims for indemnification arising after the Petition Date but before the Effective Date shall, despite being entitled to payment as an administrative expense, be treated as part of BEP's Allowed Class 10 Unsecured Claim. For the avoidance of doubt, the modification of Section 6 of the 2019 Settlement Agreement shall apply prospectively only and BEP shall be entitled to an Allowed Class 10 Unsecured Claim for all indemnification obligations owed to BEP as of the Effective Date;

(c) Each of TCRB and BEP agree to waive any claim for substantial contribution under section 503(b)(3)(D) of the Bankruptcy Code; and

(d) Such other consideration as may be agreed upon among BEP and others, in BEP's sole and absolute discretion.

**C.      Analysis of Recoveries to Holders of Claims under the Plan and Recommendation of the Plan Proponent.**

The Plan Proponent has concluded that it could maximize recoveries to the Debtor's stakeholders through a Plan that resolves extensive litigation claims, restructures the Debtor's secured debts, provides for the payment of all administrative expenses, and provides certain guaranteed payments to unsecured creditors and the potential for additional recoveries from certain litigation claims which the GUC Trustee may pursue. The Plan provides for a comprehensive restructuring of the Debtor's liabilities as well as settlements of certain disputes among various constituencies. The Plan further provides for the Debtor to continue to honor its obligations to its other creditors in the ordinary course of its business. As set forth more fully below, the Plan Proponent believes that the Plan provides the best recoveries possible for the Debtor's stakeholders and recommends that, if you are entitled to vote, you vote to accept the Plan.

**D.      Plan Confirmation and Consummation.**

**1.   The Confirmation Hearing.**

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after appropriate notice, to hold a Confirmation Hearing. On, or as promptly as practicable after the filing of the Plan and this Disclosure Statement, the Plan Proponent will request that the Bankruptcy Court schedule the Confirmation Hearing. Notice of the Confirmation Hearing will be provided to all known creditors or their representatives. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

**2.   Objections to Confirmation.**

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Bankruptcy Rules of the United Stated Bankruptcy Court for the Eastern District of Tennessee, must set forth the name of the objector, the nature and amount of Claims held or asserted by the objector against the Debtor, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, together with proof of service thereof as the Bankruptcy Court may direct.

### 3.   Requirements for Confirmation of the Plan.

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan is (i) accepted by all impaired Classes of Claims entitled to vote or, if rejected or deemed rejected by an impaired Class, that the Plan (a) "does not discriminate unfairly," (b) is "fair and equitable" as to such Class and (c) in the "best interests" of the holders of Claims impaired under the Plan (that is, Creditors will receive at least as much under the Plan as they would receive in a hypothetical liquidation case under chapter 7 of the Bankruptcy Code); and (ii) is feasible (that is, there is a reasonable probability that the Debtor will be able to perform its obligations under the Plan without needing further financial reorganization not contemplated by the Plan).

### a.   Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, that, except as described below, each class of claims or equity interests that is impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  As a general matter under the Bankruptcy Code, a class is "impaired," unless the plan: (i) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (ii) cures any default and reinstates the original terms of such claim or equity interest; or (iii) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their ballots in favor of acceptance. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.  If no votes to accept or reject the Plan are received with respect to a Class whose votes have been solicited under the Plan (other than a Class that is deemed eliminated under the Plan), such Class shall be deemed to have voted to accept the Plan.

### b.   Best Interests of Creditors.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that, with respect to an impaired class of claims or interests, each holder of an impaired claim or interest in such class either (i) accepts the plan or (ii) receives or retains under the plan property of a value, as of the effective date of the plan, that is not less than the amount (value) such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

In chapter 7 cases, a chapter 7 trustee is appointed to commence a liquidation of the debtor's assets because the debtor is insolvent.  To do so, the chapter 7 trustee retains professionals, conducts an initial

