**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF TENNESSEE**

In re

SALEM POINTE CAPITAL, LLC

Case No. 3:24-bk-31702-SHB
Chapter 11

Debtor

**MEMORANDUM ON SECOND MOTION BY CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. §§ 363(B), (F), (K), AND (M), AND 365 AND FED. R. BANKR. P. 2002, 6004, AND 6006, TO: (A) APPROVE SALE PROCEDURES, (B) SCHEDULE A SALE APPROVAL HEARING AND OBJECTION DEADLINE, (C) APPROVE THE FORM OF NOTICES OF THE MOTION TO SELL, THE SALE APPROVAL HEARING, AND OBJECTION DEADLINE, AND (D) APPROVE PROCEDURES TO ESTABLISH CERTAIN CURE AMOUNTS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES THAT MAY BE ASSUMED AND A NOTICE RELATED THERETO; (E) APPROVE THE SALE OF CERTAIN ASSETS FREE AND CLEAR OF CLAIMS, LIENS, ENCUMBRANCES, AND OTHER INTERESTS; (F) APPROVE THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**APPEARANCES:**

BASS, BERRY & SIMS PLC
Paul G. Jennings, Esq.
Gene L. Humphreys, Esq.
21 Platform Way South, Suite 3500
Nashville, Tennessee 37203
Attorneys for Gary M. Murphey, Chapter 11 Trustee

WOOLF, MCCLANE, BRIGHT, ALLEN & CARPENTER, PLLC
M. Aaron Spencer, Esq.
Post Office Box 900
Knoxville, Tennessee 37901-0900
Attorneys for Rarity Bay Partners

BRADLEY ARANT BOULT CUMMINS LLP
William L. Norton, III, Esq.
Austin McMullen, Esq.
1221 Broadway, Suite 2400
Nashville, Tennessee 37203
KIZER & BLACK, ATTORNEYS, PLLC
Melanie E. Davis, Esq.
217 E. Broadway Avenue
Maryville, Tennessee 37804
Attorneys for Plaintiffs in Adversary Proceeding Nos. 3:24-ap-03032-SHB and 3:26-ap-03006-SHB

FRANTZ, MCCONNELL & SEYMOUR, LLP
Michael W. Ewell, Esq.
550 W. Main Street
Suite 500
Knoxville, Tennessee 37902
Attorneys for Rarity Bay Community Association, Inc.

BURR & FORMAN LLP
David W. Houston, IV
222 2nd Avenue South
Suite 2000
Nashville, Tennessee 37201
Attorneys for Timbertop Land Company, LLC

PAUL RANDOLPH, ESQ.
ACTING UNITED STATES TRUSTEE
Tiffany A. DiIorio, Esq.
Howard H. Baker Jr. United States Courthouse
800 Market Street
Suite 114
Knoxville, Tennessee 37902
Attorneys for United States Trustee

**SUZANNE H. BAUKNIGHT**
**UNITED STATES BANKRUPTCY JUDGE**

This contested matter is before the Court on the Second Motion by Chapter 11 Trustee Pursuant to 11 U.S.C. §§ 363(b), (f), (k), and (m), and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006, to: (A) Approve Sale Procedures, (B) Schedule a Sale Approval Hearing and Objection Deadline, (C) Approve the Form of Notices of the Motion to Sell, the Sale Approval Hearing, and Objection Deadline, and (D) Approve Procedures to Establish Certain Cure Amounts for Executory Contracts and Unexpired Leases that May be Assumed and a Notice Related Thereto; (E) Approve the Sale of Certain Assets Free and Clear of Claims, Liens, Encumbrances, and Other Interests; (F) Approve the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases ("Sale Motion") filed on June 4, 2026 [Doc. 938].[1] Pending objections to the Sale Motion were filed by the plaintiffs in Adversary Proceeding No. 3:24-ap-03032-SHB ("Hoban Plaintiffs") and the plaintiffs in Adversary Proceeding No. 3:26-ap-03006-SHB ("Lorts Plaintiffs") (collectively, "Objecting Property Owners"), and Rarity Bay Community Association, Inc. ("RBCAI"), both of which also objected to the proposed assumption and assignment of contracts or agreements as contemplated by the Amended Notice of (I) Trustee's Intent to Assume and Assign Certain Executory Contracts, Unexpired Leases of Personal Property, and Unexpired Leases of Nonresidential Real Property, and (II) Related Cure Amounts [Docs. 1149, 1060, 1105, 1155, 1209, 1212].[2]

---

[1] The evidentiary hearing originally was scheduled with confirmation of the Third Amended Plan of Reorganization filed by The Club at Rarity Bay, Inc ("TCRB"). and BEP Rarity Bay, LLC ("BEP") on July 20, 2026 [Doc. 1082]; however, the Third Amended Plan of Reorganization was withdrawn on August 24, 2026 [Doc. 1234]. The hearing also was to include the Court's show-cause order concerning whether the case should be converted to Chapter 7, but after hearing evidence over five days, the Court announced on September 17 that it was no longer considering conversion and entered an order that day [Doc. 1286] finding that no cause exists to convert the case to Chapter 7 at this time.

[2] All other objections were either withdrawn or overruled for failure to prosecute. The Objecting Property Owners and RBCAI are referred to collectively herein as "Objecting Parties."

At the auction on August 6, 2026, the successful bidder was Timbertop Land Company ("Timbertop") with a bid of $11,157,895.00, and the back-up bidder was Rarity Bay Partners ("RBP") with a bid of $10,950,000.00. [Doc. 1150.]

The evidentiary hearing on the Sale Motion and objections was held September 3, 11, 14, 16, 17, 18, 23, and 24, 2026, with closing arguments on September 25, 2026 ("the Sale Approval Hearing"). The record before the Court consists of the following exhibits introduced into evidence:

- Trustee's Exhibits (designated at the Sale Approval Hearing and herein as T before the exhibit number): 1, 2, 3, 4, 5, 6, 7, 8 (as amended by #1283-1), 9, and 10 (as amended by #1283-2);
- RBP's[3] Exhibits (designated at the Sale Approval Hearing and herein as R before the exhibit number): 4, 21, and 22; and
- Objecting Parties' Exhibits[4] (designated at the Sale Approval Hearing and herein as O before the exhibit number): 3; 9 (which is a duplicate of T7); 10; 11; 12; 15; 19; 20; 21; 22; 23; 24; 25; 26; 28; 29; 30; 31; 32; 33; 34; 35; 36; 37; 38; 39; 40; 42; 44; 45; 46 (only pages 18, 21, 25, 48, 49, 50, 106-07, 108-09, 111, 148, and 156); 47; 48; 49; 50; 51; 52; 53; and 54.

The Court heard testimony from the Chapter 11 Trustee, Gary Murphey ("Trustee"); Roscoe High and Brandon Schempp, both of CBRE, Inc. (the court-approved real estate marketing firm); Robert Chris Magda (the CEO and managing member of Timbertop); and property owners Terry Aff, Tracy Lorts, Matthew Gibbons, and Rick Hoban. The Court also takes judicial notice of all documents of record in this bankruptcy case pursuant to Federal Rule of Evidence 201.

The parties submitted a Joint Statement of Issues for Sale Approval Hearing on August 26, 2026 ("Joint Statement") [Doc. 1241]. At the first day of the Sale Approval Hearing, the

[3] RBP participated in the Sale Approval Hearing as a proponent of the Sale to Timbertop, along with the United States Trustee and Timbertop.

[4] The Objecting Property Owners and RBCAI submitted joint exhibits as Objecting Parties' Exhibits.

Trustee and RBP announced, and the Objecting Parties agreed, that the Court would adjudicate only the proposed sale to Timbertop ("Proposed Sale" or "Sale"[5]) and that consideration of RBP's back-up bid would be held in abeyance for adjudication only if either the Sale to Timbertop is not approved or if Timbertop is unable to close the transaction after approval of the Sale Motion. The issues were further narrowed by consent[6] at closing argument to the following issues that are determined by this opinion:

1. Whether the Sale should be approved as an exercise of the Trustee's good faith and sound business judgment, considering the salient factors, including whether the Sale was negotiated at arm's length, without collusion, and in good faith under 11 U.S.C. § 363(b), and whether Timbertop has the ability to close the transaction;[7]

2. Whether the Trustee has shown under 11 U.S.C. § 363(f) that the Purchased Assets[8] can be sold free and clear of all liens, claims, interests, and encumbrances, including the interests, claims, and encumbrances asserted by the Lorts and Hoban Plaintiffs;[9]

---

[5] The terms "Sale" or "Proposed Sale" as used herein mean the sale proposed by the Asset Purchase Agreement ("APA") that is Amended Exhibit T8.

[6] At closing argument, the Objecting Parties withdrew the following issues in the Joint Statement: numbers 3, 4, 10, 13, 16, 17, 18 (as an independent objection), 19, 20, 21, and 22. Specifically, issue number 17 was resolved because all parties stipulated that the sale does not purport to convey any Declarant Rights, which to the extent they exist in Debtor are property of the bankruptcy estate. Additionally, the Trustee withdrew his request to waive or shorten the 14-day stay under Rules 6004(h) and 6006(d), mooting issue number 11 of the Joint Statement.

[7] This issue was derived from the following issues stated in the Joint Statement, numbers 1, 2, 5, and 7. [Doc. 1241.]

[8] The "Purchased Assets" are defined in the proposed APA.

[9] This was issue number 6 in the Joint Statement. RBCAI acknowledged in closing argument that its objection is not dependent on this issue.

3. Whether the Trustee and/or Timbertop have shown adequate assurance of future performance for assumed contracts;[10]

4. Whether Timbertop has acted in good faith to support a finding under § 363(m) (issue number 9 in the Joint Statement);

5. Whether the injunction language in the proposed Sale Approval Order at Doc. 938-4 affects the Objecting Property Owners' pending litigation (issue number 12 in the Joint Statement);

6. Whether the Sale must comply with the right-of-first-refusal procedure set forth in the Club's membership plan before it can be approved and, if so, whether the procedure has been satisfied;[11] and

7. Whether the procedure for assuming, assigning, or rejecting contracts in Federal Rule of Bankruptcy Procedure 6006, including the 100-contract limit in Rule 6006(f)(6) and the notice-content requirements of Rule 6006(f)(1)-(4), has been satisfied.[12]

After closing arguments on September 25, the Court took the matter under advisement, indicating that, because time is of the essence with the Sale, the Court would prepare an oral ruling to be delivered at the first available opportunity, which was October 5, 2026. The Court is issuing this written opinion to memorialize its oral ruling.[13]

---

[10] This was issue number 8 in the Joint Statement. RBCAI acknowledged in closing argument that its objection is not dependent on this issue.