41

evaluation of the debtor's assets, and then proceeds with what is generally referred to as a "fire sale" of the debtor's assets, seeking, if possible, to sell substantially all of the debtor's remaining assets either wholesale or through piecemeal liquidation in a compressed timeframe.  In chapter 7 cases, creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid in full: (i) holders of secured claims (to the extent of the value of their collateral); (ii) holders of priority claims; (iii) holders of unsecured claims; (iv) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (v) holders of interests.  Accordingly, any cash amount that would be available for satisfaction of claims (other than secured claims) would consist of the proceeds resulting from the disposition of the unencumbered assets of the debtor, augmented by the unencumbered cash held by the debtor at the time of the commencement of the liquidation.  Such cash would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from termination of the debtor's business and the use of chapter 7 for purposes of a liquidation.

Classes 2 through 14 are impaired under the Plan.  Classes 2 through 8 are classes of secured claims that are receiving treatment consistent with section 1129(b)(2) of the Bankruptcy Code, and such secured claims, to the extent allowed, will retain their liens on their prepetition collateral (to the extent such property is not being sold under the Plan) and will be paid 100% of their Allowed Secured Claims. Accordingly, such creditors are receiving at least what they would receive in a hypothetical chapter 7 liquidation.

Classes 9, 11, and 12 are receiving negotiated consideration which equals at least what they would receive in a hypothetical chapter 7 liquidation.

Each holder of an Allowed Class 10 and 13 Claim will receive their pro rata share of at least $1 million under the Plan.  Holders of Allowed Class 10 Claims shall receive their pro rata share of recoveries, if any, from the GUC Trust until such time as all Allowed Class 10 Claims are paid in full.  Because RBP is a potential target of litigation to be pursued by the GUC Trustee, RBP's rights to recovery from the GUC Trust is subject to satisfaction of the Allowed Class 10 Claims.  In each instance, however, the holders of Allowed Claims in all classes are to receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount (value) such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date as demonstrated by the liquidation analysis set attached hereto as **Exhibit 4.**

Accordingly, the Debtor believes that in a chapter 7 liquidation, Holders of Claims would receive less than such Holders would receive under the Plan.  There can be no assurance, however, as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Debtor's conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

     **c.   Feasibility of the Plan.**

Pursuant to section 1129(a)(11) of the Bankruptcy Code, the proponent of a plan must demonstrate that confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor or its successor under the plan, unless such liquidation or reorganization is proposed under the plan.

In order to establish the feasibility of the Plan for purposes of section 1129(a)(11) of the Bankruptcy Code, the Plan Proponent and its management team and advisors, have developed the projections attached hereto as **Exhibit 5** (the "Financial Projections"). The Financial Projections set forth the projected financial performance of the Reorganized Debtor over a defined period of time based upon a number of assumptions and factors.  The Financial Projections are unaudited.  Impaired creditors and other interested parties should

42

review Section IV of this Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtor.

The Plan Proponent submits that the Financial Projections demonstrate that the Reorganized Debtor will have a viable operation following the Chapter 11 Case and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

TCRB and BEP, as the Plan Proponent, are already capitalized and prepared to immediately fund a total of $3.5 million upon the Effective Date to pay down the RBP Allowed Secured Claim (if and when such claim becomes an Allowed Secured Claim) and to pay administrative and priority claims. TCRB is currently holding $1,500,000, which funds are available and allocated to payments under the Plan upon the Effective Date.

BEP's ownership group approved the funding of $2,000,000. As shown in the Sources and Uses table below, this amount will go to reduce secured debt and pay administrative and priority claims on the effective date. In exchange, for $1,000,000 of the $2,000,000 total to be funded by BEP, BEP is receiving the real property listed in Schedule 7.01 of the Plan (the "BEP Sale Property"). BEP will, in turn, transfer certain of these parcels listed in Schedule 1402(a) of the Plan to Rarity Bay Community Association, Inc. in exchange for (a) a Use Agreement (the "Use Agreement") acceptable to BEP that ties portions of the BEP Sale Property which are parcels which have not been annexed into Rarity Bay development and (b) an agreement regarding architectural/design review terms (the "ARG Agreement") acceptable to BEP for all of BEP's lots and land. The referenced Use Agreement and ARG Agreement must be in place prior to the Effective Date of the Plan. The remaining $1,000,000 BEP is in exchange for $1,250,000 in credits that BEP can transfer to subsequent homeowner purchasers and that can be applied against all Club related fees, dues, assessments associated with becoming or maintaining a golf or social membership following the effective date of the Plan.