[11] This was issue number 14 in the Joint Statement. RBCAI acknowledged in closing argument that its objection is not dependent on this issue.

[12] This was issue number 15 in the Joint Statement. RBCAI acknowledged in closing argument that its objection is not dependent on this issue.

[13] This decision constitutes findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure, made applicable to contested matters by Rule 9014(c) and 7052 of the Federal Rules of Bankruptcy Procedure. To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and

The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(N). Venue is proper in this district under 28 U.S.C. § 1408.

# I. FINDINGS OF FACT

## A. BACKGROUND

Debtor filed its Voluntary Petition commencing this Chapter 11 case on September 29, 2024, and served as debtor-in-possession until August 13, 2025, when the Court appointed the Trustee. Debtor (now through the Trustee) operates the Rarity Bay Golf Club ("Club") and the real properties and amenities located in Vonore, Tennessee. The Debtor's assets include real and personal property described in the Sale Motion. The Club includes an 18-hole golf course and other recreational facilities, as well as a restaurant and event facility. As of the Sale Approval Hearing, the Club had approximately 622 members,[14] of which approximately 196 were golf members.

Debtor is owned by Michael and Amy Ayers, and Mr. Ayers testified at the November 4, 2024 meeting of creditors that the primary reason for the bankruptcy filing was the $3,508,098.00 judgment entered by the Monroe County Chancery Court in favor of RBP against Debtor on March 1, 2024, and the related judgment entered on September 23, 2024, for post-judgment interest and attorneys' fees and expenses (collectively, "State Court Judgment"). As explained by Mr. Ayers, Debtor sought bankruptcy protection because it did not possess $4 million in cash that would be required to post an appeal bond to stay execution by RBP of the State Court Judgment pending appeal. He also acknowledged that Debtor had negative cash

to the extent any conclusion of law shall be determined to be a finding of fact, it shall be so deemed. During delivering of its oral ruling, the Court reserved the right to issue this formal written decision and to make any edits as to format, style, grammar, or citation, in addition to the rights under Federal Rule of Bankruptcy Procedure 9024, which makes Federal Rule of Civil Procedure 60(a) applicable in bankruptcy proceedings.

[14] Approximately 200 members objected to assumption and assignment of their membership agreements.

flow for the year 2024 through September in an amount exceeding $423,000 and that Debtor's 2023 tax return reflected a loss exceeding $489,000. Mr. Ayers blamed Debtor's financial situation on "protracted and frivolous litigation."

The Rarity Bay community is a gated, waterfront, residential, country club community with 1,331 platted lots ("Community"), all of which are annexed into the Community. RBCAI[15] is the Community's governing body, and since a 2023 court ruling by the Monroe County Chancery Court that prohibited Debtor (through the Ayers) from firing and replacing RBCAI board members, the property owners have controlled the seven-member board because each lot owner has one vote in RBCAI.[16] As explained by Mr. Hoban, the current RBCAI president elected by the other board members, the property owners control RBCAI and its decisions

---

[15] RBP raised near the end of the evidentiary hearing a challenge to RBCAI's objection, arguing that the objection was filed (along with all of RBCAI's filings in this case) in violation of RBCAI's bylaws. Such a claim came too late in the Sale Approval Hearing as RBP did not raise it as an issue until the evidence was nearly concluded. Moreover, the Court is overruling RBCAI's objections to the Sale. Thus, the Court will not address the merits of RBP's argument.

[16] The chancery court's decision was affirmed in part and reversed in part. Relevant here is the court of appeals' explanation about Declarant Rights and how they impact control over RBCAI and through it, the Community. As explained by the Tennessee Court of Appeals in *Frisbey v. Salem Pointe Capital, LLC*, No. E2023-01233-COA-R3-CV, 2024 WL 3102873, at *1 (Tenn. Ct. App. June 24, 2024): "Declarant's rights originally belonged to the subdivision's developer, and the Bylaws defined 'Declarant' as'Tellico Lake Properties, L.P., a Tennessee limited partnership, or any successors, successor-in-title, or assigns.' . . . The Receiver transferred the Declarant's rights to [Debtor]." The court explained, "From the very beginning of the subdivision's development, the Declarant's rights have included the right to amend the Bylaws [unilaterally]." *Id*. at *6. The court noted that "it [wa]s undisputed that the development period [wa]s ongoing and that [Debtor] validly purchased the Declarant's rights in 2015." *Id*. The court affirmed the trial court's ruling that the amendment to section 8.5 in the Sixth Amendment to the Master Declaration was contrary to state law so that the provision allowing the Declarant to remove any director was unenforceable. This allowed the property owners to vote for their director of choice and, thus, control RBCAI and the Community.

The Declarant Rights also carry power to alter covenants, conditions, and restrictions ("CC&Rs") for the Community, and the Objecting Parties' position is that only RBCAI may exercise Declarant Rights. Currently, three entities claim the ability to exercise Declarant Rights: Debtor, RBCAI, and RBP. The Monroe County Chancery Court decision (currently on appeal) that caused Debtor to seek bankruptcy protection adopted RBP's argument that Debtor lost its standing to be Declarant no later than June 1, 2017, after Debtor terminated its partnership with RBP, because Debtor owned no developable property subject to the Master Declaration. Until resolution of the appeal (currently stayed by agreement between the Trustee and RBP), significant questions of law (and possibly fact) remain concerning who may exercise the Declarant Rights over the Community. The Trustee testified that he initially agreed to stay the fully briefed appeal because he was concerned about administrative expenses, but if the Sale is approved, he intends to move forward with the appeal to have it set for oral argument.

through the annual board elections, which allow groups of homeowners to combine their votes to ensure their voice is heard on the board.

RBCAI provides services to the Community that include maintenance of the roads (which RBCAI owns), the private sewer system and pipes, and the common areas. RBCAI also provides 24/7 security at the gate house. The entity operates a design review board to review plans submitted for building of or modifications to houses for adherence to the design review manual. It also monitors ongoing construction projects to ensure conformance with the plans. RBCAI leases land from Debtor for its maintenance shed and storage, as well as for vehicle parking at night. RBCAI funds its services to the Community through collection of assessments from property owners.

Since the Ayers created Debtor (in partnership with RBP) to purchase the Club and related assets out of a federal receivership in 2015, numerous lawsuits ensued from approximately 2017 through 2024, in addition to the already referenced lawsuits involving Debtor and RBP and RBCAI and Debtor. The parties acknowledge the long-standing and continuing acrimony among various constituencies in the Community. That acrimony is evidenced in part by the protracted litigation in this bankruptcy case, with the docket reflecting more than 1300 entries in the two years since the petition was filed. The appointment of the Trustee did not slow the pace of litigation in this bankruptcy case, as more than half of the docket entries occurred since the Trustee was appointed. Before the Trustee filed multiple adversary proceedings on September 29 to preserve claims under 11 U.S.C. § 546(a)(1)(A), five adversary proceedings were pending before this Court involving more than 350 distinct parties. Claims filed total 329, with general unsecured claims totaling more than $34.5 million. The Court notes that most hearings in this case, even short status hearings, have resulted in the

involvement of a dozen or more attorneys and attendance by more than two dozen homeowners, with the gallery sometimes being full of parties in interest.

B. THE TRUSTEE'S SALE PROCESS

The Trustee is a highly experienced financial restructuring professional who has served numerous times as a chapter 11 trustee in this and other districts. The Court finds the Trustee to be a wholly credible witness whose testimony was supported both by other witnesses and by the documentary record. The Trustee began his work in this case by meeting with the Ayers and several homeowner groups to gather information and understanding about the Community and operations of the Club. After resolving accounting issues with Debtor's operations, he concluded that there was insufficient cash flow from operations to litigate all of the claims against Debtor.

The Trustee's goal from his appointment has been to maximize value and minimize claims. Once he sufficiently understood the Club's operations and finances, he retained Hampton Golf in January 2026 to take over operations of the Club while he focused on solutions to maximize Debtor's value. The Trustee initially explored the possibility of developing a Chapter 11 plan, but he ultimately concluded that given the Club's cash flow and the amount of deferred maintenance,[17] a sale would be in the best interest of the estate and parties in interest.[18]

In early 2026, the Trustee communicated with Debtor's secured lenders, including RBP as the transferee of ORNL's secured claim, about his plan to hold a sale of Debtor's assets. Once

[17] The Trustee testified that substantial deferred maintenance affects the golfing cart path, greens, and bunkers and includes inadequate kitchen equipment needing repair and cracks in the tennis and racquetball courts. Informal discussions about costs to correct the problems led the Trustee to believe he would need from $1.5 million to $4 million for repairs, which was not feasible given the net operating income of the Club.

[18] The Trustee spoke with representatives of TCRB, which was formed early in 2025, which in the fall of 2025, offered the Trustee approximately $4 million (and later $4.5 million) to purchase Debtor's assets. The Trustee rejected those offers outright as insufficient to pay even the secured creditors.

the Trustee determined that he should pursue a sale, he contacted CBRE, with which he had previously worked. CBRE is one of the largest real estate firms globally with a large golf and resort division, which handles brokerage services for golf courses, marinas, ski resorts, and developable assets connected to such properties.

Initially, the Trustee proposed that RBP would be a stalking-horse bidder to set a floor for bidding, but when the related Rule 9019 compromise motion with RBP was met with multiple objections and skepticism by the Court, the Trustee withdrew the Rule 9019 motion and his first sale motion. He still sought approval to employ CBRE to begin marketing the assets, and the Court approved CBRE's employment retroactive to March 25, 2026, by an agreed order entered on May 8, 2026. [Doc. 913.]

CBRE's marketing included a team of at least four real estate professionals. The team, which previously had been involved in § 363 sales, reviewed Debtor's financial records provided by the Trustee, visited the golf course, discussed the exact opportunity with the Trustee, and developed a set of comparable properties to try to determine the best approach for marketing the assets. CBRE created an offering memorandum and a virtual data room that was populated with information from the Trustee. CBRE then directly marketed the property to groups that would typically be buyers of golf courses, including owners, operators, and developers for golf courses and golfing communities. The CBRE team answered questions about the opportunity and worked to ensure that anyone who might be interested was aware of the opportunity. The team engaged in extensive digital marketing and email outreach by communicating the opportunity multiple times to more than 10,000 contacts in its proprietary database plus other contacts that the Trustee provided. More than 5,000 of the email recipients viewed the email, and 60 different interested parties signed confidentiality agreements to access the data room. When information

was added, revised, or clarified for the data room, CBRE team members notified everyone who had signed a confidentiality agreement to access the data room. Additionally, CBRE team members spent over 70 hours on introductory and follow-up calls with more than 35 potential purchasers. They also hosted six official prospect tours for potential bidders.