### i.    Effective Date Payments

The Plan requires certain payments to either be made or reserved on the Effective Date (collectively, the "Effective Date Payments").  The following are the sources and uses of the Effective Date Payments:

| Sources of Cash | Amount |
|---|---|
| Cash on hand/balance sheet cash | 756,415[7] |
| TCRB Equity Infusion | 1,500,000 |
| BEP Purchase Price | 1,000,000 |
| BEP Additional Funds | 1,000,000 |
| 2019 Settlement Proceeds | 500,000 |
| SMIFs | 200,000 |
| **Total Sources** | **4,986,415** |

---

[7] Monthly Operating Report (Doc. No. 960 at pg. 13).

| Uses of Cash | Amount |
|---|---|
| Reduction of RBP Allowed Secured Claim | 2,700,000 |
| Administrative Expense Claims | 1,400,000[8] |
| Priority Claims | 52,015[9] |
| **Total Uses** | **4,152,015** |
| **Net Surplus/(Shortfall)** | **804,400** |

    ii.       **Plan Payments**

        **A.  Payments to holders of Allowed Secured Claims**

The following are the payments to holders of Allowed Claims[10] in Classes 2 through 8 of the Plan.

| Sec'd Claims | Amount | Int. Rate | Term (mos.) | Monthly Pmt. | Balloon (120 mos.) |
|---|---|---|---|---|---|
| Class 2 (RBP) | $4,342,000 | 6.65% | 240 | $ 32,757 | $2,865,594 |
| Class 3 (SBA) | 150,000 | 3.75 | 270 | 823 | |
| Class 4 (Deere Fin.) | 48,510 | 8.75 | 60 | 1,001 | |
| Class 5 (Wells Fargo) | 103,200 | 2.90 | 60 | 1,850 | |
| Class 6 (US Bank) | 103,631 | 8.75 | 60 | 2,139 | |
| Class 7 (Kapitus) | 137,800 | 8.75 | 60 | 2,844 | |
| Class 8 (PNC Bank) | 272,000 | 8.75 | 60 | 5,613 | |
| **Total** | | | | **$47,027** | |

**B.  Class 10 Guaranteed Payment**

The Financial Projections attached as Exhibit 5 demonstrate the Reorganized Debtor's projected ability to make the Class 10 Guaranteed Payment each year as required by the Plan.

        iii.     **Post-Effective Date Management.** The Reorganized Debtor intends to engage KemperSports ("Kemper") as the management company to manage the Club and golf course operations. Kemper was founded in 1978 in Chicago, Illinois and manages over 215 facilities in 40 states. TCRB interviewed five (5) management companies as potential candidates to manage the Club and golf course operations and selected Kemper due to its expertise and pricing structure. The Plan Proponent believes that Kemper will provide top quality management which will enhance the feasibility and likelihood of success of the Plan.

---

[8] Estimate of Trustee's fees and Trustee's Counsels' Fees received 6/22/2026.

[9] Claims Register Claim Nos. 13, 328, and 329.

[10] For purposes of this Disclosure Statement the Plan Proponent has assumed the claims to be Allowed in the amounts indicated; however, the claims may be allowed in a different amount or not allowed at all.

### d.  No Unfair Discrimination.

The "no unfair discrimination" test requires that the plan not provide for unfair treatment with respect to classes of claims or interests that are of equal priority but are receiving different treatment under the plan.