After resolution of numerous objections to the Trustee's proposed sale procedures, the Court entered the Sale Procedures Order [Doc. 1017] on June 26, 2026. To the Court's understanding, none of the objections to the Sale arise out of any alleged noncompliance with the Sale Approval Order, except the seventh issue enumerated above concerning Rule 6006 requirements for the notice of assumption and assignment.

The Trustee received four bids with a minimum bid of $8.9 million, deposits of $500,000, and proof of funds by the deadline of July 23, 2026 (in compliance with the Sale Procedures Order). One of the bids was disqualified by the Trustee because the focus of the purchase was on Declarant Rights, which were expressly excluded from Purchased Assets as approved in the Sale Procedures Order.

According to both the Trustee and the CBRE witnesses, CBRE assisted the Trustee with qualifying the bidders, which is standard practice. This included ensuring each bid included proof of funds, a deposit (with CBRE providing wire instructions), and an APA (redlined with any revisions from the form APA in the data room), as well as researching the bidders online and talking to the team's market contacts to try to understand the bidder and its track record, if any. CBRE's Schempp[19] testified that proof of funds for qualifying to bid can be multiple forms – it varies by bidder and the source of financing or capital. He also stated that the proof-of-funds

[19] Schempp has been involved in at least twelve sales of golf courses in his three years with CBRE.

letters provided by the qualifying bidders in this case were standard industry practice[20] in his experience with § 363 sales. The three remaining bids were qualified, and the auction commenced on August 6, 2026, with the Trustee not designating a stalking-horse bidder as permitted by the Sale Procedures Order.

The Trustee explained that several issues were important to him in the sale process. First, he did not want a successful bidder to charge new initiation fees to members. He resolved this issue by an agreement from Timbertop that new initiation fees would not be charged for existing Club members with a membership agreement.[21] The Trustee's goal was to give members an option because so many were unhappy with the Club and the prospect of a new owner might not satisfy the members' concerns. He especially was pleased that he could negotiate this win for members by offering the sale with no contingency for a minimum number of members (as stated in the APA with both Timbertop and RBP), especially given that a buyer naturally would desire to maximize income. The practical result is that all members who do not want their memberships to be assumed and assigned will not be required to be members.

At the auction, along with the Trustee and his attorneys, Timbertop and RBP were in person, and a third bidder was present virtually. Parties in interest were permitted to observe virtually the official bidding at the auction, although the camera and microphones were disabled

---

[20] RBCAI's counsel acknowledged during closing argument that the record contains no refutation of the Trustee's testimony that he followed standard industry practice in accepting the proof-of-funds letter submitted with Timbertop's bid package.

[21] The Court recognizes that although the Trustee, with Timbertop's consent, is not proposing to assume and assign the membership agreements of the Objecting Property Owners and that Timbertop's purchase includes an agreement not to charge new membership initiation fees to *existing* members, if the Objecting Property Owners want to become members again in the future after their agreements are rejected (at some point after closing), they would be required to pay new membership initiation fees. Magda, however, was clear that Timbertop will not assess a new initiation fee on a transfer of property to a new purchaser by a then-existing member.

during off-the-record breaks.[22] The bidders were separated during breaks, and none of the bidders communicated with another bidder during any break; in fact, the Trustee observed the in-person bidders walk separately into separate offices during breaks, and the bidder that participated virtually was in its own "Zoom room." CBRE's Schempp, who was also physically present at the auction, confirmed that he also saw nothing of concern between bidders during breaks. The bidders engaged in between ten and twenty rounds of bidding until one of the bidders bowed out around $10 million. Thereafter, Timbertop and RBP engaged in additional bids until Timbertop's successful bid was not countered.

The Trustee expressly instructed all bidders that there could be no deals between them. Before the bidding began at the auction, each bidder confirmed that they had engaged in no collusion or coordination with any other bidder regarding bidding strategy, bid amounts, or efforts to influence the outcome of the auction. [Ex. T7 at 7.] Each also confirmed that its qualified bid was a bona fide offer, that it intended to consummate the sale if it became the successful or back-up bidder, and that it had the financial capability to close the transaction with no financing contingency. [*Id.* at 8.]

The ultimate outcome of the auction was a bid by Timbertop of $11,157,895.00, with RBP's back-up bid at $10,950,000.00, with the same net value to the estate.[23]

---

[22] The Trustee's counsel explained at the beginning of the auction that "in between public rounds of bidding, and in some cases during a round, an off-the-record break may be taken at the discretion of the trustee to permit bidders to consult with their representatives about further bidding or to permit the trustee to consult with one or more bidders for any reason. . . . Increases in bids or changes in sale terms, if any, cannot occur off the record and must be done or at least confirmed in the presence of all remaining bidders and the trustee and be on the record." [Ex. T7 at 9-10.]

[23] Under CBRE's employment order, CBRE's commission will be lower if RBP is the ultimate purchaser.

C. TIMBERTOP & MAGDA

During his plan-investigation phase, the Trustee met with Magda, who initially expressed interest in proposing a Chapter 11 plan for Debtor's reorganization. Magda had become aware of the Club and its financial difficulties when, approximately five months before the Trustee was appointed, Magda first met the Ayers (at a Farragut area restaurant). Magda founded Timbertop, along with Timbertop Builders (the construction affiliate) and Timbertop Growth Investment Fund ("TGIF") (the funding affiliate), and he is Timbertop's CEO and managing partner. Timbertop was created as a Tennessee limited liability company in 2024 and transitioned to a Delaware LLC in 2025.[24] It was created to pursue land acquisition for the purpose of sale or lease. Although Timbertop was not created for any purpose related to the Club, this proposed purchase is the only proposed acquisition in which Timbertop has engaged since its inception.

After Magda first met the Ayers and heard their story, he told them he would "take a look" at the Club to see if it might be a possible investment for Timbertop. A few days after first meeting the Ayers, Magda toured the Club and Community. He then stopped by a real estate agent's office, who suggested that he should talk with RBP if he was interested in the Club. The agent gave Magda the phone number for Crystal Pate, who is employed by RBP and/or Apex Bank (which is owned by Matt Daniels, who also is the principle in RBP). The first contact that Magda had with the Ayers and Pate was in March 2025. Pate advised Magda that if he was interested in purchasing the Club and its assets, he should buy all available developable property, including interests and property owned by RBP and by BEP (which owns numerous lots for development, has been party to prepetition litigation with Debtor and RBP, is a defendant (along

[24] The initial APA filed with the Court reflected Timbertop as an existing Tennessee LLC, but after Magda's testimony that Timbertop is now a Delaware LLC, the Trustee submitted an amended APA that reflects Timbertop as a Delaware LLC. The Court does not find this change to be material, suspicious, or improper.

with various affiliates) in a pending adversary proceeding, and is creditor and party in interest in this bankruptcy case).

1. John Rock

Around the time when the Trustee was appointed, Magda also randomly met John Rock, who was an employee of Apex Bank. Initially, Rock was promoting to Magda the lending services of Apex Bank, where Rock had worked for one or two years. Magda and Rock became friends over their frequent interactions at the same Farragut area restaurant where Magda had met the Ayers a few months before meeting Rock.

Then, by at least September 29, 2025, Magda offered Rock a position and an interest in Timbertop as "commercial property director." Magda understood that Rock had "retired" from Apex Bank only three days before Magda invited Rock to join Timbertop. At that time, Magda was aware that Rock had handled a $70 million transaction for Apex Bank in Cookeville. Magda testified that he brought Rock on because of his knowledge about Bill Prince and Burwil Construction Company, with whom Magda has consulted for plans to improve the golf and country club if the Sale is approved.

According to Magda,[25] the only work that Rock has done for Timbertop was to review pro formas that Magda prepared. Rock does not receive a salary, but he owns 2% of Timbertop.[26] Magda was unable to explain Rock's performance requirements to receive compensation, but he acknowledged that Rock, as an owner of Timbertop, has an incentive to see the Sale close and for Timbertop to be successful in its investment.

---

[25] The Objecting Parties could have deposed Rock or subpoenaed him to testify at the Sale Approval Hearing, but they did not.

[26] Lauren Morgan, who is Timbertop's "community relations director," also owns 2% of Timbertop, with Magda owning the remaining 96%.

Rock first appears in communications with the Trustee as a CC recipient of an email from Magda to the Trustee dated September 29, 2025. Magda communicated with the Trustee shortly after his appointment, during his plan-investigation phase in late 2025. The September 29 email acknowledged recent discussions with the Trustee about his fiduciary obligations and Timbertop's desire to serve as a sponsor for a Chapter 11 plan. The Trustee testified that much of Rock's communications with him concerned the debt owed by Debtor to ORNL Federal Credit Union, which struck the Trustee as odd, and the communications in the evidentiary record between the Trustee and Rock confirm the Trustee's understanding. In one of the last emails between the Trustee and Rock, Rock inquired of the Trustee about who purchased the ORNL debt. The transferee was RBP. This evidence supports the Court's conclusion that Rock was not working with RBP while working for Timbertop because if he had been connected with RBP, he would have known that RBP had purchased ORNL's secured claim.

In any event, the Trustee made clear that he has not communicated with Rock since late 2025 and not at all about the Sale process. Moreover, the uncontroverted evidence is that Rock did not participate in the bid or auction process.

2. Timbertop's Comprehensive Plan for the Community

Magda acknowledged on cross-examination that the original dream for Timbertop's investment in the Club and Community, as stated in the Private Placement Memorandum ("PPM") [Ex. O15] issued by TGIF, was "a bankruptcy acquisition strategy . . . to initiate a transformative resort development Project" in the Community. The plan included purchase of 521 vacant residential lots, including lots of Debtor as part of the Purchased Assets and lots owned by RBP and BEP. [Ex. O15 at 47.] The dream also included developing an assisted living facility with condos and an on-site health care center, as well as other commercial

development. [*Id.*] Perhaps of greatest concern to the Objecting Parties, Timbertop has at some point advertised that it wants to become the perpetual declarant so that it would be able to change at will the CC&Rs that govern the Community and all the property within it. Such power, the Objecting Parties fear, would change the character of the Community in a way that would reduce their property values and burden their use of the amenities.