### e.  Fair and Equitable.

The fair and equitable requirement applies to classes of claims of different priority and status, such as secured versus unsecured. The plan satisfies the fair and equitable requirement if no class of claims receives more than 100% of the allowed amount of the claims in such class. Further, if a class of claims is considered a dissenting class, i.e., a Class of Claims that is deemed to reject the Plan because the required majorities in amount and number of votes is not received from the Class (a "Dissenting Class"), the following requirements apply:

### i.    Class of Secured Claims.

Each holder of an impaired secured claim either: (i) retains its liens on the subject property, to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim; (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof); or (iii) receives the "indubitable equivalent" of its allowed secured claim.

### ii.   Class of Unsecured Creditors.

Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the Dissenting Class will not receive any property under the plan.

### iii.  Class of Interests.

Either (i) each interest holder will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the interests of the Dissenting Class will not receive any property under the plan.  Here, the Class 14 Equity Security Interests in the Debtor are being canceled.  Accordingly, there is no junior class that is receiving or retaining property while a senior class is not paid being paid in full.

## VI.    RISK FACTORS

Holders of Claims and Interests should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Plan and its implementation.

## A.    Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims and Interests under the Plan but will not

necessarily affect the validity of the vote of any Impaired Class to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in any such Impaired Class.

1.      **Parties in Interest May Object to the Plan's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Plan Proponent believes that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Plan Proponent created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.      **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article 13 of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

3.      **The Plan Proponent May Fail to Satisfy Vote Requirements**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Plan Proponent intends to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Plan Proponent may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to Holders of Allowed Claims and Interests as those proposed in the Plan and the Plan Proponent does not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estate than the Plan.

4.      **The Plan Proponent May Not Be Able to Secure Confirmation of the Plan**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if a debtor was liquidated under chapter 7 of the Bankruptcy Code. There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.

The Plan Proponent, subject to the terms and conditions of the Plan, reserve its right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class of Claims than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

46

5.      **The Chapter 11 Case May Be Converted to Cases under Chapter 7 of the Bankruptcy Code**

The Bankruptcy Court may convert the Chapter 11 Case to cases under chapter 7 of the Bankruptcy Code if the Bankruptcy Court finds that conversion would be in the best interest of creditors and/or the Debtor. In such event, a chapter 7 trustee would be appointed or elected to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.

The Plan Proponent believes that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in the Plan because of (a) additional administrative expenses involved in the appointment of a chapter 7 trustee, including the chapter 7 trustee's commission, (b) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, (c) a smaller recovery on remaining estate assets in chapter 7, and (d) an enhanced ability to minimize the claims pool outside of chapter 7.

6.      **The GUC Trustee May Object to the Amount or Classification of a Claim.**

Except as otherwise provided in the Plan, the Reorganized Debtor and the GUC Trustee shall have the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

7.      **Contingencies Could Affect Votes of Impaired Class to Accept or Reject the Plan**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by any Impaired Class entitled to vote to accept or reject the Plan or require any sort of revote by any such Impaired Class.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtor cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Claims under the Plan.

9.      **Plan Proponent Could Withdraw Plan**

The Plan Proponent may revoke or withdraw the Plan prior to the Confirmation Date.

10.     **The Bankruptcy Court could approve the Second Sale Motion**

The Bankruptcy Court may approve the Second Sale Motion.  In such a case, the Plan Proponent would likely withdraw the Plan.

47

**B.      Risks Related to Recoveries under the Plan**

**1. Certain U.S. Tax Implications of the Plan**

The following discussion summarizes certain potential anticipated U.S. federal income tax consequences of the Plan to the Debtor and Holders of Claims and Interests .This summary is provided for information purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect as of the date hereof, and all of which are subject to change, possibly with retroactive effect, that could adversely affect the U.S. federal income tax consequences described below. This summary does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder of a Claim or Interest in the Debtor in light of its particular facts and circumstances or to certain types of Holders of Claims subject to special treatment under the Tax Code (for example, non-U.S. taxpayers, financial institutions, broker- dealers, life insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, grantor trusts, persons holding a Claim as part of a "hedging," "integrated," or "constructive" sale or straddle transaction, persons holding Claims through a partnership or other pass through entity, persons that have a "functional currency" other than the U.S. dollar, and persons who acquired or expect to acquire either an equity interest or other security in a Debtor or a Claim in connection with the performance of services). In addition, this summary does not discuss any aspects of state, local, estate and gift or non-U.S. taxation.