Magda acknowledged that he hopes to develop the lots in Phase 17 that are part of the Purchased Assets. Whether he can do so under the law and existing CC&Rs, however, remains to be seen given that Phase 17 has no infrastructure (which allegedly would need to be created in collaboration with RBCAI) and, according to the Monroe County Chancery Court decision that is on appeal, part of it is a designated wilderness area not authorized for development. Magda also explained that he might build residential units to sale, to rent, and/or to sale to a (new[27]) property owners' association for short-term rentals. Again, whether the CC&Rs or the law applicable to the Community would permit a new property owners' association or construction of units to sale to such an association for short-term rentals remains to be seen and is not addressed by the Proposed Sale. That is, nothing about this Court's approval of the Sale would authorize such activity, which the Objecting Parties may oppose (in a state court) if they so desire.

Much of the testimony elicited from Magda on cross-examination concerns the original comprehensive plan, which all parties acknowledge would be governed by the Tellico Reservoir Development Agency ("TRDA") if the plan would change the character of the Community as it was originally permitted by the TRDA when the Community was created in the 1990s.

[27] Magda acknowledged that a new property owners' association is not permissible absent an amendment to the Master Declaration by the holder of Declarant Rights, which are not part of the Purchased Assets in the Proposed Sale.

The Objecting Parties also questioned Magda extensively about the PPM itself,[28] which is a formal disclosure document governed by SEC Regulation D to notify potential investors of the risks of the investment. [Ex. O15 at 4.] Magda insisted that the PPM was related to Timbertop's initial plan to propose a plan of reorganization and although TGIF never filed to close the PPM, Timbertop was not using the PPM to raise funds to buy the Purchased Assets through the APA.

Magda admitted that the PPM raised $1.7 million, the only asset of Timbertop or TGIF. He testified that TGIF will determine at some point what to do with the $1.7 million raised by the PPM but that it is not being used for the purchase under the APA.[29]

Magda acknowledged that Lauren Morgan sent an email to Community residents on August 15, 2026, to communicate directly to the Community after Timbertop was the successful bidder. [Ex. O10.] The problem is that the email is from TGIF, which Magda repeatedly testified is not providing the funding under the proposed APA. Aside from the glaring problem with the reference to TGIF's involvement, which Magda explained was an oversight resulting from "use of habit," the letter does not raise red flags for the Court.

3. Magda's Credibility Problem

Magda's avoidant responses about some tangential facts certainly add complexity to the Court's analysis, as do the connections between John Brock[30] and Timbertop and John Rock and Timbertop.

---

[28] The Court allowed testimony about and admission of the PPM over the objections of the Sale proponents to allow some latitude to the Objecting Parties on the potential relevance relating to Timbertop's good faith.

[29] As detailed below, Magda also admitted that the $500,000 deposit submitted by Timbertop to be a qualified bidder came from the funds raised by the PPM, which he intends to repay once the Sale closes.

[30] Another odd connection concerns attorney John Brock, who represented Timbertop at the auction and in connection with the PPM in 2025. He previously represented RBP in 2015, when RBP partnered with Debtor in connection with the purchase of the Club and its assets from the federal receiver. Mr. Brock is the attorney who proposed and prepared

More troubling is that on the Court's own questioning, Magda was dubious and, at times, outright duplicitous. First, he testified on questioning by the Court that he had not had any further discussions with RBP about purchasing the Declarant Rights from RBP if RBP is eventually determined to own Declarant Rights. He also testified very directly on cross-examination that Timbertop had no current plan to acquire Declarant Rights from RBP. When he delayed responding to a question about whether Timbertop had any current plan to acquire the equity in RBP, the court asked Magda very directly why he hesitated. He then disclosed that he had plans to buy RBP if he could do so. The Court then asked Magda if he had had any discussions with anyone about acquiring the equity in RBP, and he acknowledged that he had had numerous conversations with RBP personnel since the beginning of his interest in the Community. He initially stated that "the most recent conversation with RBP was before the auction began" – between the withdrawal of the Rule 9019 motion and the filing of the (second) Sale Motion. Then, after stating that the discussion with RBP was left open once the auction started (because Timbertop and RBP were opposing bidders), he revealed that since the auction, he had discussions with Pate and Daniels about acquiring RBP's equity and/or Declarant Rights as recently as one or two weeks before Sale Approval Hearing commenced on September 3. Since the auction, Timbertop also provided a letter of intent to purchase RBP for $30 million, but as of September 17, RBP had not responded.

---

the Assignment of Right agreement between RBP and Debtor, and he prepared the Sixth Amendment to the Master Declaration ("Sixth Amendment"), found in the record at Ex. O26, which was recorded shortly after Debtor was created and purchased the Club and other assets from the federal receiver to give Debtor as Declarant extraordinary rights to govern the Community by the imposition of various mandatory CC&Rs. Both RBP, through counsel, and Timbertop, through Magda's testimony, strongly deny that Brock's representation of Timbertop in connection with the auction is evidence of collusion between Timbertop and RBP. In fact, Magda acknowledged his awareness that RBP characterized Brock's representation of Timbertop in connection with the auction to be a conflict of interest. The Court finds that the admittedly surprising connection is not evidence of collusion.

Ultimately, however, the Court notes that Magda's testimony on direct examination was that he had no undisclosed business arrangements with RBP regarding the "sale process, bidding, and auction." That statement was not impeached. He also testified that there was no discussion about the bids between the bidders and that there are no additional agreements, understandings, or commitments regarding the sale process that have not been disclosed to the Trustee or the Court. Similarly, his testimony, while lacking in full disclosure, appears true that he had no further discussions with RBP about purchasing *the Declarant Rights* if they ultimately are determined to be held by RBP.

Magda's testimony that there was no collusion about the bid or Sale between him and anyone associated with RBP has not been controverted by testimony of Magda's discussions with Matt Daniels and the possibility of Magda and/or Timbertop purchasing all of RBP's assets. Indeed, the text messages between Daniels and Magda (in the days between Magda's first day of testimony and his last), which were read by Magda on request of counsel for the Objecting Property Owners, reflect a lack of collusion.[31]

Concerning Timbertop's access to funds for the Proposed Sale, Magda initially testified on cross-examination that the financing arrangement with Divine Acquisitions, LLC, was for a 15% interest loan with a two-year term, with a $7 million reserve for points, fees, and interest so that there would be no debt-servicing requirement in the first two years. He expressly described the term sheet with Divine Acquisitions as a $37 million commitment (including $30 million in available funds plus $7 million in reserve for interest accrual). Magda asserted that after two

[31] The text message from Daniels to Magda read: "Why is your attorney telling the Trustee that I'm trying to taint the sale? That's a lie. Secondly, I've been trying to protect both of us from a corrupt and incompetent Trustee." Then, Magda responded to Daniels: "I just checked with our attorney, and he is adamant that's not the case. He said he's merely told the Trustee that we have an intent to buy all the owners out at some point but wants to take it one step at a time. Neither our party or yours have ever colluded, and the Trustee confirmed that to be true. . . ."

years, other capital partners would pay off the loan. When asked to identify those capital partners, Magda declined, saying that he could not disclose the identity because no agreement yet existed. He stated that he expected the loan would be paid off by conventional financing with banks with whom he had previously engaged but that those lenders were not interested in financing the purchase of a distressed asset and pending litigation. Magda described the plan as securing a bridge loan until the property is stabilized, after which traditional lenders would be willing to commit to long-term financing. He also explained that during the two-year term, there were no milestones or timelines, except that he had provided a budget to Divine Acquisitions and it was expected that the golf course and country club renovation would be complete and that the cost and completion to "get Phase 17 to be saleable" (or "shovel ready") would be accomplished during the first two years.

Then, once the referenced term sheet (that was supposedly with Divine Acquisitions) was provided before the fifth day of trial, it became clear that another entity was involved in the funding of Timbertop's purchase, namely Valor Capital Lending ("Valor"). [Ex. O49.] Magda denied that the "Range of Terms" from Valor, which was produced by Timbertop's counsel as the term sheet at issue, was the term sheet he had previously referenced with Divine Acquisitions (although no term sheet with Divine Acquisitions was ever produced). Magda then insisted that other than the proof-of-funds letter from Divine Acquisitions, no other document exists with Divine Acquisitions.

Concerning the Range of Terms document Valor, dated and signed by Magda on September 4, 2026 (notably after the Sale Approval Hearing commenced), Magda testified that there was no binding agreement with Valor. He acknowledged, however, that the source of the $37 million that he had previously mentioned is Valor (notwithstanding that his earlier testimony

left a clear impression, at least to the Court, that the source of such funds was Divine Acquisitions). Magda could not say when he first communicated with Valor, but the record reflects that Valor did not exist until it was organized in the State of Florida on July 28, 2026 (after the qualifying bid deadline under the Sale Procedures Order). [Ex. O50.]

When questioned about whether he intends to replace the Divine Acquisitions funding with funding from Valor, Magda represented that Divine Acquisitions brought Valor to Timbertop. Although Divine Acquisitions is not referenced in the Valor Range of Terms, Magda said that if Valor is willing to fund the purchase, then Valor would pay off Divine Acquisitions. Magda also testified, however, that Divine Acquisitions was not proposing a loan but would be a capital partner. He described his understanding of the arrangement as follows: Divine Acquisitions is getting a structured finance deal; it puts in the capital for the acquisition and becomes a capital stake partner and then it finds other equity partners (either lenders or otherwise). According to Valor's Range of Terms, if it provides funding, it will be given a first priority security interest on the Purchased Assets, as would Divine Acquisitions if it funds the purchase. Frankly, Magda's explanation of his understanding of the tranches of funding in the Range of Terms does not add up. Ultimately, though, if Timbertop is unable to close the Sale, then the estate will keep the $500,000 deposit and the Trustee will pursue approval of RBP's back-up bid.

Most concerning is Magda's testimony about the source of the $500,000 deposit. As referenced, he insisted that the PPM was separate from the proposed purchase under the APA. Magda was then asked about the source of the $500,000 deposit, and after a delay, Magda testified that "it was brought originally from Toney Cosey," TGIF's VP of Capital Markets, "from his fund." Noting the delayed and carefully worded response, the Court asked if Magda

knew the source of the funds originally, and he responded, “No, ma’am.” On further questioning by counsel for the Objecting Property Owners, Magda said “he couldn’t say” whether the funds were Mr. Cosey’s personal money. As will be evident from the recitation of the testimony below, those statements were patently false.