For purposes of this summary, a "U.S. Holder" means a Holder of a Claim or Interest that, in any case, is, for U.S. federal income tax purposes: (i) an individual that is a citizen or resident of the U.S.; (ii) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the U.S., any state thereof or the District of Columbia; (iii) an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust, if (a) a court within the U.S. is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all of the substantial decisions of such trust, or (b) it has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person. A "Non-U.S. Holder" means a Holder of a Claim or Interest that is not a U.S. Holder and is, for U.S. federal income tax purposes, an individual, corporation (or other entity treated as a corporation for U.S. federal income tax purposes), estate or trust.

If an entity taxable as a partnership for U.S. federal income tax purposes holds a Claim, the U.S. federal income tax treatment of a partner (or other owner) of the entity generally will depend on the status of the partner (or other owner) and the activities of the entity. Such partner (or other owner) should consult its tax advisor as to the tax consequences of the Plan. A substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final Distribution under the Plan. Events occurring after the date of this Disclosure Statement, such as additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. There can be no assurance that the Internal Revenue Service (the "IRS") will not take a contrary view with respect to one or more of the issues discussed below. No ruling will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Debtor with respect thereto.

Accordingly, the following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a Holder of a Claim or Interest in the Debtor. All Holders of Claims or Interests in the Debtor are urged to consult their own tax advisors for the federal, state, local and other tax consequences applicable to them under the Plan.

**EACH HOLDER IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTOR IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN OR THE PLAN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

       **i.**      **U.S. Federal Income Tax Consequences to U.S. Holders of Claims and Interests**

       **a.**      **In General**

Generally speaking, the U.S. federal income tax consequences to U.S. Holders of Allowed Claims and Interests in the Debtor arising from the Distributions (if any ) to be made in satisfaction of their Claims pursuant to the Plan may vary, depending upon, among other things: (a) the type of consideration received by the Holder of a Claim in the Debtor in exchange for such Claim; (b) the nature of such Claim; (c) whether the Holder has previously claimed a bad debt or worthless security deduction in respect of such Claim or Interest; (d) whether such Claim constitutes a security; (e) whether the Holder of such Claim is a citizen or resident of the United States for tax purposes, or otherwise subject to U.S. federal income tax on a net income basis; (f) whether the Holder of such Claim in the Debtor reports income on the accrual or cash basis; and (g) whether the Holder of such Claim receives Distributions under the Plan in more than one taxable year. For tax purposes, if a Claim is reinstated yet subject to a modification, the reinstatement may be treated as a taxable exchange of the Claim for a new Claim, even though no actual transfer takes place.

This summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtor within the meaning of the Tax Code, brokerdealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, persons who hold Claims or who will hold the New Warrants or the Reorganized AAC Equity Interests as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and holders of Claims who are themselves in bankruptcy). Furthermore, this summary assumes that a Holder holds only Claims in a single Class or Sub-Class and holds a Claim only as a "capital asset" (within the meaning of Section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtor "solely as a creditor" for purposes of Section 897 of the Tax Code. This summary does not discuss differences in tax consequences to a Holder that acts or receives consideration in a capacity other than as a Holder of a Claim of the same Class or Sub-Class, and the tax consequences for such Holders may differ materially from that described below.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more

United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. Once the Holder's basis in the generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan. In addition, where gain or loss is recognized by a Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Claim or Interest constitutes a capital asset in the hands of the Holder and how long it has been held or is treated as having been held, whether the Claim was acquired at a market discount, and whether and to what extent the Holder previously claimed a bad debt deduction with respect to the underlying Claim or Interest. In general, for purposes of the discussion below, subject to other matters discussed herein such as the market discount rules, if the asset giving rise to a Holder's Claim, or a Holder's Interest, was held as a capital asset, gain or loss recognized by a Holder upon exchange of that Claim or Interest generally would be long-term capital gain or loss if the U.S. Holder held such asset or Interest for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations. If property is received by a Holder upon an exchange, a Holder's tax basis in the property received should equal the fair market value of such property. A U.S. Holder's holding period for the property received on the Effective Date would begin on the day following the Effective Date.