When asked whether Mr. Cosey had any obligation to repay TGIF or anyone else any portion of the $500,000, Magda said, “Yes, I would pay back that money, of course, once I close.” Next, Magda was asked who would pay it back, and he responded that it “would probably come back from Timbertop.” Magda then testified that Timbertop has $500,000 to repay Mr. Cosey, which caused the Court to inquire why the deposit came from Mr. Cosey and not from Timbertop if Timbertop has the money to pay him back. Magda’s avoidant response: “It was just our choice.” When the Court expressed dissatisfaction with the non-answer, Magda said it was done to use leverage, to keep cash in the Timbertop accounts. (This, too, was false.) The Court then asked Magda if Timbertop has any other expense, and Magda responded that it has no other expenses, but he “wanted to keep cash in bank, so he didn’t want to spend if he didn’t have to.”

When asked by counsel how much cash Timbertop has in a bank account, Magda responded, “$650,000,” which he said was in Smart Bank. Magda denied any written agreement with Mr. Cosey concerning the $500,000. Then, when asked repeatedly by counsel whether the source of the $500K deposit was the $1.7 million raised by TGIF through the PPM, Magda again equivocated, saying, “I just told you; it came directly from Tony Cosey.” When asked if he knew where Mr. Cosey got the $500,000, Magda testified, “I understand that it was directly.” Because the response did not make sense to the Court, the Court again engaged Magda, stating,

"I don't understand the response." Counsel then asked, "Directly from what?" Magda responded, "It comes directly from there, yes sir."

After another question seeking clarification, Magda *finally* admitted that Tony Cosey "probably did get it from the PPM, I would guess." The Court then confronted Magda: "Why have you been so reluctant to acknowledge that when you've been asked, do you know or believe where Cosey got the money from?" Magda responded, "I don't know, your honor. I'm just nervous, I suppose. Sorry."

Magda then disclosed after questioning by counsel that the $650,000 that Timbertop has on hand in a bank account (actually in TGIF's bank account) is also from the PPM funds,[32] acknowledging that the $650,000 is what remains of the $1.7 million raised by the PPM. The Court then asked Magda about his prior testimony that Cosey provided the $500,000 so that Timbertop could keep money in its account. Magda claimed confusion.

Sadly, the Court can only conclude that Magda was intentionally false in his responses to counsel and the Court about the source of the $500,000 deposit. The Court surmises that Magda must have thought that he needed to keep secret the fact that Timbertop had used $500,000 of the PPM funds because he was concerned about violating SEC rules governing the PPM[33] and he legitimately intends to pay back the funds once the Sale closes.

## II. CONCLUSIONS OF LAW

While the facts before the Court are complex, the law is fairly simple. The Trustee seeks approval of the Sale to Timbertop pursuant to 11 U.S.C. § 363, which states, in material part:

> (b)(1) The trustee, after notice and a hearing, may . . . sell . . . , other than in the ordinary course of business, property of the estate . . . .

---

[32] Magda later admitted that Timbertop has spent another $500,000 of the PPM funds on plans by Burwil Construction and varied costs and expenses, including attorneys' fees relating to the purchase.

[33] The Court need not analyze whether use of the PPM funds violates any SEC regulation or other law.

> . . . .
>
> (f) The trustee may sell property under subsection (b) . . . of this section free and clear of any interest in such property of an entity other than the estate, only if--
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.
>
> . . . .
>
> (m) The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363; *see also* Fed. R. Bankr. P. 6004, 6006.

The Sixth Circuit has long held that a bankruptcy court may authorize a sale under § 363(b)(1) after considering the evidentiary record to determine whether the Trustee has presented a sound business purpose (other than appeasement of major creditors) to grant a motion to sell property of the estate outside the ordinary course of business. *See Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986) (adopting the standard articulated in *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp*.), 722 F.2d 1063, 1071 (2d Cir. 1983)); *see also In re Iovate Health Scis. Int'l, Inc.*, No. 25-11958 (MG), 2026 WL 1295907, at *8 (Bankr. S.D.N.Y. May 12, 2026) (citing *In re Lionel Corp.* for the rule that the articulated business justification must be other than appeasement of major creditors). As the party seeking

approval of the sale, the Trustee bears the burden to show a sound business purpose; however, whether a § 363(b) sale should be approved "falls within the sound discretion of the trial court." *In re Nicole Energy Servs., Inc.*, 385 B.R. 201, 230 (Bankr. S.D. Ohio 2008) (quoting *Stephens Indus*., 789 F.2d at 388). "[T]he main responsibility of the [Trustee] and the primary concern of the court [must] be the *maximization of the value of the asset sold*," and the Trustee must "show that [he] has obtained the best possible price for the asset." *In re New Era Resorts, LLC*, 238 B.R. 381, 387 (Bankr. E.D. Tenn. 1999) (emphasis added) (citation modified). Although the Trustee bears the burden of proof, "an object[or] to a § 363(b) motion is required to produce some evidence supporting its objections." *In re EaglePicher Holdings, Inc*., No. 05-12601, 2005 WL 4030132, at *1 (Bankr. S.D. Ohio Aug. 26, 2005) (citation modified).

Generally, courts consider the following factors when evaluating whether to approve a § 363 sale: "(1) whether adequate and reasonable notice of the sale was provided to interested parties; (2) whether the sale has been proposed in good faith; and (3) whether the purchase price is fair and reasonable"; however, "no one factor is determinative," and the list of factors is not exhaustive. *In re Woodberry*, 629 B.R. 239, 246 (Bankr. E.D. Mich. 2021) (citations omitted); *see also In re Maloney*, No. 19-60895, 2020 WL 4810070, at *2 (Bankr. N.D. Ohio July 13, 2020) ("The sale of assets outside of the ordinary course of business generally requires proof that: (1) there is a sound business purpose for the sale; (2) the proposed sale price is fair; (3) the trustee has provided adequate and reasonable notice; and (4) the buyer has acted in good faith." (citation modified)). "A court must consider the unique facts and circumstances of each case as opposed to applying a predetermined formula." *In re Family Christian, LLC*, 533 B.R. 600, 626 (Bankr. W.D. Mich. 2015) (citation modified).

As explained by the court in *Stephens Industries*,

> In fashioning its findings, a bankruptcy [court] must not blindly follow the hue and cry of the most vocal special interest groups; rather, [it] should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. [It] might, for example, look to such relevant factors as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy [court].

*Stephens Indus.*, 789 F.2d at 389 (quoting *In re Lionel Corp.*, 722 F.2d at 1071). In short, "the standard to be applied by the court in approving a disposition of assets is variously stated, but the general thrust is that the proposed sale should be in the best interest of the estate." *In re Nicole Energy Servs.*, 385 B.R. at 231 (quoting *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1994)); *see also In re Family Christian, LLC*, 533 B.R. at 627 ("When considering offers for the purchase of assets, the [seller's] duty, and the primary concern of the bankruptcy court, is to ensure that the sale maximizes the value of the asset sold.").

The Court gives "some deference" to the Trustee's business judgment. *See In re Cmty. House Ass'n, Birmingham, Mich.*, 679 B.R. 877, 881 (Bankr. E.D. Mich. 2026) (citations omitted). Nonetheless, "even this ostensibly deferential standard requires findings based on a fair preponderance of evidence actually presented." *In re FirstEnergy Sols. Corp.*, 591 B.R. 688, 695 (Bankr. N.D. Ohio 2018) (explaining that "[t]he facially lenient requirement of an 'articulated business justification' for a transaction outside the ordinary course of business is not a license to rely on pretextual justifications that fail to withstand scrutiny . . . , [which] is particularly true when the proposed transaction and the motion filed seeking its approval are the subject of a substantive objection." (quoting *In re Lionel Corp.*, 722 F.2d at 1070)). In the context of a debtor's proposed sale under § 363, some courts have found that "[a] debtor's

business decision should be approved by the court unless it is shown to be so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" *In re SW Boston Hotel Venture, LLC*, No. 10–14535–JNF, 2010 WL 3396863, at *3 (Bankr. D. Mass. Aug 27, 2010), *cited with approval in In re Cmty. House Ass'n, Birmingham, Mich.*, 679 B.R. at 881. "This is especially so in a case such as this, where all creditors and all administrative expenses will be paid from the proceeds of the proposed sale." *In re Cmty. House Ass'n*, 679 B.R. at 881.

Though not defined by the Bankruptcy Code, "courts have defined a 'good faith purchaser' as one who purchases the assets 'for value' and 'in good faith.'" *In re Junk*, 566 B.R. 897, 916 (Bankr. S.D. Ohio 2017) (citation modified). "The good faith requirement, although not expressly contained in § 363(b), has been grafted on to the approval of sales . . . because that requirement appears in § 363(m) . . . [and t]ypically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Nicole Energy Servs*., 385 B.R. at 235 (citation modified). "In assessing the good faith of a purchaser, courts have considered factors such as: (1) whether the sale was negotiated at arm's length; (2) whether any officer or director of the debtor holds any interest in or is otherwise related to the potential purchaser; and (3) whether fraud or collusion exists among the prospective purchaser, any other bidders or the trustee." *Id*. (citations omitted). "A negotiation or transaction is conducted at arm's length if it is between two parties who are not related and not on close terms and who are presumed to have roughly equal bargaining power." *Id.* (quoting *Allegheny Ludlum Corp. v. United States*, 367 F.3d 1339, 1348 (Fed. Cir. 2004)).

As for the requirements of § 363(f), the provisions are disjunctive; thus, the Court need find only one of the five subsections applicable. The relevant provision here is the existence of a bona fide dispute, which "exists when 'there is an objective basis for either a factual or legal dispute as to the validity of the debt. . .' [and i]t is the existence of a bona fide dispute rather than the resolution of the dispute that is relevant under 11 U.S.C. § 363(f)(4)." *In re Sumner Reg'l Health Sys., Inc.*, No. 310-04766, 2010 WL 2521081, at *2 (Bankr. W.D. Tenn. June 18, 2010) (quoting *In re Pierce*, 384 B.R. 477, 482 (Bankr. S.D. Ohio 2008); *In re Nicole Energy Servs., Inc.*, 385 B.R. at 229).

1. <u>The Trustee's Good Faith and Sound Business Judgment</u>

The first issue raised by the Objecting Parties questions whether the Sale should be approved as an exercise of the Trustee's good faith and sound business judgment. The Court finds, based on the evidentiary record, that the Trustee's decision to support the Sale is a good-faith, reasonable exercise of his business judgment and is in the best interests of the estate, its creditors, and other parties in interest.