### b. Taxation of GUC Trust Units

The GUC Trust is intended to be treated as a "liquidating trust" within the meaning of Treasury Regulations § 301.7701-4(d). Further, for U.S. federal income tax purposes (and for purposes of all state, local and other jurisdictions to the extent applicable), a liquidating trust is treated as a grantor trust pursuant to IRC sections 671-677, or any successor provisions thereof. The Holders of Allowed Claims receiving GUC Trust Units should be treated as the grantors and the beneficiaries of their respective shares of the GUC Trust Assets. A liquidating trust is not subject to tax, instead the grantors of the trust recognize the income of the trust, whether or not such income is actually distributed.

For U.S. federal income tax purposes, the recipients of GUC Trust Units (i.e., the beneficiaries of the GUC Trust) should be treated as having received a distribution of an undivided interest in the GUC Trust Assets on the Effective Date and then immediately contributing such interests to the Liquidation Trust. The GUC Trust shall not be deemed a successor in interest of the Debtor for any purpose other than as specifically set forth in the Plan or in the GUC Trust Agreement.

The distribution of an undivided interest in the GUC Trust Assets should be a taxable exchange to the recipients of GUC Trust Units on the Effective Date. Given the anticipated treatment of the GUC Trust as a grantor trust, each Holder of GUC Trust Units has an obligation to report its share of the GUC Trust's tax items (including gain on the sale or other disposition of a GUC Trust Asset) which is not dependent on the distribution of any cash or other GUC Trust Assets by the GUC Trust. Accordingly, a Holder of GUC Trust Units may incur a tax liability on account of holding GUC Trust Units, regardless of whether the GUC Trust distributes cash or other assets. A Holder of GUC Trust Units may be required to report and pay tax on a greater amount of income for a taxable year than the amount of cash received by the Holder during the year.

The GUC Trust will file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the GUC Trust Assets (*e.g.,* income, gain, loss, deduction and credit). Each Holder of GUC Trust Units will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the GUC Trust will pertain to Holders of GUC Trust Units who received their interests in the GUC Trust in connection with the Plan.

**C.      Other Risks**

**1.      No Duty to Update**

The statements contained in this Disclosure Statement are made by the Plan Proponent as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.

The Plan Proponent has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

**2.      No Representations Outside Disclosure Statement Are Authorized**

No representations concerning or related to the Plan Proponent, the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

**3.      No Legal or Tax Advice Is Provided by Disclosure Statement**

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Claim or Interest Holder should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest. This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

**4.      No Admission Made**

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Plan Proponent, the Debtor or Holders of Claims or Interests.

**VII.    CERTAIN SECURITIES LAW MATTERS**

The Plan Proponent does not believe that the Plan's treatment of the units being distributed under the GUC Trust constitute an offering, distribution, issuance or sale of "securities" under the Securities Act or state securities laws and therefore no registration or exemption thereunder is necessary. If the Plan's treatment were deemed to be an offering, distribution, issuance or sale of "securities" under the Securities Act of 1933, as amended, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder ("Securities Act") or state securities laws, the Plan Proponent believes that such offer, distribution, issuance or sale would be exempt from the registration requirements of the Securities Act and state securities laws and that, based on the particular Federal and state securities law exemption,

and provisions of the Bankruptcy Code, any subsequent transfers of such securities may be subject to registration requirements.

## VIII.    RECOMMENDATION

The Plan Proponent believes that the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtor's creditors than would otherwise result in any other scenario. Accordingly, the Plan Proponent recommends that Holders of Claims entitled to vote vote to accept the Plan and support Confirmation of the Plan.

Respectfully submitted, as of the date first set forth above.

101340594.v5