The salient facts that show the Trustee's good faith and sound exercise of business judgment began with the Trustee's decision to accept Timbertop as a qualified bidder (which, technically, has not been challenged). Timbertop timely submitted its bid package to the Trustee, and the Trustee deemed it a qualifying bid. Timbertop included in its bid package a letter from Divine Acquisitions, which was described by the letter's author, Eli Farhi, President of Divine Acquisitions, as a "proof of funds letter" in connection with Timbertop's proposed acquisition of the Purchased Assets. [Ex. O44.]

The Trustee testified that after receiving Timbertop's bid package, he primarily relied on CBRE to look up both Timbertop and Divine Acquisitions. CBRE's Schempp confirmed that his

team investigated Divine Acquisitions and advised the Trustee that the firm appeared to be a legitimate funder of mergers and acquisitions. The Trustee found the same through his own brief internet research. The Trustee acknowledged that he did not confirm that the pledged $13 million belonged to Timbertop because, in fact, the Divine Acquisitions letter indicates that Divine Acquisitions is the "provider" of funds for Timbertop's bid.

As for the Objecting Parties' concerns about Timbertop's comprehensive plan for the Community, at bottom, the Purchased Assets do not include the Declarant Rights. The Sale does not allow Timbertop to activate its "dream" of becoming a perpetual declarant. Timbertop's goal of purchasing lots from RBP and BEP does not affect the Trustee's business judgment concerning the wisdom of the Proposed Sale.

The Trustee's earliest email communications with Timbertop (beginning during his plan-investigation stage shortly after he was appointed) indicate his good faith in the exercise of his fiduciary duties. [*See* Ex. O48.] Both at the beginning of the Sale Approval Hearing and at the end, during his rebuttal testimony (after he had heard the torturous cross-examination of Magda about Timbertop's intentions, its funding, and its communications with RBP about buying RBP's equity and/or any interest of RBP in Declarant Rights), the Trustee affirmed that he believes the Proposed Sale was not the subject of collusion or any activity that decreased bidding or artificially inflated bids to exclude another bidder. He testified that the Sale is in the best interests of the bankruptcy estate.

Given the rock and the hard place where the Trustee sits with no prospect of a viable plan of reorganization and the declining value of the Purchased Assets by continuing deferred maintenance, as well as the continuing acrimony throughout the Community (through which his

own motives have been irrationally questioned) and the ever-increasing administrative expenses, the Court accepts the Trustee's business judgment in support of the Sale.

In particular, the Proposed Sale satisfies the secured claims (to the extent they ultimately are allowed) and will also satisfy the administrative claims and expenses and result in a distribution to unsecured creditors.[34] The Trustee will retain all cash, accounts receivable, all Chapter 5 causes of action belonging to the bankruptcy estate, and the Declarant Rights (to the extent that they exist in Debtor, with multiple parties having expressed interest to the Trustee in purchasing the Declarant Rights[35]). The Trustee explained that the Sale is a neutral transaction in that it will maintain the status quo over issues around Declarant Rights and the validity and enforceability of the Sixth Amendment and related deed restrictions. This means that the estate will still need to engage in litigation, but the Sale will allow a new owner to invest in much needed capital improvements from long deferred maintenance to the golf course and restaurant, which is beneficial to the Community as a whole.

As for the Trustee's opinion about Timbertop's ability to perform, he testified after listening through seven days of testimony – some of it new information to him – that in his business judgment, the Club could produce sufficient income from operations to continue to operate, and Timbertop would also have funds from the Divine Acquisitions commitment of $2 million more than the purchase price Given the confirmed plan to employ Hampton Golf, he

---

[34] The Trustee indicated that he expected a distribution to unsecured creditors of approximately $2 million based on an estimate that CBRE expenses plus secured claims and administrative claims would total approximately $9 million.

[35] During the auction, one of the bidders asked to include the Declarant Rights in the Purchased Assets, but the Trustee rejected the bid because the Court had not approved a sale of the Declarant Rights. The bidding then continued for the Purchased Assets only. The Trustee testified that the substantive discussions about the Declarant Rights held off the record were not then put on the record because the only assets subject to the auction were the Purchased Assets as approved by the Court in the Sale Procedures Order – i.e., because the Declarant Rights were not being auctioned, neither he nor his counsel saw any reason to document the discussions for the auction record. Based on numerous discussions, however, the Trustee believes he might eventually be able to liquidate the Declarant Rights for $1 million or more, but any such sale would be subject to Court approval after notice and opportunity for objection.

was unconcerned about Magda and Timbertop's lack of experience in operating a golf course and country club.

Simply, absent a sale (this one or to RBP as the back-up bidder – which undoubtedly would garner even more objections than those addressed here), the Trustee has virtually no path forward to maximize the value of the estate. Disapproval of the Sale, the Trustee believes, would soon be followed by conversion to Chapter 7. Even Tracy Lorts, one of the Objecting Property Owners, testified that keeping the Club open and operating is in everyone's best interest.

Further, given the deferred maintenance, the time is now to consummate a sale so that a new owner will have the off-season to make improvements before the spring golf season begins. The Court finds that the Trustee balanced the real challenges and competing interests of all constituents and agrees with the Trustee's business judgment that no viable plan of reorganization is likely (or even plausible) and that this Proposed Sale will result in a meaningfully positive result for all parties in interest.

The first issue, concerning the Trustee's business judgment, also encompasses the Objecting Parties' concern about whether Timbertop can close the transaction. The Trustee reasonably relied on the proof-of-funds letter from Divine Acquisitions. As indicated above, if Timbertop is unable to close the Sale, then the estate will retain the $500,000 deposit and seek approval of the back-up bid by RBP. The Objecting Parties' concern about Timbertop's ability to close is not a reason for the Court to reject the Proposed Sale under § 363(b).

2. Sale Free and Clear and Injunction Language in the Sale Approval Order

The second and fifth issues identified by the parties concern whether the Court may approve the Sale under § 363(f) in light of the Objecting Property Owners' pending claims. The Court finds, based on the evidentiary record, that there exists an objective basis for a bona fide

legal dispute as to the validity of Objecting Property Owners' challenge to the Sixth Amendment as alleged in the pending adversary proceedings. Such a finding, however, is unnecessary because the Proposed Sale does not purport to transfer the Purchased Assets free and clear of the Objecting Property Owners' claims. The Trustee made clear that the Proposed Sale is neutral and leaves the various challenges unaffected. Further, the amended APA [Am. Ex. T8] expressly states that while Timbertop is not assuming liability for the pending adversary proceedings, those litigation matters might affect Timbertop's use of the Purchased Assets. Finally, the Court will also include a clear statement about this issue in its Sale Approval Order, including the injunction provision.

3. Adequate Assurance of Future Performance for Assumed Contracts

As an initial matter, this issue does not affect the Sale Motion because no objecting party's contracts are being assumed or assigned, and the requirement of adequate assurance is relevant only to the § 365 analysis.[36] Even when the concept of adequate assurance of future performance applies, courts determine it "by the facts and circumstances of each case," and the debtor or trustee "need not provide an absolute guarantee of performance." *Androse Assocs. Of Allaire, LLC v. Great Atl. & Pac. Tea Co.* (*In re Great Atl. & Pac. Tea Co.*), 472 B.R. 666, 674 (S.D.N.Y. 2012) (citation modified); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) ("As designed by Congress, [the term adequate assurance of future performance found in § 365(b)(1)(C)] does not mean absolute insurance that the debtor will thrive and make a profit.").

---

[36] The Objecting Property Owners are adequately protected because Timbertop and the Trustee have agreed that their consent is required for an agreement to be assumed and assigned, and they have not given their consent, with the result that their agreements will not be assumed or assigned. *Cf. In re Giftcraft, Ltd.*, 672 B.R. 173, 187 (Bankr. S.D.N.Y. 2025). Thus, they have no injury and no standing to raise the issue. *See Mackinac Ctr. for Pub. Pol'y v. U.S. Dep't of Educ.*, 175 F.4th 692, 700 (6th Cir. 2026).

Notwithstanding that the Proposed Sale is not separately subject to the § 365(b)(1)(C) requirement for adequate assurance of future performance, the Court has also considered the Objecting Parties' fears about realization of Timbertop's "dream," especially the stated goals of becoming the declarant in perpetuity to impose whatever CC&Rs that Timbertop desires; turning the Community into a resort with commercial development; and the building of an assisted living facility. Simply, the Court will not deny the Sale Motion because of these fears, which are not wholly unreasonable given the long history of the Club and its owners. Ultimately, Timbertop's comprehensive plan is not achievable by this Sale. Nothing included in the Purchased Assets would allow Timbertop to violate whatever restrictions exist concerning commercial or resort development in or around the Community, and Timbertop is not purchasing the Declarant Rights, any future sale of which would be subject to the Court's approval.

The Objecting Parties also raise Timbertop's and Magda's lack of experience in owning or managing golf courses. Timbertop, however, intends to continue the management contract with Hampton Golf, which has been operating the Club successfully since January of this year. The Trustee testified that Hampton Golf has confirmed Timbertop's intentions to continue to employ Hampton Golf for Club operations. Also, Timbertop is working with other professionals (LJA Civil Engineering and Burwil Construction Company) to plan and implement needed improvements to the golf course and country club facilities.

4. <u>Timbertop's Good Faith as a Purchaser Under § 363(m)</u>

Though the bankruptcy code itself does not define the term "good faith purchaser," courts have adopted the "traditional equitable definition of a 'good faith purchaser,'" defined as "one who purchases the assets for value, in good faith, and without notice of adverse claims." *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1197 (7th Cir. 1978). Thus, to be covered under the

statutory protection of § 363(m), Timbertop must demonstrate that it purchased the Property "in good faith" and that it did so "for value." *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986).

As explained by the Sixth Circuit,

> With regard to a showing of "good faith," we have held that "[t]o show lack of good faith, the debtor must demonstrate that there was fraud or collusion between the purchaser and the seller or the other bidders, or that the purchaser's actions constituted an attempt to take grossly unfair advantage of other bidders." *255 Park Plaza Assocs. Ltd. P'ship v. Conn. Gen. Life Ins. Co.* (*In re 255 Park Plaza*), 100 F.3d 1214, 1218 (6th Cir. 1996) (internal quotation omitted). The good-faith requirement "speaks to the integrity of [the purchaser's] conduct *in the course of the sale proceedings*." *In re Rock Indus.*, 572 F.2d at 1198. Thus, the purchaser's "intended use of the assets purchased is not relevant to the good faith inquiry." *Licensing by Paolo, Inc. v. Sinatra* (*In re Gucci*), 126 F.3d 380, 394 (2d Cir. 1997).

*In re Made in Detroit, Inc.*, 414 F.3d 576, 581 (6th Cir. 2005) (emphasis added).

The Court finds that Magda's lack of credibility concerns only issues tangential to the purchase and not the purchase itself. Without excusing Magda's deceit, the Court concludes that Magda's dishonesty about the deposit does not establish bad faith in the purchase under the APA. Simply, Magda's lack of credibility on peripheral issues does not obviate that the Proposed Sale was (1) negotiated at arm's length in compliance with a Court-approved sale procedure, (2) Timbertop is not related to Debtor or the Trustee, (3) no fraud or collusion has been shown between Timbertop and any other bidders or the Trustee, and (4) no evidence exists that Timbertop attempted to take grossly unfair advantage of other bidders. *See In re Nicole Energy Servs.*, 385 B.R. at 235; *cf. Matter of Embrace Sys. Corp.*, 178 B.R. 112, 123 (Bankr. W.D. Mich. 1995) ("If there is any degree of fraud, unfairness, or mistake, the bankruptcy court should assess the impact of these factors *on the sale at issue* when the offer is compared to the court's finding of valuation of the assets to be sold." (emphasis added)).

5. <u>The "Whereas" Clause Issue</u>

Although not expressly identified as an issue for the Sale Approval Hearing, the Objecting Property Owners argue that the APA's inclusion of the right to mandatory social memberships created by the Sixth Amendment in a "whereas" clause is improper because such right is not expressly identified as a Purchased Asset and because the right is essentially a Declarant Right that is not being sold. The "whereas" clause states:

> WHEREAS, the Club and the Business are being sold with whatever rights are presently available to impose mandatory social memberships, which are the subject of pending litigation, and which litigation may or may not affect the ongoing viability of some social memberships[.]

[Am. Ex. T8 at 2.] The APA defines "Business" as the "Rarity Bay Country Club." [*Id.* at 1.] "Club" is not expressly defined in the APA, but clearly it is the Rarity Bay Country Club, which is owned and operated by the "Seller," which is Debtor. [*Id.*]

First, the mandatory membership requirement of the Sixth Amendment is not a Declarant Right. To be sure, the requirement was created by the Declarant (defined as Debtor). [Ex. O26 at 1.] The "Club," however, is defined in the Sixth Amendment as "the Rarity Bay Golf and Country Club and its successor or assigns." [*Id*. at 5.] This distinction matters in the recorded document that governs the rights and obligations of Owners (also defined [*id.* at 2]).

Ultimately, the Court is not now deciding the disputed issues arising from the Sixth Amendment. The "whereas" clause of concern to the Objecting Property Owners merely makes clear the risk connected to acquisition of the Purchased Assets, "which includes, but is not limited to, the Business" (i.e., the Club). [*Id.* at 1.] The rights of the Business or Club clearly include those provided by the Sixth Amendment, including the challenged mandatory memberships in the Sixth Amendment. The Court finds no contradiction or ambiguity in the "whereas" clause and concludes that the inclusion of the Club's rights under the Sixth

Amendment in the Sale does not purport to transfer any Declarant Rights and does not affect the Objecting Property Owners' rights to continue to challenge the Sixth Amendment.

6. The Right-of-First-Refusal Issue

Concerning the Objecting Property Owners' assertion that the Sale violates their right of first refusal, they point the Court to the following exhibits:

- Ex. T3, consisting of (1) a redacted, incomplete, and unsigned Application and Agreement for Membership Privileges; (2) a redacted and incomplete Application and Agreement for Membership Privileges that is unsigned by the Club; (3) a redacted and incomplete Agreement for Membership Privileges with a redacted Club's representative's signature; and (4) an apparently complete, redacted Application for Membership Privileges that is unsigned by any representative of the Club;
- Ex. O3, the Rarity Bay Golf & Country Club Overview of Offering of Memberships, September 1, 2008, which is unsigned ("Membership Plan"); and
- Ex. O26, the Sixth Amendment, which is signed by Debtor's representative and is recorded in the office of the Monroe County Register of Deeds.

The complete (but unsigned by the Club) version of the Application for Membership Privileges contains the following provisions relevant to a potential right of first refusal:

> 2. Receipt of the Membership Plan. The undersigned acknowledges receipt of Rarity Bay Golf & Country Club Membership Plan and the Rules and Regulations dated June, 1997 (collectively, the "Membership Plan"), and agrees to be bound by all its respective terms and conditions as amended from time to time. If approved for membership, the undersigned agrees to fully substitute the membership privileges acquired pursuant to the Membership Plan for any present and prior rights in or to use the Club Facilities.
>
> 3. Membership Privileges in the Club. Membership in the Club entitles the Members to use the Club Facilities, but is not an investment in the Club, nor does the membership confer on the Member any equity or ownership interest or any other property interest in the Club or the Facilities of the Club. Membership does not

> grant the Member a vested or prescriptive right or easement to use the Facilities of the Club, but grants to the Member a revocable license to use the Facilities. Members do not have any interest in the income of the Club and do not have the right to receive any of the Club's assts if the Club is dissolved. A member only obtains a revocable license to use the Facilities of the Club.
>
> . . . .
>
> *This Application for Membership Privileges shall be governed by and constructed in accordance with the laws of the State of Tennessee.*
>
> . . . .
>
> This Application for Membership Privileges shall not be binding on the Club until the acceptance below is signed.

[Ex. T3.]

The Membership Plan contains the following under the heading, "Sale of Club Facilities at Home Club":

> If, any time, the Club decides to sell the Club Facilities at the Home Club, the Club agrees that it will first give the Premier Members and the Full Golf and Sports Members issued pursuant to the Former Membership Plan the opportunity to purchase the Club Facilities at the Home Club as follows: Prior to selling all or any portion of the Club Facilities to any third party, the Club will first offer to sell such Club Facilities to the aforementioned members by mailing to each such member written notice of the terms and conditions (including price) pursuant to which the Club is willing to sell such Club Facilities to such members. Thereafter, the aforementioned members shall have ninety (90) days from the date on which the Club mails such written notice to either accept or reject such offer; provided, however, that the Club's offer can only be accepted if approved by at least seventy-five (75%) percent of the aforementioned members. During the ninety (90)-day notice period, the Club agrees to meet with representatives of the aforementioned members to discuss the terms and conditions of the Club's offer and any counter-proposal that such members may formulate; provided, however, that nothing in this Membership Plan commits the Club to accept any counter-proposal that may be formulated by the aforementioned members and the Club retains the right to reject any such counter-proposal in the sole exercise of its business discretion.

[Ex. O3 at 19-20.[37]]

---

[37] The Court also notes that TCRB was formed for the purpose of purchasing the Club in January 2025 (*i.e.*, well more than 90 days before the July 2026 bid deadline).

The Objecting Property Owners point the Court to paragraphs 7.11(a) and (d) of the signed and recorded Sixth Amendment as establishing, in conjunction with the Membership Plan and the Application for Membership Privileges, the asserted right of first refusal. Paragraph 7.11(a) provides that "[a]ll Owners will be subject to the bylaws, rules, regulations, and charges of the Club . . . . Social Membership shall entitle the Owner and his or her family and guests to Social Membership privileges at the Club in accordance with the Club's membership program." [Ex. O26.] Paragraph 7.11(d) provides that "Owners may upgrade their mandatory Social Membership pursuant to the membership plan, by-laws, and rules and regulations of the Club, as amended from, time to time." [*Id.*]

The Court concludes that this record does not contain a writing signed by the party to be charged (Debtor) that gives members the right of first refusal.[38] The purported right of first refusal proposes to allow members to purchase the "Club Facilities," which the Membership Plan defines as "golf, sports and social facilities." [Ex. O3 at 1.] Whether those "facilities" are realty[39] or personalty, "in general terms, a 'right of first refusal' is the generic label commonly used to describe a contractual right to preempt another." *Riverside Surgery Ctr., LLC v. Methodist Health Sys., Inc.*, 182 S.W.3d 805, 811–12 (Tenn. Ct. App. 2005) (citation modified).

"Tennessee law has implicitly recognized two types of provisions conferring a right of first refusal. . . . [In the first,] preemptive purchase rights conferred by a right of first refusal are triggered when the grantor or seller receives an offer from a third party. The seller must then

[38] The Court sustained the Sale proponents' objection to documents offered through the testimony of Matthew Gibbons for lack of foundation and authentication. The documents from Mr. Gibbons's file were not the original agreements and also did not bear the signature of the party to be charged (i.e., Debtor). The Court also denied the Objecting Parties' request to treat Mr. Gibbons as an expert in investment funding as unfair because he was not disclosed before his testimony was offered and his qualifications were insufficient under Federal Rule of Evidence 702 to allow him to challenge Timbertop's proposed funding mechanism.

[39] The golf facilities, at least, presumably would include the golf course, which is real property.

offer the holder of the right the property at the price offered by the third party." *Abbott v. Abbott*, No. E2015-01233-COA-R3-CV, 2016 WL 3976760, at *3 (Tenn. Ct. App. July 20, 2016). For the "second type of right of first refusal, the triggering event is the seller's intent to sell." *Id.*

Regardless, under Tennessee law, as a contractual right, the parties' intent is determined by examining the document. *See Bacon v. Sandlin*, No. E2024-00674-CIA-R3-CV, 2025 WL 2555914, at *10 (Tenn. Ct. App. Sept. 5, 2025). Black-letter law requires:

> For a contract to be enforceable, the parties must agree on the material terms. *Gurley v. King*, 183 S.W.3d 30, 35 (Tenn. Ct. App. 2005). In the case of *United American Bank of Memphis v. Walker*, No. 3, 1986 WL 11250 (Tenn. Ct. App. 1986), this Court stated: "In order for a contract to be binding it must spell out the obligation of the parties with sufficient definiteness that it can be performed. All the essential terms of a contract must be finally and definitely settled. None must be left to determination, by future negotiations." *Id.* at *2. This Court has repeatedly held that price is typically an essential term in a sales or services contract. *See id.*; *see also Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 197 (Tenn. 2001) (considering whether the contract contained a sufficiently definite price to be enforceable); *Tetra Tech, Inc. v. Performa Entm't Real Estate, Inc.*, No. W2007-02244-COA-R3-CV, 2008 WL 4457061, at *5 (Tenn. Ct. App. Oct. 3, 2008) ("A contract may not be enforceable where an essential element, such as price or compensation terms, is determined to be indefinite."); *Four Eights, LLC v. Salem*, 194 S.W.3d 484, 487 (Tenn. Ct. App. 2005) (noting that an option to purchase was not definite enough to enforce by specific performance where the parties could not agree to a price) (citing 71 *Am. Jur. 2d Specific Performance* § 47); *Castelli v. Lien*, 910 S.W.2d 420, 427 (Tenn. Ct. App. 1995) (refusing to enforce a contract because there were no sufficiently definite terms concerning the cost of performance).

*Abbott*, 2016 WL 3976760, at *4. As explained by the Tennessee Court of Appeals, "[t]he general rule that a contract is not sufficiently certain and definite to be specifically enforced if some of its essential terms are left for the future determination or agreement of the parties themselves is usually applied if the contract price is left to be determined by the parties. Accordingly, an option to purchase contained in a lease, at a price to be subsequently agreed upon by the parties, is too indefinite to be specifically enforceable." *Four Eights, LLC*, 194 S.W.3d at 487 (citation omitted).

Based on its reading of the foregoing, the Court finds that the purported right of first refusal is not enforceable under Tennessee law. First, the language is unclear about what property interests are subject to a right of purchase. The Membership Plan states in Section A that "[t]he Club offers use of exceptional golf, sports and social facilities (the 'Club Facilities') located within the residential and recreational community known as Rarity Bay on Lake Tellico," and Section B expressly includes the golf course within the Club Facilities. [Ex. O3 at 1.] Nothing, however, in the Membership Plan states whether the Club Facilities includes any real property; nor does it define any real property to be subject to the right of purchase. This failure to clearly define what property interests are at issue renders the right unenforceable as being insufficiently certain or definitive.

Furthermore, if the Club Facilities includes real property, the Membership Plan is insufficient to satisfy the Statute of Frauds, which requires that "any contract for the sale of lands . . . shall be in writing, and signed by the party to be charged therewith, or some other person lawfully authorized by such party. In a contract for the sale of lands, . . . the party to be charged is the party against whom enforcement of the contract is sought." Tenn. Code Ann. § 29-2-101(a)(4). As noted, the Membership Plan in the evidentiary record is not signed by any party and does not reflect recordation with the appropriate Register of Deeds. Additionally, the purported agreement that references a membership plan is not signed by Debtor's representative. Further, the only complete Application for Membership Privileges in this record contains strong language to limit the members' privileges to a revocable license to use the Club facilities. [Ex. T3.]

Finally, the Membership Plan includes a provision immediately preceding the right of first refusal that allows for modification and termination of the Membership Plan in a way that appears to negate any binding obligation on the Club:

> Modification and Termination of Membership Plan
>
> The Club reserves the right, in its sole and absolute discretion, to modify the terms of this Membership Plan, provided such modification is not materially adverse to the rights of the members. Any change or modification to the terms of this Membership Plan which are materially adverse to the rights of the Club Members must be approved by the majority of the affected members. The Club further reserves the right to terminate this Membership Plan or any particular membership classification, category, or dues category, to discontinue operations of any or all of the Club Facilities, *to sell or otherwise dispose of the Club Facilities*, to convert the Club into a membership-owned club, and to make any other changes to the terms and conditions of the membership or the Club Facilities which are available for use by members. In the event this Membership Plan or any particular membership is terminated without cause or the operation of all, or substantially all, of the Club Facilities is discontinued, the affected members will be refunded one hundred percent (100%) of the Membership Deposit previously paid, without interest.

[Ex. O3 at 19 (emphasis added).]

Even if the right-to-purchase language in the Membership Plan were binding under Tennessee law, the Court finds that in the context of a bankruptcy case, a right of first refusal is unenforceable because "it does somewhat restrict or condition the assignment of a contract . . . [and is] unenforceable under [11 U.S.C. §] 365(f)." *In re Genesis Healthcare, Inc.*, No. 25-80185-SGJ-11, 2026 WL 2065679, at *12 (Bankr. N.D. Tex. July 14, 2026) (noting that such rights "could chill bidding and interfere with a trustee's . . . efforts to maximize value for an estate").

> Section 365(f) renders unenforceable not only provisions which prohibit assignment outright, but also . . . provisions that are so restrictive that they constitute de facto anti-assignment provisions. Among the types of provisions that have been held to be unenforceable under section 365(f) are rights of first refusal, and for good reason. They always "restrict" assignment—one of the three types of scenarios that result in invalidation under section 365(f). And in many (though not all) circumstances, rights of first refusal will do so in a fashion that materially

> impairs the estate's ability to maximize value for its creditors when it markets its assets, which often consist of (partly or entirely) executory contracts.

*In re Adelphia Commc'ns Corp.*, 359 B.R. 65, 85-86 (Bankr. S.D.N.Y. 2007) (citation modified).

Citing and following the rationale of *In re Adelphia Communications* and *In re Mr. Grocer, Inc.*, 77 B.R. 349, 355 (Bankr. D.N.H. 1987), the *Genesis Healthcare* court recognized that there are "practical and policy concerns raised by enforcing rights of first refusal in bankruptcy." 2026 WL 2065679, at *12-13. The court focused on the facts before it, many of which are similar to the facts here, such as a sale process that took place over several weeks, the bidders were interested in the entire enterprise rather than piecemealing, there was an opportunity for the party with the right of first refusal to participate in the auction, and after the sale hearing, the court determined that the purchaser had the financial resources and could provide adequate assurance of future performance as the new owner. *Id.* at *13. As in that case, the Court finds that "enforcing the [right of purchase] in this situation would improperly restrict an assumption of the assignment of [Debtor's assets], contrary to the dictates of section 365(f) – an assumption and assignment for which there is a sound business justification and that benefits all concerned." *Id.*

7. Rule 6006 Compliance

Finally, the Objecting Property Owners raise a hyper-technical objection concerning the Trustee's compliance with Rule 6006(f) because the Trustee noticed all of the members of his intent to assume and assign their membership agreements in a single notice. Rule 6006(f) provides that a motion to assume or assign multiple executory contracts "must be limited to no more than 100 executory contracts." The Trustee responded that his single notice to the more than 600 members of the Club did not affect the members' understanding of what the Trustee proposed. He argues that compliance with the 100-limit of Rule 6006(f)(6) would have caused

him to send seven separate assumption notices, which likely would have created more confusion than the single alphabetized list that he sent.

First, the Court finds that the Objecting Property Owners lack standing to raise the issue because their membership agreements are not being assumed or assigned and they have no pending objection to the proposed assumption and assignment. Additionally, the Court approved the form for the notice in the Sale Procedures Order after the hearing[40] on June 25, 2026. [Doc. 1017 at ¶ 10 (approving the Notice of Assumption and Assignment Procedures).] Accordingly, the Court finds that the Trustee substantially complied with the requirements of Rule 6006(f)(1)-(4), especially given that the notice approved by the Sale Procedures Order was the result of much discussion among the parties and the Court with no issues remaining after the June 25 hearing.

The Court also relies on Federal Rule of Bankruptcy Procedure 9005, incorporating Federal Rule of Civil Procedure 61, which provides, in relevant part: "At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." *See In re Norvergence, Inc.*, 405 B.R. 709, 763 (Bankr. D.N.J. 2009) (finding that Rule 61 allowed the court to excuse the trustee's failure to abide by the provisions of Rule 7004(b)(3) when the objecting party failed to show how it was prejudiced by deficient service of the summons and complaint). Not many cases exist concerning the requirement of Rule 6006(f)(6), but in *In re Old Carco LLC*, 406 B.R. 180, 210 (Bankr. S.D.N.Y. 2009), the court excused the Rule 6006(f)(6) limit given that all of the agreements were substantially similar and were subject to a single comprehensive analysis by the debtors. The court also considered the

[40] The transcript of the June 25 hearing also reflects that the parties – namely the Trustee and TCRB – discussed the need for the assumption notice to contain clear deadlines to avoid confusion. No one raised the question of the Rule 6006(f)(6) limit.

1983 Advisory Committee Notes that "deemed the objective and economical administration of cases under the Bankruptcy Code which has frequently been recognized by the courts to be a chief purpose of the bankruptcy laws." *Id.* (citation modified). The Court ultimately concludes as did the court in *In re Old Carco* that "it would not have advanced the process by requiring the [Trustee] to file . . . separate motions requesting the same relief. Notice was timely and proper." *Id.*; *see also In re TM Vill., Ltd.*, 598 B.R. 851, 856 (Bankr. N.D. Tex. 2019) ("Nothing in the record suggests that the Debtor's less than scrupulous compliance disserved the objectives of the amended rule. First, the motion involves only one type of executory contract, all identified on Exhibit A by unit number and a purchaser's name. Second, the motion is straightforward . . . .").

## IV. CONCLUSION

For these reasons, the Court overrules the objections of the Objecting Property Owners and RBCAI. The Court finds that the Sale should be approved under § 363(b) because the Trustee's decision to enter into and consummate the APA with Timbertop is a good-faith, reasonable exercise of the Trustee's business judgment and is in the best interests of the estate, the creditors, and all other parties in interest. The Court finds that the Sale was negotiated at arm's length, without collusion, and in good faith.

The Sale will be approved by separate order as free and clear of interests, liens, claims, and encumbrances, with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the Sale proceeds. In addition, each entity with a lien on the Purchased Assets has consented to the Sale or is deemed to have consented to the Sale or otherwise falls within the provisions of § 363(f)(1) through (5).

Finally, the Court finds that Timbertop has acted in good faith in relation to the Sale as that term is used in § 363(m).

In closing argument, the Objecting Property Owners asked the Court to disapprove the Sale but, alternatively, if the Court approves the Sale, to (1) expressly find that the Sale does not include any right to enforce any disputed mandatory membership and (2) include in the Sale Approval Order an injunction against Timbertop attempting to exercise Declarant Rights until further order of the Court. The Court will grant the alternative request for the Objecting Property Owners and include an injunction against Timbertop enforcing the mandatory membership requirements of the Sixth Amendment against the Objecting Property Owners until this or another court of competent jurisdiction decides the dispute over the mandatory membership provision in the Sixth Amendment. The Court will also enjoin Timbertop from attempting to exercise Declarant Rights pending further order of this Court.

The Sale Approval Order, which is consistent with this opinion, was entered on October 6, 2026 [Doc. 1315].

FILED: October 13, 2026

BY THE COURT

*s/ Suzanne H. Bauknight*

SUZANNE H. BAUKNIGHT
UNITED STATES BANKRUPTCY JUDGE